# EXHIBIT C



31 Purchase Street, Ste. 3-4
Rye, New York 10580
914 • 967 • 9421
www.keeganandco.com

# Study of Consumer Perceptions of Maybelline SuperStay Products: Supplemental Report

## Dr. Eli Seggev

February 14, 2014
_____
Keegan & Company LLC
31 Purchase Street, Ste. 3-4
Rye, NY 10580
(914) 967-9421



31 Purchase Street, Ste. 3-4
Rye, New York 10580
914 • 967 • 9421
www.keeganandco.com

## Table of Contents

Introduction ..................................................................................................................1
Assumed Price Premium...........................................................................................2
Repeat Purchasers....................................................................................................3
Survey Universe.........................................................................................................4
    Personal Use....................................................................................................5
    Exclusion of Specialized Respondents .....................................................6
    Geographic Representation of Market......................................................7
Conclusions ...............................................................................................................7



31 Purchase Street, Ste. 3-4
Rye, New York 10580
914 • 967 • 9421
www.keeganandco.com

## Introduction

1. I am the author of the December 9, 2013 expert report titled Study of Consumer Perceptions of Maybelline SuperStay Products which has been submitted in this case (my "First Report"). My curriculum vitae, listing of publications, prior testimonial experience, and documents considered in this case[1] can be found as exhibits to my First Report.

2. As stated in my First Report, I was asked by counsel for the defendant in this case to evaluate the reasons for purchase, and purchasers' expectations at the time of purchase as to the duration of the product of the following Maybelline SuperStay products (hereafter the "Products"):

    - Maybelline SuperStay 24 2-Step Color
    - Maybelline SuperStay 24HR Makeup

3. To that end, I designed and executed consumer research studies among purchasers of the Products to explore the research areas stated above (described in detail in my First Report). The findings of those studies, in summary, include the following:[2]

    - Many purchasers do not have precise duration expectations with regard to the Products;
    - There were a variety of expectations among purchasers regarding the duration of the Products;

---

[1] Since the submission of my First Report, I was also provided with Plaintiffs' Notice and Motion for Class Certification, dated 2/7/2014, and the Expert Rebuttal Report of Keith A. Reutter, Ph.D., dated 1/20/2014.

[2] First Report at ¶108.

- A small proportion of purchasers had 24 hour duration expectations consistent with the claims in the complaints;

- Some purchasers did not have duration expectations at all, and many others were sufficiently satisfied with the Products to purchase them more than once;

- Overall, many more purchasers had duration expectations that are inconsistent with the claims in the complaints than had expectations consistent with the claims in the complaints.

4. Subsequent to the submission of my First Report, defendant's counsel provided to me a report submitted in this case by plaintiffs' expert, titled *Expert Rebuttal Report of Keith A. Reutter, Ph.D.* (the "Reutter Report").[3] The Reutter Report comments on, among other things, various aspects of the consumer survey research that I conducted in this case.[4]

5. In response to the Reutter Report as it relates to my study, I wish to correct the Reutter Report's misapprehensions about the methodological design and execution of my studies. I will address the relevant issues in the sections that follow.

## Assumed Price Premium

6. The Reutter Report claims that all "class members paid a premium [for the Products] based on the represented 24 hour benefit."[5] The Reutter Report identifies the premium it claims consumers paid as being the additional price paid for the Products as compared to a theoretical product that is identical to the Products but for "the alleged deceptive claims."[6]

7. Inherent to this opinion is the assumption that the 24 hour claims command a price premium in the marketplace. The Reutter Report offers no evidence on this issue.

8. I have studied the reasons that purchasers bought the Products and their duration expectations, and I provided these findings in my First Report. To summarize, upon surveying a sample of 500 purchasers of the Products, I found that:

---

[3] Expert Rebuttal Report of Keith A. Reutter, Ph.D., 1/20/2014.

[4] See for example, Reutter Report at ¶21, 27-32.

[5] Reutter Report at ¶8.

[6] Reutter Report at ¶10.

Purchasers across the studies mentioned a variety of reasons for purchasing the Products, including duration, price, color, the desire to try a new product, and brand preference, among others. Regarding duration expectations, more purchasers had expectations of less than 24 hours or had non-specific duration expectations, while few purchasers expected 24 hour duration. Broadly, most purchasers were either satisfied with the Products as indicated by their repeat purchasing behavior, had no duration expectations at all, or had duration expectations that did not conform to the allegations in the complaints.[7]

9. As my results show, very few purchasers mentioned 24 hour duration as a reason for purchase[8] and only a small proportion of purchasers in my study purchased one time and, when asked specifically about their duration expectations, expected the Product to last 24 hours.[9]

10. Although I did not study the issue of a price premium directly, if the 24 hour claim were commanding a price premium from purchasers as the Reutter Report claims, I would expect purchasers who are allegedly paying this premium to have duration expectations for the products consistent with the 24 hour claims. Generally, the results of my survey do not show 24 hour expectations from purchasers and therefore do not support the price premium claim in the Reutter Report.

## Repeat Purchasers

11. The Reutter Report claims that I "erroneously disregarded observations from repeat purchasers."[10] On the contrary, repeat purchasing is a critical indicator of consumer behavior which I carefully considered in this case.

12. As stated in my First Report, repeat purchasing behavior is an indicator of customer satisfaction.[11] Purchasers who have purchased the Products more than one time have shown

---

[7] First Report at ¶104.

[8] First Report at ¶103, Table 11.

[9] First Report at ¶107.

[10] Reutter Report at ¶27.

through their purchasing behavior that they were satisfied with the Products and were therefore not harmed through their purchases.

13. This case alleges that purchasers were defrauded "because they purchased SuperStay 24HR Products in reliance on Maybelline's 24 hour claim…but did not receive a product that performed as represented."[12] It would be inappropriate, therefore, to ignore behavioral indications of consumer satisfaction regarding the 24 hour claim. My studies took into account consumers' indications of satisfaction by measuring repeat purchase behavior of the Products and appropriately treating repeat purchasers as satisfied. Indeed, the Reuter Report contemplates excluding these repeat purchasers from the plaintiffs' damages analysis.[13]

## Survey Universe

14. In any consumer research study it is necessary to define the target population from which to sample—i.e., the survey universe. As stated by Diamond, "the target population consists of all elements whose characteristics or perceptions the survey is intended to represent."[14] Thus, the survey universe should consist of "those consumers who would likely have exposure to and be actual or likely purchasers of the product of interest in the marketplace."[15]

15. In this case, because I was interested in learning about consumer expectations and reasons for purchase as related to the Products, I defined the survey universe as female consumers (aged 18 and older) who purchased the Products during the past 12 months.[16] Thus, my sample consisted of actual purchasers of the Products within Maybelline's targeted demographic.

---

[11] First Report at ¶49. See also Szymanski, D.M. & Henard, D.H. (2001). "Customer Satisfaction: A Meta-Analysis of the Empirical Evidence." *Journal of the Academy of Marketing Science*, Vol. 29, No. 1, p. 24-25, 28-29.

[12] Second Amended Complaint at ¶38

[13] See Reutter Report at footnote 18.

[14] Diamond, S. (2011). Reference Guide On Survey Research. in *Reference Manual on Scientific Evidence*. Federal Judicial Center/National Academy of Sciences, p. 376. Dr. Diamond is a recognized authority on consumer survey research.

[15] First Report at ¶19.

[16] See First Report at ¶20.

**Personal Use**

16. The survey universe that I used in my studies was both appropriate and robust. Examination of the open-ended responses[17] collected from survey participants shows that respondents overwhelmingly purchased the Products for their own personal use.[18] In only one instance across both studies (Maybelline SuperStay 2-Step Color, n=251; Maybelline SuperStay 24HR Makeup, n=249) was there any indication from the open-ended responses that the respondent purchased the Product for anyone but themselves.[19] This respondent represents 0.4 percent (1 / 251) of the Maybelline SuperStay 2-Step Color sample and just 0.2 percent (1 / 500) of the total number of respondents across the two studies. These proportions are so small as to have no material statistical impact on the findings of my studies.

17. Because cosmetics are an inherently personal purchase, it is not surprising that the vast majority of respondents in my studies purchased the Products for their own personal use. Many factors—including color, price, brand, etc.—were shown to contribute to each individual's purchase decision. The importance of these factors can vary considerably from consumer to consumer; this is consistent with a majority of consumers purchasing cosmetic products for personal use.

18. Furthermore, there was no indication in any of the open-ended responses that any respondent purchased the products in a wholesale capacity or with any intent to resell the Products.

19. Thus, it is reasonable to conclude that 100 percent of Maybelline SuperStay 24HR Makeup purchasers and 99.6 percent of Maybelline SuperStay 2-Step Color purchasers included in my samples purchased the Products for their own personal use and zero percent of respondents across both studies purchased the product for the purpose of resale.

---

[17] See First Report at ¶51, ¶56, and Exhibit 7.

[18] In particular, examination of responses to the open-ended question "Thinking of the time you purchased [Maybelline SuperStay product], please list all the reasons that you decided to purchase this product" and the follow up question, "Are there any other reasons you decided to purchase this product?" provides direct evidence that the respondent purchased the product for their own personal use.

[19] Maybelline SuperStay 2-Step Color study, Respondent ID R_3eFNfnvZcfqGS9v, verbatim response "For my 13 yr old great-niece".

**Exclusion of Specialized Respondents**

20. The definition of the survey universe also addressed the issue of excluding potential respondents who have specialized knowledge of the cosmetics and/or consumer research industries. In the screening portion of the questionnaire, respondents were asked whether they or anyone in their household worked for any of the following:

    - Cosmetics manufacturer
    - Auto dealer
    - Travel Agency
    - Consumer electronics manufacturer
    - Marketing research firm
    - Advertising agency

21. Respondents who selected "cosmetics manufacturer," "marketing research firm," and/or "advertising agency" were not allowed to participate in the survey. As stated at paragraph 42 in my First Report:

    > This screening is necessary in order to eliminate from the sample potential respondents who, because of their employment or interpersonal associations, may have specialized knowledge and, therefore, may not be representative of the majority of consumers. This measure also ensures industry confidentiality by excluding anyone who may be employed by or associated with the defendant's competitors.

22. Thus, in this study, excluding only those respondents who had a personal connection to Maybelline would potentially have allowed respondents affiliated with other cosmetics manufacturers as well as those with knowledge of the methods and procedures employed by the marketing research industry to participate in the survey. Such respondents are not reflective of the general population, which is why it is a generally accepted research criterion[20] in my field of consumer behavior[21] to exclude such respondents. Far from

---

[20] Diamond, S. & Swann, J., eds. (2012). *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, American Bar Association, p. 48-49.

compromising the representativeness of my sample, the screening criteria applied in my studies safeguarded it.

23. Thus, with regard to sampling, the objective in this research was to sample among average purchasers within the target market for the Products. The screening requirements I employed accomplished this objective.

**Geographic Representation of Market**

24. Finally, my survey was deployed to a random sample of potential respondents across the U.S. When I conducted my surveys, plaintiffs claimed to represent a multi-state class as well as a California class.[22] The sample was provided by Research Now, a leading provider of survey sample with a U.S. census-balanced consumer panel of over 3 million members.[23] While I understand that plaintiffs now claim only to represent a class of California purchasers,[24] Maybelline does not specifically target its advertising or restrict sales of its products to any particular region or state, but rather addresses the U.S. market for its products *en masse*.[25] For all of these reasons, random sampling across the entire U.S. was therefore the most appropriate sampling method in this case, and I have no reason to believe that surveys among California purchasers would differ materially from my nationwide survey results.

## Conclusions

25. The Reutter Report's criticisms of my surveys are unfounded and do not in any way undermine or alter the results of my surveys or my conclusions based on those surveys.

26. I reaffirm all of the findings, conclusions, and opinions contained in my First Report.

---

[21] I note that Dr. Reutter is an economist (Reutter Report p.2) with no apparent training or experience in the field of consumer research.

[22] Second Amended Complaint at ¶27.

[23] First Report at ¶23.

[24] Plaintiffs' Notice and Motion for Class Certification, 2/7/2014.

[25] Declaration of Ali Goldstein at ¶15.

I reserve the right to supplement and revise this report and the opinions expressed herein based on new information provided to me.

| | |
|---|---|
| _____ | February 14, 2014 |
| Dr. Eli Seggev | Date |