# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

|  |  |  |
|---|---|---|
| YANIRA ALGARIN and PATSY MURDOCK, on behalf of themselves and All others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 12CV3000 AJB DHB |
| MAYBELLINE, LLC, a New York Limited Liability Company, d/b/a MAYBELLINE NEW YORK, | ) ) ) ) | |
| Defendant. | ) ) ) ) ) | |

## EXPERT REPORT OF KEITH R. UGONE, PH.D.

**December 9, 2013**

CONFIDENTIAL

# EXPERT REPORT OF KEITH R. UGONE, PH.D.

## December 9, 2013

I.    OVERVIEW OF ASSIGNMENT ................................................................. 1

II.   SUMMARY OF OPINIONS ...................................................................... 2

    A. Reasons For Purchase And Benefits Derived From SuperStay 24 Products Require Individualized Inquiry.................................................................... 2

    B. Variations In Retail Prices Of SuperStay 24 Products................................ 3

III.  QUALIFICATIONS AND EXPERIENCE ................................................. 6

IV.   FACTS, DATA, AND INFORMATION RECEIVED.................................... 7

V.    OVERVIEW OF PARTIES ....................................................................... 9

    A. Maybelline, LLC ....................................................................................... 9

    B. Named Plaintiffs ....................................................................................... 9

        1. Yanira Algarin ................................................................................... 9

        2. Patsy Murdock ................................................................................... 9

VI.   PRODUCTS AT-ISSUE ........................................................................... 10

    A. Maybelline SuperStay 24 2-Step Color ..................................................... 10

    B. Maybelline SuperStay 24HR Makeup ....................................................... 11

VII.  WHETHER ANY CLASS MEMBER WAS INJURED AS A RESULT OF THE CHALLENGED CLAIMS DEPENDS UPON INDIVIDUALIZED INQUIRY ....... 11

    A. Individual Inquiry Is Required To Determine Putative Class Members' Reasons For Purchasing SuperStay 24 Products................................................... 12

    B. Individual Inquiry Is Required To Determine Whether Putative Class Members Derived Benefits From Using SuperStay 24 Products................................ 19

    C. Individual Inquiry Is Required To Determine Whether Putative Class Members Are Repeat Purchasers ............................................................................. 24

VIII. ANALYSIS OF RETAIL PRICES OF SUPERSTAY 24 PRODUCTS ................... 27

    A. Description Of Data .................................................................................. 28

    B. Analyses Performed Regarding Retail Prices Of The Challenged Products ............. 30

        1. SuperStay 24 Product Prices Vary Depending Upon Sales Channel.................. 30

        2. SuperStay 24 Product Prices Vary Depending on Retailer Even Within The Same Sales Channel .......................................................................... 32

        3. SuperStay 24 Product Prices Vary Depending Upon Geographic Market ........... 35

        4. SuperStay 24 Product Prices Vary Depending Upon Promotional Activities ...... 37

            i.  Variation Between Promoted And Non-Promoted Prices .............................. 37

        5. Alternatives To The Challenged Products Vary By Product Type and Price....... 41

    C. Summary .................................................................................................. 45

IX.    LACK OF EVIDENCE TO DETERMINE INDIVIDUAL PUTATIVE CLASS MEMBERS' ALLEGED ECONOMIC INJURY ........................................................ 45

## EXPERT REPORT OF KEITH R. UGONE, PH.D.

### December 9, 2013

## I.    OVERVIEW OF ASSIGNMENT

1.    I am an economist and have been retained by counsel for Maybelline, LLC ("Maybelline" or "Defendant") to offer my opinions regarding various economic and associated class certification issues relevant to the matter of *Yanira Algarin and Patsy Murdock, et al. v. Maybelline, LLC* (Case No. 12CV3000 AJB DHB).    It is my understanding Yanira Algarin and Patsy Murdock (the "Named Plaintiffs") allege that Maybelline has engaged in false marketing and advertising relating to two Maybelline products: Maybelline SuperStay 24 2-Step Color and Maybelline SuperStay 24HR Makeup ("Challenged Products" or "SuperStay 24 Products").[1]    Generally, the Named Plaintiffs allege that Maybelline falsely claims the SuperStay 24 Products "will provide lipcolor that lasts 24 hours and foundation coverage that will last for 24 hours on the consumer's skin."[2]    Throughout my report, I will refer to the Named Plaintiffs' allegations as the "Challenged Claims."

2.    It is my understanding that the Named Plaintiffs seek to represent a "Multi-State Class." The putative "Multi-State Class" consists of:[3]

> [a]ll consumers who purchased SuperStay 24 2-Step Color™ and/or SuperStay 24HR Makeup™, in California and states with similar laws, for personal use until the date notice is disseminated.    Excluded from this Class are Maybelline and its officers, directors and employees, and those who purchased SuperStay 24 2-Step Color™ and/or SuperStay 24HR Makeup™ for the purpose of resale.

---

[1] Second Amended Class Action Complaint filed on September 19, 2013 ("Amended Complaint"), paragraphs 23, 24, 31, 38, and 47.

[2] Amended Complaint, p. 2.

[3] Amended Complaint, pp. 10 – 11.

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013
_____

I understand that in the alternative to a multi-state class, the Named Plaintiffs seek to represent a California class.  My opinions described in this report apply to a putative multi-state class of purchasers or a putative class of California purchasers.

3.  It is my general experience that Named Plaintiffs retain an economist to evaluate whether a putative Class (in matters such as this) should be certified and whether standard economic analysis can be used to quantify economic damages on a class-wide basis using common proof.  It is my understanding that as of the issuance of my report, the Named Plaintiffs have not disclosed or designated an economist or submitted a report relating to this issue.  I reserve the ability to submit a supplemental report evaluating the Plaintiffs' expert report on class certification issues should such a report be issued.

4.  I have been requested by counsel for Maybelline to independently evaluate from an economic perspective whether standard economic analysis can be used to determine on a Class-wide basis whether members of the putative Class suffered economic injury and, if so, whether the extent of that injury can be determined on a Class-wide basis using common proof.

## II.    SUMMARY OF OPINIONS[4]

### A. Reasons For Purchase And Benefits Derived From SuperStay 24 Products Require Individualized Inquiry

5.  As is detailed throughout my report, whether any putative Class member was injured as a result of the Challenged Claims is not amenable to proof on a Class-wide basis.  Proof of alleged injury, if any, would depend upon individualized inquiry into particular purchasing decisions.

---

[4] This Summary of Opinions is intended to be an overview.  A full description of my opinions is contained throughout this report and the associated exhibits.

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013
_____

    a.   <u>Reasons For Purchase</u>.  Many consumers chose to purchase SuperStay 24 Products based upon considerations unrelated to the Challenged Claims (e.g., shades/colors available, prior experience with the products, desire to try a new product, prior experience with the brand, and price (including coupons and promotional pricing)) - indicating that these purchasers did not suffer harm because of the Challenged Claims.  In economic terms, these consumers received the value that was paid for.

    b.   <u>Benefits Derived From Use</u>.  The Challenged Claims rely upon the demonstrably false assumption that no Class member received any value or benefit from their use of SuperStay 24 Products.  Any proposed measure of Class-wide damages that makes such an assumption is unreliable if there are putative Class members that derived benefits from usage of SuperStay 24 Products (as suggested by the evidence in this matter including repeat purchasers of the SuperStay 24 Products).

    c.   <u>Repeat Purchasing Behavior</u>.  A substantial portion of SuperStay 24 Product purchases are made by repeat purchasers, indicating satisfaction with the purchases made by those putative Class members.  The fact that SuperStay 24 Products have regular or repeat purchasers indicates that these purchasers were satisfied with their initial purchases of SuperStay 24 Products.  Repeat purchasing activity also indicates that the product met the buyer's expectations relative to price paid.  Additionally, as purchasers were aware of the duration they personally experienced with the SuperStay 24 Products after just one usage, repeat purchasing activity indicates that these purchasers were satisfied with their respective duration experiences.

6.    Based upon the above considerations, individualized inquiry is required to determine whether any putative Class member was injured as a result of the Challenged Claims. Any evaluation of injury absent such an individualized analysis would not be reliable from an economic and claimed damages perspective.  Any contention that damages could be evaluated and then awarded on a Class-wide basis would result in awarding damages to some putative Class members who actually suffered no injury and overcompensating putative Class members who received some value from the use of SuperStay 24 Products to varying degrees.

**B.  <u>Variations In Retail Prices Of SuperStay 24 Products</u>**

7.    As is detailed throughout my report, whether any putative Class member was injured as a result of the Challenged Claims is not amenable to proof on a Class-wide basis.  Proof of

alleged injury, if any, would depend upon individualized inquiry into the prices paid by putative Class members purchasing SuperStay 24 Products.  My analyses of retail pricing data collected by IRI demonstrates that there were wide variations in the retail prices associated with SuperStay 24 Products during the alleged class period.  In other words, many factors affect the actual sales prices paid for SuperStay 24 Products by putative Class members.[5]  These factors included:

    a.  the type of store in which the purchase was made (i.e., the sales distribution channel) – because grocery stores, drug stores, mass merchandisers, and other types of retailers often charge different prices for SuperStay 24 Products;

    b.  different retailers in the same sales distribution channel – because different retailers make their own independent determinations regarding mark-ups and the retail selling prices of the Challenged Products given local market conditions;

    c.  the geographic market where the purchase was made – because different pricing conditions (i.e., supply and demand conditions) exist in different geographic areas, both nationwide and within a given state, such as California (with pricing being driven by each retailer's pricing strategy and each retailer's cost structure); and

    d.  the type of promotions offered and/or used when the purchase was made – because discounted prices, coupons, and shopper cards reduce the actual price paid.

8.    Because of the wide variations in retail prices associated with SuperStay 24 Products, putative Class members' claimed damages cannot be calculated reliably on a Class-wide basis using common proof.  For example, in 2012:

    a.  SuperStay 24 2-Step Color ranged in price from $6.74 when on promotion at grocery stores in the Great Lakes region to $10.26 when not on promotion at grocery stores in California – representing a price difference of $3.52 (and a percentage difference of 52%); and

    b.  SuperStay 24HR Makeup ranged in price from $7.29 when on promotion at grocery stores in California to $11.26 when not on promotion at grocery stores in California – representing a price difference of $3.97 (and a percentage difference of 54%).[6]

---

[5] Based on allegations in the Amended Complaint, I understand that the alleged Class Period for each SuperStay 24 Product is from product launch through September 2013, at the latest.

[6] IRI Data.  ("Copy of Maybelline Superstay 24 HR Pricing Details (11-4-13) Updated  Formatted  .xlsx")

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013

_____

9.    Alternatively, to the extent that Plaintiffs' damages claims are based upon an asserted price premium associated with SuperStay 24 Products relative to alternative products, such an approach would be confounded by multiple sources of price variability. In addition to the variability in the price paid for the SuperStay 24 Products, there would also be variability associated with the price of products that Plaintiffs may claim that putative Class members would have purchased in the alternative, and with the value received for these alternative products.  Plaintiffs claim that all Class members would have purchased some cosmetic product other than the SuperStay 24 Product.[7] While Plaintiffs have not identified the specific products putative Class members would have purchased in the alternative, I understand multiple products may exist.[8] For example, to the extent that putative Class members claim that they would have purchased products such as regular lipstick products, longwear lipstick products, and 2-Step lipstick products in lieu of SuperStay 24 2-Step Color, and regular foundation products and longwear foundation products in lieu of SuperStay 24HR Makeup, in some cases these prices would be no less than those of the SuperStay products, and in all would result in variability among the Class members.

10.    Additionally, much as the prices of SuperStay 24 Products vary by such factors as sales distribution channel, retailer within sales distribution channel, geographic location (across and within geographic markets), and the type of promotions offered and/or used when the purchase was made, so too would the alternative products' prices be expected to vary greatly.

_____

[7] Amended Complaint paragraphs 12, 13, and 25.

[8] Deposition of Ali Goldstein taken on November 5, 2013, p. 21.

CONFIDENTIAL

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013
_____

11.    For both the SuperStay 24 2-Step Color and SuperStay 24HR Makeup, as well as products the putative Class members may claim they would have purchased in the alternative, there is no single retail price paid that can be used to evaluate whether any Class member was injured or the amount of any damage claimed damages for all Class members on a Class-wide basis.

III.    **QUALIFICATIONS AND EXPERIENCE**

12.    I am a Managing Principal at Analysis Group, Inc. ("AG"). AG provides economic, financial, and business strategy consulting to its clients and specializes in the interpretation of economic and financial data and the development of economic and financial models. Internationally, AG consists of approximately 600 professionals who specialize in, among other things, the fields of economics, accounting, finance, statistics, and strategy consulting.

13.    My primary responsibility at AG is to provide economic, financial, and/or damages-related consulting services to clients. Throughout my career I have provided these consulting services in class certification matters, antitrust cases, breach of contract cases, intellectual property cases, fraud-related cases, business tort cases, business interruption cases, and securities-related cases, among others. I have worked on engagements (or submitted reports) relating to class certification issues numerous times, including but not limited to matters relating to beverages (alcoholic and non-alcoholic), fast food, non-stick cooking sprays, gas mileage, hand soap, facial cream, and probiotics, among others.

14.    I specialize in the application of economic principles to complex commercial disputes, and I am generally retained in cases requiring economic, financial, and/or damages-related analyses. Financial models I have constructed or evaluated in the past have

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013
_____

contained as components revenue analyses, cost analyses, assessments of profitability, and assessments of the competitive business environment. I also have evaluated various claims of economic value using peer group comparisons and/or discounted cash flow analyses relating to projected future earnings streams. During the course of my career, I have frequently performed economic analyses using large databases of information and complex computer models. I have provided expert testimony in deposition and trial settings numerous times.

15.    I received my B.A. in Economics from the University of Notre Dame in 1977, my M.A. in Economics from the University of Southern California in 1979, and my Ph.D. in Economics from Arizona State University in 1983. Attached as **Exhibit 1** is a true and correct copy of my current resume. A listing of publications I have authored is contained in my resume. Attached as **Exhibit 2** is my trial and deposition testimony experience. My business address is Analysis Group, Inc., Park Place Center, 2911 Turtle Creek Blvd., Suite 600, Dallas, Texas, 75219.

16.    AG is being compensated based upon hours incurred and the hourly rates of the personnel involved. Payment to AG is not contingent upon my findings or the outcome of this matter. AG is being compensated at a rate of $580 per hour for my time. Hourly rates for other staff at AG working on this matter range from $245 to $570 per hour, depending upon the level and experience of the staff involved.

## IV.    FACTS, DATA, AND INFORMATION RECEIVED

17.    The facts, data, and information available to me in forming my opinions are contained in **Exhibit 3** or elsewhere in my report (including footnotes and exhibits). Examples of the types of information available to me include the following:

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013

_____

     a.  legal documents (e.g., Second Amended Class Action Complaint, Declaration of Ali Goldstein dated September 27, 2013 and supporting exhibits, Declaration of Patricia Erin DeVincenzo dated September 20, 2013 and supporting exhibits);

     b.  deposition transcripts (i.e., deposition of Yanira Algarin taken on October 30, 2013, deposition of Patsy Murdock taken on October 30, 2013, deposition of Ali Goldstein taken on November 5, 2013)[9];

     c.  documents supplied by Maybelline (e.g., IRI retail pricing data);

     d.  expert report (i.e., Study of Consumer Perceptions of Maybelline SuperStay Products by Dr. Eli Seggev dated December 9, 2013); and

     e.  information independently obtained (e.g., advertised prices and purchaser reviews at online retailers, information from Maybelline website)

In addition, I have held discussions with Dr. Eli Seggev, Maybelline's survey expert in this matter.

18.    My analyses and opinions are based upon the information available, standard economic theory and approaches, and my education and training. The information I am relying upon is information typically relied upon by experts in my field. I reserve the ability to review documents, deposition transcripts, expert reports, or other information still to be produced by the Parties to this dispute. I reserve the ability to supplement my opinions based upon additional discovery, if appropriate. I also reserve the ability to use demonstrative exhibits and/or other information at hearings/trial to explain and illustrate my opinions. Furthermore, I reserve the ability to submit a supplemental report evaluating the Plaintiffs' expert report on class certification issues should such a report be issued.

---

[9] Contained in **Exhibit 4** are the names, positions, and company affiliations of each of the deponents whose deposition transcripts are cited in the narrative to my report.

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013

## V.    OVERVIEW OF PARTIES

### A. Maybelline, LLC

19.    Maybelline manufacturers a wide range of cosmetic products, including: makeup products for the eyes, face, and lips; nail polishes and colors; powders; lip balms, colors, gloss, and liners; brow liners, eye liners and shadows, mascaras, blushes, bronzers, concealers, foundation products; and brushes, combs, curlers, false lashes, removers, and tweezers.[10] According to L'Oreal, Maybelline is the "world's leading cosmetics brand, available in over 100 countries."[11]

### B. Named Plaintiffs

#### 1. Yanira Algarin

20.    Yanira Algarin resides in San Diego, CA. In or around September 2012, Ms. Algarin allegedly was "exposed to and saw Maybelline's 24 hour claim by reading the SuperStay 24 2-Step Color™ So Sienna label at a Wal-Mart in Lemon Grove, California."[12] According to the Amended Complaint filed in this matter, "[i]n reliance on the 24 hour claim, Plaintiff Algarin purchased SuperStay 24 2-Step Color™ So Sienna."[13] Ms. Algarin allegedly paid approximately $10, plus tax, for the product.[14]

#### 2. Patsy Murdock

21.    Patsy Murdock resides in Susanville, CA. On May 7, 2012, Ms. Murdock allegedly was "exposed to and saw Maybelline's 24 hour claim by reading the SuperStay 24HR

---

[10] "Company Overview of Maybelline, LLC," Businessweek. (http://investing.businessweek.com/research/stocks/private/snapshot.asp?privcapId=321417, viewed on November 6, 2013.)

[11] "Maybelline New York," L'Oreal Group. (http://www.loreal.com/brands/consumer-products-division/maybelline-new-york.aspx, viewed on November 6, 2013.)

[12] Amended Complaint, p. 5.

[13] Amended Complaint, p. 5.

[14] Amended Complaint, p. 5.

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013
_____

Makeup™ and the SuperStay 24 2-Step Color™ labels at a Walgreen's in Susanville, California."[15]  According to the Amended Complaint filed in this matter, "[i]n reliance on the 24 hour claim, Plaintiff Murdock purchased SuperStay 24 2-Step Color™ for approximately $10, plus tax, and SuperStay 24HR Makeup™ for approximately $12, plus tax."[16]

## VI.    PRODUCTS AT-ISSUE

### A.   Maybelline SuperStay 24 2-Step Color

22.   According to Maybelline, SuperStay 24 2-Step Color is a two-step lipcolor based upon a "Micro-Flex" formula in which the user applies a liquid lip color to the lips, followed by an ultra-conditioning balm.[17]  Maybelline offers the product in 30 different shades.[18]  I understand that Maybelline introduced SuperStay 24 2-Step Color in January 2011.[19]  SuperStay 24 2-Step Color has a manufacturer's suggested retail price ("MSRP") of $9.99.[20]  However, I also understand that the actual price charged by retailers for the SuperStay 24 2-Step Color product is determined based upon local supply and demand conditions.[21]

---

[15] Amended Complaint, p. 5.

[16] Amended Complaint, p. 5.

[17] "Superstay 24 Color," Maybelline, (www.maybelline.com/Products/Lip-Makeup/Lip-Color/Superstay-24-Color.aspx, viewed on November 7, 2013.)

[18] "Superstay 24 Color," Maybelline, (www.maybelline.com/Products/Lip-Makeup/Lip-Color/Superstay-24-Color.aspx, viewed on November 7, 2013.)

[19] Declaration of Ali Goldstein dated September 27, 2013 ("Goldstein Declaration"), Exhibit A1.

[20] "Superstay 24 Color – Lip Color by Maybelline," Maybelline.com. (www.maybelline.com/Products/Lip-Makeup/Lip-Color/Superstay-24-Color.aspx, viewed on November 18, 2013.)

[21] Goldstein Declaration, paragraph 5.

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013

_____

### B. Maybelline SuperStay 24HR Makeup

23.    According to Maybelline, SuperStay 24HR Makeup is an oil-free, dermatologist-tested, fragrance-free foundation based upon a "Micro-Flex" formula.[22] Maybelline offers the product in 12 different shades.[23] I understand that Maybelline introduced SuperStay 24HR Makeup in July 2009.[24] SuperStay 24HR Makeup has an MSRP of $10.99.[25] However, I also understand that the actual price charged by retailers for the SuperStay 24HR Makeup product is determined based upon local supply and demand conditions.[26]

## VII.    WHETHER ANY CLASS MEMBER WAS INJURED AS A RESULT OF THE CHALLENGED CLAIMS DEPENDS UPON INDIVIDUALIZED INQUIRY

24.    Determining whether a putative Class member suffered any economic injury as a result of the Challenged Claims requires individualized information specific to each putative Class member. This individualized information includes, *inter alia*: (a) the putative Class member's reasons for purchasing the SuperStay 24 Product(s); (b) whether the putative Class member derived benefits from the use of the SuperStay 24 Product(s) (and the extent of such benefits); and (c) whether the putative Class member is a repeat purchaser of the SuperStay 24 Products. The circumstances surrounding each individual putative Class member's purchasing decision (and resulting benefits) must be considered in order to determine whether or not the individual was injured as a result of the Challenged Claims (and, if so, to what extent).

---

[22] "SuperStay 24HR Makeup," Maybelline.com, (www.maybelline.com/Products/Face-Makeup/Foundation/SuperStay-24HR-Makeup.aspx, viewed on November 7, 2013.)

[23] "SuperStay 24HR Makeup," Maybelline.com, (www.maybelline.com/Products/Face-Makeup/Foundation/SuperStay-24HR-Makeup.aspx, viewed on November 7, 2013.)

[24] Goldstein Declaration, Exhibit A2.

[25] "SuperStay 24HR Makeup – Foundation by Maybelline," Maybelline.com. (www.maybelline.com/Products/Face-Makeup/Foundation/SuperStay-24HR-Makeup.aspx, viewed on November 18, 2013.)

[26] Goldstein Declaration, paragraph 5.

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013

_____

   **A.   Individual Inquiry Is Required To Determine Putative Class Members' Reasons For Purchasing SuperStay 24 Products**

25.    From an economic perspective, a person who purchased a SuperStay 24 Product for a reason or reasons other than the Challenged Claims (e.g., a person who bought solely because of the shade selection) and who would have purchased the same product at the same price regardless of the Challenged Claims was not injured as a result of the alleged wrongful conduct.  In economic terms, that purchaser received the value that was paid for.  In such situations, because the purchase of the SuperStay 24 Product was not based upon the Challenged Claims, these consumers did not receive less than what was bargained for in connection with the Challenged Claims.   Hence, these purchasers incurred no economic injury <u>as a result of</u> the Challenged Claims.  Therefore, inquiry and analyses regarding putative Class members' motivations in purchasing SuperStay 24 Products are determinative as to whether individual putative Class members suffered economic injury <u>as a result of</u> the Challenged Claims - which would require individual inquiry with respect to each putative Class member.

26.    To identify the reasons for purchase of the purchasers of SuperStay 24 Products, I reviewed the survey results of Dr. Seggev[27] from the perspective of whether damages can be calculated on a class-wide basis.[28]  Dr. Seggev's online survey, as well as various purchaser reviews relating to SuperStay 24 Products, demonstrates that putative Class members purchased SuperStay 24 Products for a number of reasons other than the Challenged Claims.[29]  Participants in Dr. Seggev's survey were women aged 18 or older

_____

[27] I also have held discussions with Dr. Seggev.

[28] I also reviewed online reviews relating to the SuperStay 24 Products.

[29] The information presented in this section of my report is based upon customer reviews for SuperStay 24 Products on online retailer websites (e.g., Amazon.com) as well as the survey and analyses of Dr. Seggev relating to

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013
_____

that had purchased one or both of the SuperStay 24 Products within twelve months of taking the survey.[30]  The sample consisted of 251 respondents that purchased SuperStay 24 2-Step Color and 249 respondents that purchased SuperStay 24HR Makeup.

27.     Of the aforementioned sample, 115 (46%) women purchased SuperStay 24 2-Step Color once in the past twelve months and 124 (50%) women purchased SuperStay 24HR Makeup once in the past twelve months.  These one-time purchasers were asked both close-ended and open-ended questions about the SuperStay 24 Products, including the following examples.

   a.  Question (open-ended):  Thinking of the time you purchased [Maybelline SuperStay product], please list all the reasons that you decided to purchase this product.

   b.  Question (close-ended):  When you purchased [Maybelline SuperStay product], did you have any expectations about how long the [Product] would last?

      Multiple choice answers were:
      *  Yes
      *  No
      *  Don't recall

28.     According to Dr. Seggev's survey analyses and online reviews written by purchasers, there were various reasons why putative Class members purchased SuperStay 24 Products, including: (a) expected duration of the product, (b) prior experience with the

_____

purchaser purchasing decisions.  Information obtained from customer reviews is separate and distinct, and clearly identified, as compared to information obtained from Dr. Seggev's survey and analyses relating to purchaser purchasing decisions and duration expectations.  The information obtained from customer reviews is for probative purposes and is not inconsistent with the information obtained from purchaser surveys and analyses relating to purchaser purchasing decisions.

[30] In addition, these participants were not employed by or have a household member employed by cosmetic manufacturers, advertising agencies, or marketing research firms.(Study of Consumer Perceptions of Maybelline SuperStay Products by Dr. Eli Seggev dated December 9, 2013, ("Seggev Study"), Methodology section).

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013

_____

product, (c) desire to try a new product, (d) prior experience with the brand, (e) product colors, and (f) price (including coupons).[31]

a. Expected Duration Of The Product(s). Dr. Seggev's survey results[32] demonstrate that while some purchasers of SuperStay 24 Products mentioned expected duration of the products as a reason for purchase, only a small number of purchasers mentioned an expected duration of 24 hours or more as a reason for purchase.

i. 20% of total SuperStay 24 2-Step Color purchasers mentioned duration as a reason for purchase.[33] The purchasers who mentioned duration as a reason for purchase can be broken down into the following groups.

- 1% of total SuperStay 24 2-Step Color purchasers mentioned a duration of 24 hours or more as a reason for purchase.[34,35]

- 19% of total SuperStay 24 2-Step Color purchasers mentioned non-specific duration expectations (e.g., "lasting power," "stays on") as a reason for purchase.[36]

ii. 14% of total SuperStay 24HR Makeup purchasers mentioned duration as a reason for purchase.[37] The purchasers who mentioned duration as a reason for purchase can be broken down into the following groups:

_____

[31] The purchase drivers discussed herein might drive purchasing behavior for some putative Class members but not for others (e.g., some putative Class members may not have previous experience with the Maybelline brand or may consider SuperStay 24 Products to be expensive). Nevertheless, the observation that these factors drive the purchasing behavior of some individuals indicates that some putative Class members purchase SuperStay 24 Products for reasons other than the Challenged Claims, that differences exist among putative Class members in terms of reasons for purchase and duration expectations, and that the assessment of economic injury, if any, resulting from the Challenged Claims is not amenable to Class-wide proof.

[32] I understand that the survey results presented below were calculated by Dr. Seggev by dividing (i) the number of respondents that had purchased SuperStay 24 Products once in the past twelve months and mentioned duration as a reason for purchase by (ii) the total number of respondents that had purchased SuperStay 24 Products in the past twelve months.(Seggev Study, Methodology and Individual Study Results sections).

[33] Seggev Study, Individual Study Results section.

[34] Seggev Study, Individual Study Results section.

[35] I understand Dr. Seggev also did an analysis of whether purchasers had explicit duration expectations and, if so, what those duration expectations were. For instance, Dr. Seggev found that approximately 9 percent of SuperStay 24 2-Step Color purchasers mentioned a duration expectation of 24 hours or more at the time of purchase in at least one of the three question types he used to gauge duration expectations among purchasers. (Seggev Study, Individual Study Results – SuperStay 24 2-Step Color Overall Duration Expectations section).

[36] Seggev Study, Individual Study Results section.

[37] Seggev Study, Individual Study Results section.

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013
_____

- • 4% of total SuperStay 24HR Makeup purchasers mentioned a duration of 24 hours or more as a reason for purchase.[38,39]

- • 10% of total SuperStay 24HR Makeup purchasers mentioned non-specific duration expectations (e.g., "long lasting," "stays on") as a reason for purchase.[40]

  iii. To further illustrate the variation in purchasers' expectations of duration for the SuperStay 24 Products, Ms. Murdock indicated she expected both the SuperStay 24 2-Step Color and SuperStay 24HR Makeup to have a duration of 24 hours,[41] while Ms. Algarin indicated that she did not expect the SuperStay 24 2-Step Color to last 24 hours or have any specific expectation for duration.[42]

b. <u>Prior Experience With The Product(s)</u>.  Dr. Seggev's survey data indicate that a significant number of purchasers of the products in question were repeat purchasers.[43]

  i. 45% of total SuperStay 24 2-Step Color purchasers purchased the product <u>two or more</u> times in the past twelve months.

  ii. 32% of total SuperStay 24HR Makeup purchasers purchased SuperStay 24HR Makeup <u>two or more</u> times in the past twelve months.

  In addition, reviews of SuperStay 24 Products on online retailer websites indicate that many reviewers were satisfied with their initial purchase of SuperStay 24 Products (See **Section 7.C** below).  The fact that SuperStay 24 Products have regular or repeat purchasers indicates that these purchasers were satisfied with their initial purchases of SuperStay 24 Products.  For these purchasers, their own prior experience (rather than the Challenged Claims) was a likely determinant of subsequent purchases of the SuperStay 24 Products.

c. <u>Desire To Try a New Product</u>.  Findings from Dr. Seggev's survey[44] offer evidence that buyers of SuperStay 24 Products were motivated by the desire to try a new product.

_____

[38] Seggev Study, Individual Study Results section.

[39] I understand Dr. Seggev also did an analysis of whether purchasers had explicit duration expectations and, if so, what those duration expectations were.  For example, Dr. Seggev found that approximately 14 percent of the total sample of SuperStay 24HR Makeup purchasers mentioned a duration expectation of 24 hours or more at the time of purchase in at least one question he used to gauge duration expectations among purchasers (Seggev Study, Individual Study Results – SuperStay 24HR Makeup Overall Duration Expectations section).

[40] Seggev Study, Individual Study Results section.

[41] Deposition of Patsy Murdock dated October 30, 2013, pp. 47 – 48, 68 – 69.

[42] Deposition of Yanira Algarin dated October 30, 2013, pp. 118 – 119.

[43] Seggev Study, Individual Study Results section.

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013
_____

      i.  11% of total SuperStay 24 2-Step Color purchasers indicated the desire to try a new product as a reason for purchasing the product.[45]

     ii.  11% of total SuperStay 24HR Makeup purchasers indicated the desire to try something new as a reason for purchasing the product.[46]

d.  <u>Prior Experience With The Brand</u>.  Findings from Dr. Seggev's survey[47] offer evidence that the Maybelline brand was a motivating factor in purchasers' purchasing decisions.

      i.  6% of total SuperStay 24 2-Step Color purchasers indicated the Maybelline brand was a reason for purchasing the product.[48]

     ii.  9% of total SuperStay 24HR Makeup purchasers indicated the Maybelline brand was a reason for purchasing the product.[49]

In addition, purchasers have provided the following feedback on Amazon.com. (See **Exhibit 5**.)[50]

- "This is the only brand of lipstick and products I use…I have trusted and used Maybelline for years."

- "Maybelline always brings good products."

- "I love maybelline [sic] products and this is one of them, this foundation covers great, I have worn foundation all my life and this is one of the best foundations yet."

---

[44] I understand that the survey results presented below were calculated by Dr. Seggev by dividing (i) the number of respondents that had purchased SuperStay 24 Products once in the past twelve months and mentioned desire to try a new product as a reason for purchase by (ii) the total number of respondents that had purchased SuperStay 24 Products in the past twelve months. (Seggev Study, Methodology and Individual Study Results sections.)

[45] Seggev Study, Individual Study Results section.

[46] Seggev Study, Individual Study Results section.

[47] I understand that the survey results presented below were calculated by Dr. Seggev by dividing (i) the number of respondents that had purchased SuperStay 24 Products once in the past twelve months and mentioned prior experience with the brand as a reason for purchase by (ii) the total number of respondents that had purchased SuperStay 24 Products in the past twelve months. (Seggev Study, Methodology and Individual Study Results sections.)

[48] Seggev Study, Individual Study Results section.

[49] Seggev Study, Individual Study Results section.

[50] "Maybelline Superstay 2-Step Lipcolor: Customer reviews," Amazon.com. (http://www.amazon.com/ Maybelline-Superstay-2-step-Lipcolor-Cherry/product-reviews/B004677628/ref=sr_1_2_cm_cr_acr_txt?ie=UTF8& showViewpoints=1, viewed on November 12, 2013.); "Maybelline Super Makeup: Customer reviews," Amazon.com. (http://www.amazon.com/Maybelline-Super-Makeup-Beige-Fluid/product-reviews/B002LFNWCU/ ref=sr_1_1_cm_cr_acr_txt?ie=UTF8&showViewpoints=1, viewed on November 12, 2013.)

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013

_____

e. <u>Product Colors</u>.  According to Dr. Seggev's survey analyses[51], the available colors of the SuperStay 24 Products are important drivers of sales for SuperStay 24 Products. To further illustrate this point, Ms. Algarin indicated that color was a contributing factor to her purchasing decision.[52]

    i.  14% of total SuperStay 24 2-Step Color purchasers indicated that color was a reason for purchasing the product.[53]

    ii.  7% of total SuperStay 24HR Makeup purchasers indicated that color was a reason for purchasing the product.[54]

In addition, purchasers have provided the following feedback on Amazon.com. (See **Exhibit 5**.)[55]

- "This is my favorite shade, and my signature color!!!  I do wear other shades of superstay [*sic*] also!"

- "The colors are fantastic and the lip balm makes your lips smooth and adds just enough sheen."

- "First of all, there is a large range of colors, so it's easy to find a color that fits your skin.  I personally have a yellow undertone to my skin and it was so easy to find the perfect shade (Sand Beige)."

- "Love the color.  Skin looks smooth and natural."

f. <u>Price</u>.  According to Dr. Seggev's survey analyses[56], the prices of the SuperStay 24 Products are an important driver of sales for SuperStay 24 Products.

---

[51] I understand that the survey results presented below were calculated by Dr. Seggev by dividing (i) the number of respondents that had purchased SuperStay 24 Products once in the past twelve months and mentioned color as a reason for purchase by (ii) the total number of respondents that had purchased SuperStay 24 Products in the past twelve months. (Seggev Study, Methodology and Individual Study Results sections.)

[52] Deposition of Yanira Algarin dated October 30, 2013, pp. 41 – 42.

[53] Seggev Study, Individual Study Results section.

[54] Seggev Study, Individual Study Results section.

[55] "Maybelline Superstay 2-Step Lipcolor: Customer reviews," Amazon.com. (http://www.amazon.com/ Maybelline-Superstay-2-step-Lipcolor-Cherry/product-reviews/B004677628/ref=sr_1_2_cm_cr_acr_txt?ie=UTF8& showViewpoints=1, viewed on November 12, 2013.); "Maybelline Super Makeup: Customer reviews," Amazon.com.  (http://www.amazon.com/Maybelline-Super-Makeup-Beige-Fluid/product-reviews/B002LFNWCU/ ref=sr_1_1_cm_cr_acr_txt?ie=UTF8&showViewpoints=1, viewed on November 12, 2013.)

[56] I understand that the survey results presented below were calculated by Dr. Seggev by dividing (i) the number of respondents that had purchased SuperStay 24 Products once in the past twelve months and mentioned price as a reason for purchase by (ii) the total number of respondents that had purchased SuperStay 24 Products in the past twelve months. (Seggev Study, Methodology and Individual Study Results sections.)

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013

_____

      i.  17% of total SuperStay 24 2-Step Color purchasers indicated that price was a reason for purchasing the product.[57]

     ii.  28% of total SuperStay 24HR Makeup purchasers indicated that price was a reason for purchasing the product.[58]

In addition, purchasers have provided the following feedback on Amazon.com. (See **Exhibit 5**.)[59]

- "I love this product, and the price was great!"

- "Will buy more at this great price."

- "And you can't beat the price! I've been using Revlon Colorstay for years, and at almost $15 a pop at the local drugstore (though a bit cheaper on Amazon) I wanted to find something else a bit less pricey. This foundation did the trick!"

- "The price for this product is very reasonable and I think that you can usually get this on sale for a good price."

29.    For SuperStay 24 2-Step Color, Dr. Seggev determined that "duration, price and color are all primary purchase drivers of the Product" and that "24 hour duration is not a primary purchase driver."[60] For SuperStay 24HR Makeup, Dr. Seggev determined that "duration, price and brand are all primary purchase drivers of the Product" and that "24 hour duration is not a primary purchase driver."[61] Contained in **Table 1** is a summary of Dr. Seggev's survey results discussed above, indicating that purchasers have a variety of preferences and reasons for purchasing SuperStay 24 Products, which are unrelated to the expectation of the SuperStay 24 Products having a duration of 24 hours or more.

_____

[57] Seggev Study, Individual Study Results section.

[58] Seggev Study, Individual Study Results section.

[59] "Maybelline Superstay 2-Step Lipcolor: Customer Reviews," Amazon.com. (http://www.amazon.com/ Maybelline-Superstay-2-step-Lipcolor-Cherry/product-reviews/B004677628/ref=sr_1_2_cm_cr_acr_txt?ie=UTF8& showViewpoints=1, viewed on November 12, 2013.); "Maybelline Super Makeup: Customer Reviews," Amazon.com. (http://www.amazon.com/Maybelline-Super-Makeup-Beige-Fluid/product-reviews/B002LFNWCU/ ref=sr_1_1_cm_cr_acr_txt?ie=UTF8&showViewpoints=1, viewed on November 12, 2013.)

[60] Seggev Study, Individual Study Results section.

[61] Seggev Study, Individual Study Results section.

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013

_____

**Table 1[62]**
**Reasons for Purchase of**
**SuperStay 24 2-Step Color and SuperStay 24HR Makeup**

| Reason For Purchase | SuperStay 24 2-Step Color % of Total Purchasers | SuperStay 24HR Makeup % of Total Purchasers |
|---|---|---|
| Mentioned Non-Specific Duration Expectations | 19% | 10% |
| Price | 17% | 28% |
| Color | 14% | 7% |
| Wanted to Try New Product | 11% | 11% |
| Trusted Brand | 6% | 9% |
| Mentioned 24 or More Hours | 1% | 4% |

30.    Because many purchasers of the SuperStay 24 Products made purchases for reasons other than the Challenged Claims, it would be necessary to examine why each putative Class member purchased the SuperStay 24 Product(s) in order to evaluate alleged injury, if any. Because of the different reasons for which putative Class members may have purchased SuperStay 24 Products, this aspect of the economic injury analysis cannot be determined using Class-wide proof.

**B.    Individual Inquiry Is Required To Determine Whether Putative Class Members Derived Benefits From Using SuperStay 24 Products**

31.    The Named Plaintiffs allege that Maybelline has engaged in false marketing and advertising by claiming SuperStay 24 Products will "provide lipcolor that lasts 24 hours and foundation coverage that will last for 24 hours on the consumer's skin."[63] According to the Named Plaintiffs, (a) "[i]n truth, SuperStay 24 2-Step Color™ is not a 'no-transfer'

_____

[62] Percentages do not total to 100% as survey respondents may provide more than one reason for purchase.

[63] Amended Complaint, p. 2.

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013

_____

lipcolor that lasts 24 hours as advertised" and (b) "[i]n truth, SuperStay 24HR Makeup™ is not a 'no-transfer' foundation that lasts 24 hours as advertised."[64]  However, in contrast to the allegations made by the Named Plaintiffs, customer ratings and reviews for Maybelline's SuperStay 24 Products indicate that many customers are satisfied with their purchases and have found SuperStay 24 Products to be effective.  Examples are provided below.

a. Amazon.com reviews.  109 out of 137 Amazon reviewers of SuperStay 24 2-Step Color and 53 out of 66 Amazon reviewers of SuperStay 24HR Makeup rated the products with four or five stars (see **Table 2** below).[65]  The Amazon reviewers of SuperStay 24 2-Step Color that rated the product with four or five stars described their experiences with the product with language such as "Love it," "I like the color and staying power," "The BEST longwear lip color," "the lipstick stays on as advertised," and "it really did last all day long."[66]  The Amazon reviewers of SuperStay 24HR Makeup that rated the product with four or five stars  described their experiences with the product with language such as "Best makeup I've ever used," "This is a great foundation," "This is the best and most long-wearing foundation I have ever used," and "The makeup lasts all day."[67]

_____

[64] Amended Complaint, p. 3.

[65] 18 out of the 26 one and two star reviewers of SuperStay 24 Products did not mention duration in their reviews. These reviewers provided one and two star ratings for a variety of other reasons, including issues with packaging, drying of lips and skin, and the colors of the SuperStay 24 Products. ("Customer reviews: Maybelline New York SuperStay 24, 2-step Lipcolor," Amazon.com, (http://www.amazon.com/Maybelline-Superstay-2-step-Lipcolor-Sienna/product-reviews/B00467AYL8/ref=dp_top_cm_cr_acr_txt?showViewpoints=1, viewed on December 9, 2013.) and "Customer reviews: Maybelline New York SuperStay 24HR Makeup," Amazon.com, (http://www.amazon.com/Maybelline-Super-Makeup-Porcelain-Ivory/product-reviews/B002LFNWCU/ref=dp_top_cm_cr_acr_txt?showViewpoints=1, viewed on December 9, 2013.))

[66] "Customer reviews: Maybelline New York SuperStay 24, 2-step Lipcolor," Amazon.com. (http://www.amazon.com/Maybelline-Superstay-2-step-Lipcolor-Eternal/product-reviews/B0046798IS/ref=sr_1_2_cm_cr_acr_txt?ie=UTF8&showViewpoints=1, viewed on November 6, 2013.)

[67] "Customer reviews: Maybelline New York SuperStay 24HR Makeup," Amazon.com, (http://www.amazon.com/Maybelline-Super-Makeup-Porcelain-Ivory/product-reviews/B002LFQ6LO/ref=sr_1_1_cm_cr_acr_txt?ie=UTF8&showViewpoints=1, viewed on November 6, 2013.) and  "Customer reviews: Maybelline New York SuperStay 24HR Makeup," Amazon.com, (http://www.amazon.com/...akeup-Porcelain-Ivory/product-reviews/B002LFQ6LO/ref=cm_cr_pr_top_link_2?ie=UTF8&pageNumber=2&showViewpoints=0&sortBy=byRankDescending, viewed on November 6, 2013.)

CONFIDENTIAL

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013
_____

**Table 2**[68]
**Amazon.com Reviews of SuperStay 24 Products**

| Stars | SuperStay 24 2-Step Color | | SuperStay 24HR Makeup | |
|---|---|---|---|---|
| | Reviewers | Percentage of Reviewers | Reviewers | Percentage of Reviewers |
| 5 | 69 | 50% | 43 | 65% |
| 4 | 40 | 29% | 10 | 15% |
| 3 | 9 | 7% | 6 | 9% |
| 2 | 7 | 5% | 3 | 5% |
| 1 | 12 | 9% | 4 | 6% |
| Average Rating | 4.1 Stars | | 4.3 Stars | |

   b.  <u>Maybelline.com reviews.</u>  66 out of 96 reviewers of SuperStay 24 2-Step Color on Maybelline.com and 31 out of 39 reviewers of SuperStay 24HR Makeup on Maybelline.com rated these products with four or five stars (see **Table 3** below).[69,70] Maybelline.com reviewers that rated SuperStay 24 2-Step Color with four or five stars described the product with language such as "I LOVE this product – LOVE IT," "It lasts all day and doesn't come off on my coffee mug or my wine glass," "a long lasting lip colour that lasts," "I can't wait to buy more," and "I get compliments on it all time."[71]  Maybelline.com reviewers that rated SuperStay 24HR Makeup with four or five stars described the product with language such as "by far the best," "favorite go-to foundation for longwear [sic]," "literally does stay on 24hrs," and "will buy another bottle of this awesome foundation when [I] use up the bottle [I]'ve got."[72]

---

[68]  "Customer reviews: Maybelline New York SuperStay 24, 2-step Lipcolor," Amazon.com, (http://www.amazon.com/Maybelline-Superstay-2-step-Lipcolor-Eternal/product-reviews/B0046798IS/ref= sr_1_2_cm_cr_acr_txt?ie=UTF8&showViewpoints=1, viewed on November 6, 2013.) and "Customer reviews: Maybelline New York SuperStay 24HR Makeup," Amazon.com, (http://www.amazon.com/Maybelline-Super-Makeup-Porcelain-Ivory/product-reviews/B002LFQ6LO/ref=sr_1_1_cm_cr_acr_txt?ie=UTF8&showViewpoints=1, viewed on November 6, 2013.).

[69] The majority of reviews posted on Wal-mart.com, CVS.com, and Walgreens.com for the SuperStay 24 Products are extracted from reviews posted on Maybelline.com.

[70] 15 out of the 28 one and two star reviewers of SuperStay 24 Products did not mention duration in their reviews. These reviewers provided one and two star ratings for a variety of other reasons, including issues with packaging, drying of lips and skin, and the colors of the SuperStay 24 Products. ("Superstay 24 Color," Maybelline.com, (www.maybelline.com/Products/Lip-Makeup/Lip-Color/Superstay-24-Color.aspx, viewed on November 7, 2013.) and "SuperStay 24HR Makeup," Maybelline.com, (www.maybelline.com/Products/Face-Makeup/Foundation/ SuperStay-24HR-Makeup.aspx, viewed on November 7, 2013.))

[71] "Superstay 24 Color," Maybelline.com, (www.maybelline.com/Products/Lip-Makeup/Lip-Color/Superstay-24-Color.aspx, viewed on November 7, 2013.)

[72] "SuperStay 24HR Makeup," Maybelline.com, (www.maybelline.com/Products/Face-Makeup/Foundation/ SuperStay-24HR-Makeup.aspx, viewed on November 7, 2013.)

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013

_____

### Table 3[73]
### Maybelline.com Reviews of SuperStay 24 Products

| Stars | SuperStay 24 2-Step Color | | SuperStay 24HR Makeup | |
|---|---|---|---|---|
| | Reviewers | Percentage of Reviewers | Reviewers | Percentage of Reviewers |
| 5 | 41 | 43% | 25 | 64% |
| 4 | 25 | 26% | 6 | 15% |
| 3 | 9 | 9% | 1 | 3% |
| 2 | 11 | 11% | 4 | 10% |
| 1 | 10 | 10% | 3 | 8% |
| Average Rating | 3.8 Stars | | 4.2 Stars | |

   c. <u>Ulta.com reviews</u>.[74]  425 out of 614 reviewers of SuperStay 24 2-Step Color on Ulta.com and 133 out of 176 reviewers of SuperStay 24HR Makeup on Ulta.com rated these products with four or five stars (see **Table 4** below).[75]  74 percent of respondents on Ulta.com indicated that they would recommend SuperStay 24 2-Step Color to a friend.[76]  81 percent of respondents on Ulta.com indicated that they would recommend SuperStay 24HR Makeup to a friend.[77]  Ulta.com reviewers that rated SuperStay 24 2-Step Color with four or five stars described the product with language such as "I really loved this lipstick," "it lasts all day," "the color lasts," and "Thank goodness this lipstick exists."[78]  Ulta.com reviewers that rated SuperStay 24HR Makeup with four or five stars described the product with language such as "Very light and lasts all day," "It goes on smoothly and stays on all day with excellent coverage," "I love this foundation," and "this makeup is weightless but lasts all

---

[73] "Superstay 24 Color," Maybelline.com, (www.maybelline.com/Products/Lip-Makeup/Lip-Color/Superstay-24-Color.aspx, viewed on November 7, 2013) and "SuperStay 24HR Makeup," Maybelline.com, (www.maybelline.com/Products/Face-Makeup/Foundation/ SuperStay-24HR-Makeup.aspx, viewed on November 7, 2013.)

[74] Ulta describes itself as "the largest beauty retailer that provides one-stop shopping for prestige, mass and salon products and salon services in the United States."  Ulta was founded in 1990, is headquartered in Chicago, Illinois, and employs over 16,000 associates. ("About Ulta Beauty," Ulta.com. (http://www.ulta.com/ulta/common/about.jsp, viewed on December 7, 2013.))

[75] The majority of reviews posted on Wal-mart.com, CVS.com, and Walgreens.com for the SuperStay 24 Products are extracted from reviews posted on Maybelline.com.

[76] "Superstay Lipcolor," Ulta.com. (http://www.ulta.com/ulta/browse/productDetail.jsp?productId=xlsImpprod 2910099&_requestid=301044, viewed on November 7, 2013.)

[77] "Superstay 24 Hour Makeup," Ulta.com. (http://www.ulta.com/ulta/browse/productDetail.jsp?productId=xls Impprod1620091&_requestid=300658, viewed on November 7, 2013.)

[78]  "Superstay Lipcolor," Ulta.com. (http://www.ulta.com/ulta/browse/productDetail.jsp?productId=xls Impprod2910099&_requestid=301044, viewed on November 7, 2013.)

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013

_____

day."[79]  Additionally, Ulta.com reviewers are provided with pre-defined descriptions that they can select in addition to the reviews that they write themselves.  96 out of the 614 SuperStay 24 2-Step Color reviewers selected the "Wears off easily" description, while 303 reviewers selected the "Long lasting" description.[80]  28 out of the 176 SuperStay 24HR Makeup reviewers selected the "Doesn't stay on" description, while 120 selected the "Long-lasting" description.[81]

**Table 4**[82]
**Ulta.com Reviews of SuperStay 24 Products**

| Stars | SuperStay 24 2-Step Color | | SuperStay 24HR Makeup | |
|---|---|---|---|---|
| | Reviewers | Percentage of Reviewers | Reviewers | Percentage of Reviewers |
| 5 | 221 | 36% | 67 | 38% |
| 4 | 204 | 33% | 66 | 38% |
| 3 | 51 | 8% | 22 | 13% |
| 2 | 54 | 9% | 8 | 5% |
| 1 | 84 | 14% | 13 | 7% |
| Average Rating | 3.7 Stars | | 3.9 Stars | |

32.     The customer ratings and reviews discussed above provide indications that many reviewers of SuperStay 24 Products hold different perceptions than those held by the Named Plaintiffs with respect to benefits derived from usage of SuperStay 24 Products. From an economic perspective, the benefits derived from the use of SuperStay 24 Products by a particular putative Class member are important for the determination of whether that putative Class member was injured as a result of the Challenged Claims.  In economic terms, if the benefits actually derived by a particular SuperStay 24 Product

_____

[79] "Superstay 24 Hour Makeup," Ulta.com.  (http://www.ulta.com/ulta/browse/productDetail.jsp?productId=xlsImpprod1620091&_requestid=300658, viewed on November 7, 2013.)

[80] "Superstay Lipcolor," Ulta.com.  (http://www.ulta.com/ulta/browse/productDetail.jsp?productId=xlsImpprod2910099&_requestid=301044, viewed on November 7, 2013.)

[81] "Superstay 24 Hour Makeup," Ulta.com.  (http://www.ulta.com/ulta/browse/productDetail.jsp?productId=xlsImpprod1620091&_requestid=300658, viewed on November 7, 2013.)

[82] "Superstay Lipcolor," Ulta.com.  (http://www.ulta.com/ulta/browse/productDetail.jsp?productId=xlsImpprod2910099&_requestid=301044, viewed on November 7, 2013.) and "Superstay 24 Hour Makeup," Ulta.com. (http://www.ulta.com/ulta/browse/productDetail.jsp?productId=xlsImpprod1620091&_requestid=300658,     viewed on November 7, 2013.)

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013

_____

customer were in line with that customer's expectations at the time of purchase, then that customer received the value that was paid for. Additionally, for those purchasers that may have experienced harm as a result of the Challenged Claims, the injuries across this group would not be uniform given variation in user expectations and experiences. For example, if two purchasers expected the duration of the SuperStay 24 Products to be 24 hours, but one purchaser experienced 5 hours of duration and one purchaser experienced 10 hours of duration, the latter individual received a greater benefit than the other purchaser. Any determination of damages absent an individualized analysis of the benefits derived from putative Class members' usage of SuperStay 24 Products would result in a windfall gain to putative Class members who actually suffered no injury (i.e., who were satisfied with their purchases of SuperStay 24 Products) and would uniformly compensate putative Class members that suffered disproportionate degrees of harm.

### C. Individual Inquiry Is Required To Determine Whether Putative Class Members Are Repeat Purchasers

33.    Dr. Seggev's survey data indicate that there are a significant percentage of repeat buyers of the products in question.

a.    45% of SuperStay 24 2-Step Color buyers purchased SuperStay 24 2-Step Color two or more times; and

b.    32% of SuperStay 24HR Makeup buyers purchased SuperStay 24HR Makeup two or more times.

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013

_____

**Figure 1**
**A Substantial Portion Of Putative Class Members Are Repeat Purchasers**



34.     For the substantial portion of SuperStay 24 Product purchases that are made by repeat purchasers, those purchasers' prior experiences with the products would play a significant role in the purchasing decision.  Repeat purchasing activity indicates that those buyers have been satisfied with their prior purchases of SuperStay 24 Products (i.e., that the product met the buyer's expectations relative to price paid).[83]  In particular, duration is an immediately identifiable attribute of the SuperStay 24 Products by the user – meaning that while individual purchasers may experience varying degrees of duration as a result of their respective application methods and daily experiences (e.g., drinking coffee, exercising), users are aware of the duration of the products they experience after just one usage.  Therefore, repeat purchasing activity indicates that those buyers are satisfied with the duration of SuperStay 24 Products.

---

[83] With respect to purchasers who chose not to continue purchasing SuperStay 24 Products, considerations unrelated to the Challenged Claims (e.g., price, means of application, no longer needing the product, and/or lack of availability) can contribute to discontinued use of SuperStay 24 Products.  Hence, even with respect to purchasers who have not continued purchasing SuperStay 24 Products, individual inquiry is required to determine their reasons for discontinuing purchases of SuperStay 24 Products.

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013
_____

35.    Consistent with the repeat purchasing data discussed above, purchaser reviews of
SuperStay 24 Products on online retailer websites provide evidence that many purchasers
were satisfied with their initial purchase of SuperStay 24 Products – which drove
subsequent purchases.    Illustrative examples are provided below.

a.    SuperStay 24 2-Step Color.

i.    "I started using this product a year ago and have been reordering in different
colors ever since."[84]

ii.    "I have been using Maybelline Superstay since it first came out, it's the only
lipstick I buy."[85]

iii.    "This is the best lipcolor ever…I will be back for more!"[86]

iv.    "I love this product…I will order more in the future."[87]

b.    SuperStay 24HR Makeup.

i.    "I am so happy I tried this foundation…[t]his is my new foundation!"[88]

ii.    "I absolutely adore this makeup…I ordered 8 of them, that's how much I love
this makeup!"[89]

_____

[84]    "Customer reviews: Maybelline New York Superstay 24, 2-step Lipcolor," Amazon.com.
(http://www.amazon.com/Maybelline-Superstay-2-step-Lipcolor-Continuous/product-reviews/B00467D1TU/
ref=cm_cr_pr_hist_5?ie=UTF8&filterBy=addFiveStar&showViewpoints=0&sortBy=bySubmissionDateDescending
, viewed on November 11, 2013.) (Emphasis added.)

[85]    "Customer reviews: Maybelline New York Superstay 24, 2-step Lipcolor," Amazon.com.
(http://www.amazon.com/Maybelline-Superstay-2-step-Lipcolor-Continuous/product-reviews/B00467D1TU/
ref=cm_cr_pr_hist_5?ie=UTF8&filterBy=addFiveStar&showViewpoints=0&sortBy=bySubmissionDateDescending
, viewed on November 11, 2013.) (Emphasis added.)

[86]    "Customer reviews: Maybelline New York Superstay 24, 2-step Lipcolor," Amazon.com.
(http://www.amazon.com/Maybelline-Superstay-2-step-Lipcolor-Continuous/product-reviews/B00467D1TU/
ref=cm_cr_pr_btm_link_next_2?ie=UTF8&filterBy=addFiveS%E2%80%A6, viewed on November 11, 2013.)
(Emphasis added.)

[87]    "Customer reviews: Maybelline New York Superstay 24, 2-step Lipcolor," Amazon.com.
(http://www.amazon.com/Maybelline-Superstay-2-step-Lipcolor-Continuous/product-reviews/B00467D1TU/
ref=cm_cr_pr_btm_link_next_3?ie=UTF8&filterBy=addFiveStar&pageNumber=3&showViewpoints=0&sortBy=b
ySubmissionDateDescending, viewed on November 11, 2013.) (Emphasis added.)

[88]    "Customer reviews: Maybelline New York Super Stay 24Hr Makeup," Amazon.com.
(http://www.amazon.com/Maybelline-Super-Makeup-Porcelain-Ivory/product-reviews/B002LFQ6LO/
ref=cm_cr_pr_hist_5?ie=UTF8&filterBy=addFiveStar&showViewpoints=0&sortBy=bySubmissionDateDescending
, viewed on November 6, 2013.) (Emphasis added.)

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013

_____

      iii.  "Very nice matte foundation, goes on smooth and looks great, and you can't beat the price…<u>Will definitely purchase this again</u>!"[90]

      iv.  "[T]his makeup is the best…<u>I will never use another foundation</u>, this stuff is AWESOME!"[91]

36.    Repeat purchasing activity provides a strong indication that the purchaser did not suffer economic harm due to the Challenged Claims.  A putative Class member who purchased (or purchases) a SuperStay 24 Product after having previously used the product has revealed satisfaction with the perceived benefits of the product relative to price paid – both from the initial purchase and from subsequent purchases (i.e., that value received was equal to or greater than what was paid).  Without individual inquiry with respect to prior purchasing behavior, one cannot identify and isolate repeat purchasers for the purpose of determining which individual purchasers of SuperStay 24 Products may have suffered economic harm.  Any determination of damages absent such an individualized analysis would result in compensation to putative Class members who actually suffered no injury.

## VIII.  <u>ANALYSIS OF RETAIL PRICES OF SUPERSTAY 24 PRODUCTS</u>

37.    This section of my report contains an analysis of retail sales and pricing data for SuperStay 24 Products.  As demonstrated in this section of my report, there are wide

_____

[89]  "Customer reviews: Maybelline New York Super Stay 24Hr Makeup," Amazon.com. (http://www.amazon.com/Maybelline-Super-Makeup-Porcelain-Ivory/product-reviews/B002LFQ6LO/ref=cm_cr_pr_btm_link_3?ie=UTF8&filterBy=addFiveStar&pageNumber=3&showViewpoints=0&sortBy=bySubmissionDateDescending, viewed on November 11, 2013.) (Emphasis added.)

[90]  "Customer reviews: Maybelline New York Super Stay 24Hr Makeup," Amazon.com. (http://www.amazon.com/Maybelline-Super-Makeup-Porcelain-Ivory/product-reviews/B002LFQ6LO/ref=cm_cr_pr_btm_link_4?ie=UTF8&filterBy=addFiveStar&pageNumber=4&showViewpoints=0&sortBy=bySubmissionDateDescending, viewed on November 11, 2013.) (Emphasis added.)

[91]  "Customer Reviews: Maybelline New York Super Stay 24Hr Makeup," Amazon.com. (http://www.amazon.com/Maybelline-Super-Makeup-Porcelain-Ivory/product-reviews/B002LFQ6LO/ref=cm_cr_pr_btm_link_3?ie=UTF8&filterBy=addFiveStar&pageNumber=3&showViewpoints=0&sortBy=bySubmissionDateDescending, viewed on November 11, 2013.) (Emphasis added.)

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013
_____

variations in the retail prices associated with SuperStay 24 Products. The actual sales prices paid for SuperStay 24 Products differ depending upon the circumstances under which the purchase was made. Because of the wide variations in retail prices associated with SuperStay 24 Products, putative Class members' claimed damages cannot be calculated reliably on a Class-wide basis using common proof.

### A.  Description Of Data

38.    In conducting my analyses, I relied in part upon retail price data collected by IRI during the time period from January 2010 to October 6, 2013.[92] The IRI data contain (a) average prices, (b) promoted prices (i.e., on-sale prices or prices charged in combination with promotional activity such as trade promotion or special packs), and (c) non-promoted prices (i.e., full prices or prices charged when not combined with promotional activity) for the SuperStay 24 Products.[93]

39.    I understand that while the SuperStay 24 2-Step Color was not introduced until January 2011, the IRI data provides prices for SuperStay 24 2-Step Color in 2010. As previously discussed, I understand the Class Period for each SuperStay 24 Product to be from the Products' respective launch dates through September 2013. Consequently, I began my analysis of the IRI price data for SuperStay 24 Products with the official launch date.

40.    The IRI data are available for the following sales distribution categories:

_____

[92] I understand that IRI data is collected every four weeks and that the data provided to me is IRI's annual aggregation of these data. (Goldstein Declaration, Exhibit A3)

[93] I understand that for both SuperStay 24 2-Step Color and SuperStay 24HR Makeup, stock keeping units ("SKUs") are only differentiated by shade. Additionally, I understand that Maybelline's wholesale prices to retailers for SuperStay 24 Products do not vary by color. (Goldstein Declaration, paragraph 9, Exhibits A1 and A2)

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013
_____

    a. total U.S. "multi-outlet" stores (i.e., retailers within the drug store distribution channel, retailers within the grocery store distribution channel, retailers within the mass market distribution channel,[94] and Wal-Mart);

    b. multi-outlet stores within various U.S. cities/markets (e.g., Los Angeles, California; Chicago, Illinois; Miami/Ft Lauderdale, Florida; Portland, Oregon)[95];

    c. total U.S. drug store, grocery store, and Wal-Mart distribution channels;

    d. retailers within the drug store distribution channel (e.g., CVS, Rite Aid, and Walgreens);

    e. retailers within the grocery store distribution channel (e.g., Kroger, Safeway, Raley's, and Albertsons); and

    f. retailers within the mass market distribution channel (i.e., Target and Kmart).[96]

41.    In addition to the IRI data, I have reviewed advertised online retail prices for SuperStay 24 Products from seven online retailers, including Amazon.com, CVS.com, Drugstore.com, Walgreens.com, and Walmart.com, among others. These advertised online retail prices represent actual prices for which online retail purchasers may purchase SuperStay 24 Products.

42.    Lastly, I reviewed IRI data provided in exhibits to the deposition of Ali Goldstein. While Plaintiffs have not identified the products with which they allege SuperStay 24 Products compete, I understand there may be multiple such products.[97] I reviewed the IRI data provided in exhibits to the deposition of Ali Goldstein as examples of products that

---

[94] I understand that the mass market distribution channel includes all retailers that IRI collects pricing information from that do not fall under the food, drug, and Wal-Mart distribution channels. IRI only provides pricing information for individual retailers in the mass market distribution channel and does not provide average prices across retailers in the channel. For example, I understand that Target would be included in the mass market distribution channel.

[95] IRI data are also available at a regional level for multi-outlet stores, drug stores, and grocery stores (e.g., Great Lakes, Southeast).

[96] IRI Data. ("Copy of Maybelline Superstay 24 HR Pricing Details (11-4-13) Updated  Formatted  .xlsx")

[97] Deposition of Ali Goldstein taken on November 5, 2013, p. 21.

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013

_____

putative Class members might have purchased as potential alternatives to SuperStay 24

Products, together with their corresponding prices.

**B.  Analyses Performed Regarding Retail Prices Of The Challenged Products**

43.  Analysis of SuperStay 24 Product pricing data demonstrates that there are wide variations

in the retail prices of the Challenged Products depending upon at least (a) sales channel,

(b) retailer, (c) geographic market, and (d) promotions utilized.[98]  The data support the

conclusion that putative Class members' claimed damages cannot be calculated reliably

using Class-wide proof.  For example, in 2012, SuperStay 24 2-Step Color ranged in

price from $6.74 when on promotion at grocery stores in the Great Lakes region, to

$10.26 when not on promotion at grocery stores in California, representing a price

difference of $3.52 (a percentage difference of 52%).[99]  Additionally in 2012, SuperStay

24HR Makeup ranged in price from $7.29 when on promotion at grocery stores in

California, to $11.26 when not on promotion at grocery stores in California, representing

a price difference of $3.97 (a percentage difference of 54%).[100]

**1.  SuperStay 24 Product Prices Vary Depending Upon Sales Channel**

44.  Analysis of the IRI data indicates that the price paid for SuperStay 24 Products by any

particular putative Class member at any particular time would vary based upon the sales

channel in which the purchase was made.  Average retail prices for the SuperStay 24

Products were lowest at Wal-Mart and highest in the drug store channel during the 2010

---

[98] I have observed the variation in prices of SuperStay 24 2-Step Color, collecting price information from Bed, Bath & Beyond in Dallas, TX, U.S. Central Command / MacDill Air Force Base in Tampa, FL, CVS in Ridgefield, CT, and Duane Reade in New York, NY.  The observed average unit prices range from $7.00 to $10.99.  See **Exhibit 6**.

[99] Price differences throughout the report may not tie due to rounding.

[100] IRI Data.  ("Copy of Maybelline Superstay 24 HR Pricing Details (11-4-13) Updated  Formatted  .xlsx")

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013

_____

to October 6, 2013 time period.[101]    In terms of average 2012 prices, the percentage difference between the highest and lowest average retail prices observed for the drug store, grocery store, and Wal-Mart channels was 19.4% for SuperStay 24 2-Step Color and 18.0% for SuperStay 24HR Makeup.  The dollar difference between the highest and lowest average retail prices observed for the drug store, grocery store, and Wal-Mart channels was $1.48 for SuperStay 24 2-Step Color and $1.63 for SuperStay 24HR Makeup.    Average retail prices for SuperStay 24 Products by sales channel are summarized in **Table 5** and **Exhibit 7**.

**Table 5**
**Average Retail Prices By Sales Channel, 2012[102]**

| Products At-Issue | Grocery Stores | Drug Stores | Wal-Mart | Difference (Highest vs. Lowest) | % Difference (Highest vs. Lowest) |
|---|---|---|---|---|---|
| SuperStay 24 2-Step Color | $8.44 | $9.13 | $7.65 | $1.48 | 19.4% |
| Superstay 24HR Makeup | $9.30 | $10.68 | $9.05 | $1.63 | 18.0% |

45.    With respect to SuperStay 24 2-Step Color, on a calendar year basis during the 2011 to October 6, 2013 time period, average retail prices were 15% to 19% higher in drug stores than at Wal-Mart – a difference of $1.15 to $1.48 per unit.  With respect to SuperStay 24HR Makeup, on a calendar year basis during the 2010 to October 6, 2013 time period, average retail prices were 7% to 21% higher in drug stores than at Wal-Mart – a difference of $0.63 to $1.94 per unit. (**See Exhibit 7**.)

_____

[101] IRI Data.  ("Copy of Maybelline Superstay 24 HR Pricing Details (11-4-13) Updated  Formatted  .xlsx")

[102] 2012 price data are presented as it represents the most recent full year of IRI data available.

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013
_____

> **2. SuperStay 24 Product Prices Vary Depending on Retailer Even Within The Same Sales Channel**

46.     Retail prices for SuperStay 24 Products vary by retailer within the same channel. Maybelline does not sell SuperStay 24 Products directly to consumers. Maybelline sells SuperStay 24 Products to distributors who in turn sell to retailers (though Maybelline also sells directly to retailers) who in turn sell to consumers.[103] I understand that different retailers make their own independent determinations regarding the mark-up and retail selling prices of SuperStay 24 Products depending upon such factors as local supply and demand conditions. Therefore, it is reasonable to expect that retail prices for SuperStay 24 Products would differ across retailers within the same sales channel. As noted above, the IRI data demonstrate this difference in the grocery store and drug store channels. In addition, my review of online retail prices for seven online retailers as of November 15, 2013 indicates significant variations in SuperStay 24 Product prices across online retailers. Thus, the price paid for the SuperStay 24 Products by any particular putative Class member at any particular time would vary based upon the retailer (even within the sales channel).

   a. <u>Drug Stores</u>.  Prices are provided for three drug store chains in the IRI data: CVS, Rite Aid, and Walgreens. Over the January 2011 to October 6, 2013 time period, the difference between the highest and lowest retail prices for SuperStay 24 2-Step Color across these drug stores (in a given calendar year) ranged from $0.98 to $1.56 per unit, a difference of 12% to 19%. Over the January 2010 to October 6, 2013 time period, the difference between the highest and lowest retail prices for SuperStay 24HR Makeup across these drug stores (in a given year) ranged from $1.05 to $1.55 per unit, a difference of 11% to 16%. (**Figure 2**, **Figure 3**, and **Exhibit 8**.)

---

[103] Goldstein Declaration, p. 2.

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013

_____

**Figure 2**
**SuperStay 24 2-Step Color**
**Average Retail Prices – Drug Stores**
**January 2011 – May 19, 2013**



**Figure 3**
**SuperStay 24HR Makeup**
**Average Retail Prices – Drug Stores**
**January 2010 – May 19, 2013**



CONFIDENTIAL

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013

_____

b.  <u>Grocery Stores</u>.  Across the seven grocery store chains with the highest total U.S.
retail sales in 2011,[104] average retail prices in 2012 for SuperStay 24 2-Step Color
ranged from $7.54 (HEB) to $10.15 (Delhaize) – a difference of $2.61 (i.e., 35%).
Average retail prices in 2012 for SuperStay 24HR Makeup ranged from $8.73 (HEB)
to $11.79 (Safeway) – a difference of $3.06 (i.e., 35%). (**Figure 4** and **Exhibit 9**.)

**Figure 4**
**Average Retail Prices – Grocery Stores, 2012**



c.  <u>Online Retailers</u>.  In addition to analyzing the IRI data, I reviewed advertised online
retail prices for SuperStay 24 Products for seven online retailers as of November 15,
2013.[105]  These advertised online retail prices for SuperStay 24 Products represent
actual prices for which online purchasers can buy SuperStay 24 Products.  As shown
in **Table 6**, the percentage differences between the highest and lowest online retail
prices are 48% ($3.25) and 33% ($2.50) for SuperStay 24 2-Step Color and

_____

[104] The seven largest U.S. grocery retailers in 2011, based on total revenues in 2011, were Kroger, Safeway,
SuperValu, Publix, Ahold, Delhaize, and HEB.  "Supermarkets: 2012 Top 100 Power Players," Stores Magazine.
(http://www.stores.org/STORES%20Magazine%20July%202012/supermarkets, viewed on November 15, 2013.)

[105] The seven online retailers chosen (Amazon.com, Ulta.com, Walgreens.com, Walmart.com, CVS.com, Soap.com,
and Drugstore.com) were those that appeared in the first page of results for Google searches of "maybelline
superstay 24 lipcolor" and "maybelline superstay 24 foundation".  Target.com, ebay.com, and buymebeauty.com
also appeared in the search results, however target.com and buymebeauty.com were excluded as they did not sell
both SuperStay 24 Products, and ebay.com was excluded as it is not a retailer.

CONFIDENTIAL
- 34 -

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013
_____

SuperStay 24HR Makeup, respectively.  (See **Exhibit 10**.)  Prices for SuperStay 24 Products for all seven online retailers reviewed are shown in **Figure 5**.

**Table 6**
**Advertised Online Retail Prices As Of November 15, 2013**

| Challenged Product | Lowest Price | Highest Price | Difference | % Difference |
|---|---|---|---|---|
| SuperStay 24 2-Step Color | $6.74 | $9.99 | $3.25 | 48% |
| SuperStay 24HR Makeup | $7.49 | $9.99 | $2.50 | 33% |

**Figure 5**
**Advertised Online Retail Prices As Of November 15, 2013**



### 3. **SuperStay 24 Product Prices Vary Depending Upon Geographic Market**

47.    Analysis of the IRI data indicates that the average retail prices of SuperStay 24 Products vary across geographic areas in the U.S.  In particular, across cities and/or markets[106] within the states for which the Named Plaintiffs seek class certification, average retail

---

[106] These cities are located in states where the Class action suit has been filed by the Named Plaintiffs.

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013

_____

prices in 2012 for SuperStay 24 2-Step Color ranged from $7.77 (Toledo, OH) to $9.12

(New York, NY) – a difference of $1.34 (i.e., 17%).  In addition, average retail prices in

2012 for SuperStay 24HR Makeup ranged from $9.10 (Salt Lake City, UT) to $10.65

(New York, NY) – a difference of $1.55 (i.e., 17%). (**Exhibit 11**.)

48.    Average retail prices of SuperStay 24 Products also vary across cities and/or markets

within the same state.  California is provided as an illustrative example below.

a.    <u>California Cities</u>.[107]    Four California markets are included in the IRI data I have
reviewed.   Over the January 2010 to October 6, 2013 time period,[108] the dollar
difference between the highest and lowest average retail prices across cities and/or
markets within California ranged from $0.33 (4%) to $0.45 (6%) for SuperStay 24 2-
Step Color and from $0.33 (4%) to $0.81 (9%) for SuperStay 24HR Makeup.  (**Table
7**, **Table 8**, and **Exhibit 12**.)

**Table 7**
**Maybelline SuperStay 24 2-Step Color**
**Average Retail Prices – California Cities**
**January 2011 – October 6, 2013**

| Geographic Market | 2011 | 2012 | 2013 |
|---|---|---|---|
| San Francisco/Oakland | $8.56 | $8.65 | $8.71 |
| Los Angeles | $8.34 | $8.39 | $8.45 |
| Sacramento | $8.23 | $8.20 | $8.30 |
| San Diego | $8.27 | $8.30 | $8.43 |
| *Difference (Highest vs. Lowest)* | *$0.33* | *$0.45* | *$0.41* |
| *% Difference (Highest vs. Lowest)* | *4%* | *6%* | *5%* |

---

[107] I understand that in the alternative to a multi-state class, the Named Plaintiffs seek to represent a California class.
(Amended Complaint, pp. 10 – 11.)

[108] SuperStay 24 2-Step Color is limited to the January 2011 to October 6, 2013 time period since the product was
launched in January 2011.

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013
_____

**Table 8**
**Maybelline SuperStay 24HR Makeup**
**Average Retail Prices – California Cities**
**January 2010 – October 6, 2013**

| Geographic Market | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|
| San Francisco/Oakland | $9.55 | $10.08 | $10.46 | $10.34 |
| Los Angeles | $9.37 | $9.81 | $10.00 | $9.82 |
| Sacramento | $9.21 | $9.56 | $9.76 | $9.52 |
| San Diego | $9.37 | $9.74 | $9.83 | $9.65 |
| *Difference (Highest vs. Lowest)* | *$0.33* | *$0.52* | *$0.70* | *$0.81* |
| *% Difference (Highest vs. Lowest)* | *4%* | *5%* | *7%* | *9%* |

### 4. <u>SuperStay 24 Product Prices Vary Depending Upon Promotional Activities</u>

49. Actual prices paid for SuperStay 24 Products by individual putative Class members depend upon discounts and promotions offered and/or used when the purchases were made. Examples of discounts and promotions that affect the purchase price of SuperStay 24 Products include promoted prices (i.e., on-sale prices), coupons, and shopper cards.

### i. Variation Between Promoted And Non-Promoted Prices

50. Large variations between SuperStay 24 Products' non-promoted prices (i.e., full prices)[109] and promoted prices (i.e., on-sale prices)[110] have been present throughout the putative Class period. Hence, whether a SuperStay 24 Product purchase is made during an active promotion is important in determining the actual prices paid by individual putative Class members.

---

[109] Full prices are labeled in the IRI data as "price with no trade promotion or special pack."

[110] Promoted prices are labeled in the IRI data as "price with any trade promotion or special pack." It is my understanding that IRI incorporates three types of promotion into its promoted price data, being circular ads, price reductions, and display advertising (e.g., products displayed at the end of an aisle). (Deposition of Ali Goldstein dated November 5, 2013 ("Goldstein Deposition"), pp. 38 – 39.)

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013
_____

51.    Examples of the differences between non-promoted prices and promoted prices of

SuperStay 24 Products as reflected in the IRI data are provided below.  The price

differences are substantial and vary across sales channels and retailers.

a.    Promotional Pricing By Sales Channel.  In 2012, on average, promoted prices were
lower than non-promoted prices for SuperStay 24 2-Step Color by approximately (i)
$0.84 in the grocery store channel (i.e., 11%), (ii) $0.72 in the drug store channel (i.e.,
8%), and (iii) $0.96 at Wal-Mart (i.e., 14%).  In 2012, on average, promoted prices
were lower than non-promoted prices for SuperStay 24HR Makeup by approximately
(i) $0.55 in the grocery store channel (i.e., 6%), (ii) $0.50 in the drug store channel
(i.e., 5%), and (iii) $0.11 at Wal-Mart (i.e., 1%). (**Table 9**, **Table 10**, and **Exhibit 13**.)

**Table 9**
**SuperStay 24 2-Step Color**
**Promoted Prices And Non-Promoted Prices By Sales Channel, 2012**

| Promoted vs. Non-Promoted | Grocery Stores | Drug Stores | Wal-Mart |
|---|---|---|---|
| Promoted Prices | $7.78 | $8.93 | $6.97 |
| Non-Promoted Prices | $8.62 | $9.65 | $7.93 |
| *Difference (Highest vs. Lowest)* | *$0.84* | *$0.72* | *$0.96* |
| *% Difference (Highest vs. Lowest)* | *11%* | *8%* | *14%* |

**Table 10**
**SuperStay 24HR Makeup**
**Promoted Prices And Non-Promoted Prices By Sales Channel, 2012**

| Promoted vs. Non-Promoted | Grocery Stores | Drug Stores | Wal-Mart |
|---|---|---|---|
| Promoted Prices | $8.86 | $10.52 | $8.95 |
| Non-Promoted Prices | $9.41 | $11.02 | $9.06 |
| *Difference (Highest vs. Lowest)* | *$0.55* | *$0.50* | *$0.11* |
| *% Difference (Highest vs. Lowest)* | *6%* | *5%* | *1%* |

Differences between promoted prices and non-promoted prices in the drug store
channel for SuperStay 24HR Makeup are presented as an illustrative example in
**Figure 6**.  The difference in absolute dollars between promoted prices and non-
promoted prices ranged from $0.64 (7%) to $1.24 (15%) per package over the
January 2010 to October 6, 2013 time period for SuperStay 24 2-Step Color and from
$0.35 (3%) to $1.64 (18%) per package for SuperStay 24HR Makeup.

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013

_____



**Figure 6**
**SuperStay 24HR Makeup**
**Promoted Prices And Non-Promoted Prices (U.S. Drug Stores)**
**January 2010 – October 6, 2013**

b.  <u>Promotional Pricing By Retailer</u>.  Wide variation between promoted prices and
non-promoted prices can be observed for retailers within each sales channel.  For
example, in 2012, average promoted prices for the year were lower than non-
promoted prices for SuperStay 24 2-Step Color by approximately (i) $0.95 in Stop
& Shop grocery stores (i.e., 10% in percentage difference), (ii) $0.58 in Rite Aid
(i.e., 7% in percentage difference), and (iii) $1.04 in Kmart (i.e., 13% in
percentage difference).  During the same period, promoted prices were lower than
non-promoted prices for SuperStay 24HR Makeup by approximately (i) $0.50 in
Stop & Shop grocery stores (i.e., 5% in percentage difference), (ii) $0.20 in Rite
Aid (i.e., 2% in percentage difference), and (iii) $0.44 in Kmart (i.e., 4% in
percentage difference). (**Table 11, Table 12,** and **Exhibit 14**.)

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013

_____

**Table 11**
**SuperStay 24 2-Step Color**
**Promoted Prices And Non-Promoted Prices By Retailer, 2012**

| Promoted vs. Non-Promoted | Stop & Shop | Rite Aid | Kmart |
|---|---|---|---|
| Promoted Prices | $9.47 | $8.30 | $8.32 |
| Non-Promoted Prices | $10.42 | $8.88 | $9.36 |
| *Difference (Highest vs. Lowest)* | *$0.95* | *$0.58* | *$1.04* |
| *% Difference (Highest vs. Lowest)* | *10%* | *7%* | *13%* |

**Table 12**
**SuperStay 24HR Makeup**
**Promoted Prices And Non-Promoted Prices By Retailer, 2012**

| Promoted vs. Non-Promoted | Stop & Shop | Rite Aid | Kmart |
|---|---|---|---|
| Promoted Prices | $10.45 | $9.74 | $9.89 |
| Non-Promoted Prices | $10.95 | $9.94 | $10.33 |
| *Difference (Highest vs. Lowest)* | *$0.50* | *$0.20* | *$0.44* |
| *% Difference (Highest vs. Lowest)* | *5%* | *2%* | *4%* |

Differences between promoted prices and non-promoted prices for SuperStay 24 2-Step Color at Kmart stores are presented as an illustrative example in **Figure 7**. The difference in absolute dollars between promoted prices and non-promoted prices at various Kmart stores ranged from $0.93 per package (12%) to $1.25 (15%) for SuperStay 24 2-Step Color over the January 2011 to October 6, 2013 time period.

CONFIDENTIAL

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013

_____



**Figure 7**
**SuperStay 24 2-Step Color**
**Promoted And Non-Promoted Retail Prices (Kmart)**
**January 2011 – October 6, 2013**

### 5. Alternatives To The Challenged Products Vary By Product Type and Price

52.    As illustrated throughout this section of my report, prices of SuperStay 24 Products vary

along at least each of the following dimensions: sales channel (e.g., drug stores versus

grocery stores), geographic region (i.e., across geographic regions and across cities

and/or markets within the same state), retailer, promotional activity, and time.  However,

when multiple dimensions are taken into consideration, this observed variation is even

larger.

a.    SuperStay 24 2-Step Color was priced as low as $4.05 when on promotion at Shaws
supermarkets in 2013, and was as high as $13.24 when not on promotion at Ralph's
supermarkets in 2012, a difference of $9.19 (representing a percentage difference of
227%).

b.    SuperStay 24HR Makeup was priced as low as $2.63 when on promotion at
Albertsons supermarkets in 2011, and was as high as $14.78 when on promotion at

Ralph's supermarkets in 2012, a difference of $12.15 (representing a percentage difference of 462%).

53.    Additionally, Plaintiffs have indicated that SuperStay 24 Products sell for a price premium over other lipsticks and foundations and that "[t]he only reason a consumer would pay the premium price of the SuperStay 24HR Products is to obtain the 24 hour "Super Stay" benefits which the Products do not provide." [111]   To the extent that Plaintiffs' damages claims are based on an asserted price premium of SuperStay 24 Products relative to products they claim they would have purchased in the alternative, such an approach would be confounded by the price variability for those potential alternative products.

54.    A price premium, in its simplest form, is the difference in price between a more expensive product and a less expensive product.  Thus, in order to calculate a price premium, comparator products must be selected and the prices of the two products must be determined and compared.  While Plaintiffs have not identified comparator products for a damages analysis, for purposes of illustration I reviewed Exhibit 4 of Ali Goldstein's deposition and IRI's information about the lip color market from January 2009 through September 4, 2011.  The two lip color products in this exhibit, aside from SuperStay 24 2-Step Color, are L'Oreal Infallible and Cover Girl Lip Perfection. [112] According to IRI, the average prices in 2011 for L'Oreal Infallible, SuperStay 24 2-Step Color, and Cover Girl Lip Perfection were $8.71, $8.57, and $6.43, respectively. [113]   Not only do the prices of these products vary by up to $2.28 (35%), but L'Oreal Infallible was

---

[111] Amended Complaint, pp. 2 – 3.

[112] Goldstein Deposition, Exhibit 4. (MAYB_ALG_000053 – 188, at 77.)

[113] Goldstein Deposition, Exhibit 4. (MAYB_ALG_000053 – 188, at 79.)

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013
_____

priced <u>higher</u>, on average, than SuperStay 24 2-Step Color, indicating SuperStay 24 2-Step Color did not sell at a premium compared to L'Oreal Infallible. Therefore, if L'Oreal Infallible were the alternative product the putative Class members would have purchased, they would have suffered no injury as a result of having purchased SuperStay 24 2-Step Color.

55.    Similarly, Exhibit 5 of Ali Goldstein's deposition provides IRI's information about the foundation market from January 2009 through August 7, 2011. The foundation products in this exhibit are Revlon Photo Ready, L'Oreal Visible Lift Serum Absolute, Maybelline Dream Smooth Mousse, Revlon Colorstay Aqua Mineral, Cover Girl Natureluxe, Maybelline Fit Me, and L'Oreal SSP Magic Smooth.[114]   According to IRI, the average prices in 2011 for the aforementioned foundation products ranged from $6.87 (Maybelline Fit Me) to $14.89 (L'Oreal SSP Magic Smooth).[115]   Not only do the prices of these products vary by up to $8.02 (117%), but Revlon Photo Ready, Cover Girl Natureluxe, L'Oreal SSP Magic Smooth, L'Oreal Visible Lift Serum Absolute, and Revlon Colorstay Aqua Mineral were all priced <u>higher</u>, on average, than SuperStay 24HR Makeup, indicating SuperStay 24HR Makeup did not sell at a premium compared to them.[116]   Therefore, if the alternative products the putative Class members would have purchased were Revlon Photo Ready, Cover Girl Natureluxe, L'Oreal SSP Magic Smooth, L'Oreal Visible Lift Serum Absolute, or Revlon Colorstay Aqua Mineral, they would have suffered no injury as a result of having purchased SuperStay 24HR Makeup.

---

[114] Goldstein Deposition, Exhibit 5. (MAYB_ALG_000658 – 677, at 673.)

[115] Goldstein Deposition, Exhibit 5. (MAYB_ALG_000658 – 677, at 675.)

[116] The drug store sales channel had the highest average price, $10.37, in 2011 across all sales channels for SuperStay 24HR Makeup. All products listed had an average price in 2011 greater than $10.37.

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013

_____

56.    In addition, as discussed earlier in this section of my report, the prices of the SuperStay 24 Products vary greatly across a number of different dimensions (e.g., geographic region, retailer).   However, the variation in prices amongst the example comparator products in the price premium calculation above is substantial.

57.    According to Ali Goldstein, SuperStay 24 2-Step Color not only competes against other 2-Step lip color products in the market, but also against general long-wear lip color products and regular lip color products.[117]   Similarly, SuperStay 24HR Makeup may compete against long-wear foundation products and regular foundation products.[118] Therefore, to the degree that putative Class members may claim that these products are considered to be potential alternatives to SuperStay Products, there would be substantial variability among the alternative products, their prices, and their features and benefits.

58.    In addition, Plaintiffs have not demonstrated that the only reason consumers would pay the alleged "premium price" of SuperStay 24 Products is due to the Challenged Claims. As discussed earlier in my report, the survey results of Dr. Seggev have demonstrated that purchasers of SuperStay 24 Products purchase the products for a variety of reasons, with only a very small percentage of purchasers indicating that they purchased the SuperStay 24 Products because they expected durations of 24 hours or greater.

59.    Lastly, it is my understanding that certain promotional opportunities such as coupon usage and shopper cards are not reflected in the IRI data.   Consequently, the price variations discussed above between promoted prices and non-promoted prices do not take into account usage of coupons and shopper cards.   To the extent that coupons and

---

[117] Goldstein Deposition, p. 21.

[118] Goldstein Deposition, p. 21.

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013
_____

shopper cards are available to putative Class members, the observed variation of prices

sold to members of the putative class would increase, which would further demonstrate

the necessity of individual inquiry to determine the actual price paid by individual

putative Class members when purchasing SuperStay 24 Products.

### C. <u>Summary</u>

60.     Analysis of the IRI data and reviews of SuperStay 24 Product prices on various online

retailer websites demonstrates that there are wide variations in the retail prices of

SuperStay 24 Products and that many factors affected the actual sales prices paid by

consumers for SuperStay 24 Products during the putative Class period.  These factors

include at least (a) sales channel, (b) retailer, (c) geographic market, and (d) promotions

utilized.  The data support the conclusion that there is no single average purchase price,

whether for the SuperStay 24 Products or products that Plaintiffs may claim would have

been purchased in the alternative, that the Named Plaintiffs could use to evaluate claimed

damages on a Class-wide basis.  The wide variations in the retail prices of SuperStay 24

Products and potential alternative products necessitate individual inquiries to identify the

prices paid by putative Class members for the Challenged Products.   Because of the wide

variations in retail prices associated with SuperStay 24 Products, whether putative Class

members were injured, and if so, by what amount, cannot be determined reliably on a

class-wide basis, using common proof.

## IX.    <u>LACK OF EVIDENCE TO DETERMINE INDIVIDUAL PUTATIVE CLASS MEMBERS' ALLEGED ECONOMIC INJURY</u>

61.     Compounding the above considerations, putative Class members are unlikely to (a) have

kept all or any of the receipts associated with their respective purchases of SuperStay 24

Products, (b) remember the prices they paid for SuperStay 24 Products, and/or (c) be able

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013
_____

to substantiate the quantity or the prices associated with their purchases of SuperStay 24

Products.   In particular, it is my understanding that the Named Plaintiffs have not

provided documentary evidence to substantiate the actual prices they paid for SuperStay

24 Products, as evidenced by the following deposition passages:

a.  Yanira Algarin.

> **Q.** How much did you pay for SuperStay LipColor when you bought it in September
> 2012?
> **A.** Something around like $10, something around 12 to 10, something like that.  I
> don't recall the specific amount.[119]

> **Q.** Do you have a receipt for your purchase that day?
> **A.** No, I don't.  I know I should have.  I usually keep them for a couple of weeks, but
> that I just toss them.[120]

b.  Patsy Murdock.

> **Q.** How much did you pay for SuperStay Foundation when you purchased it?
> **A.** It was approximately $12.
> **Q.** Do you have a receipt for that purchase?
> **A.** No.  Just my bank statement.
> **Q.** Do you have any other documents other than your bank statement that would
> confirm how much you paid for the foundation?
> **A.** No, I do not.
> …
> **Q.** Do you have a debit card statement that does correspond to your purchase of
> SuperStay Foundation?
> **A.** I do.
> …
> **Q.** Do you know how much it indicates you paid for SuperStay Foundation that day?
> **A.** No, because when I went in there, I just didn't buy that.  I bought other stuff.[121]

> **Q.** How much did you pay for SuperStay LipColor when you purchased it?
> **A.** $10.  Approximately $10.
> ...

---

[119] Deposition of Yanira Algarin taken on October 30, 2013 ("Algarin Deposition"), p. 48.

[120] Algarin Deposition, p. 49.

[121] Deposition of Patsy Murdock taken on October 30, 2013 ("Murdock Deposition"), pp. 69 – 70.

_____

> **Q.** Did you buy anything else from Walgreens that day other than SuperStay LipColor?
> **A.** Yes, I did.
> …
> **Q.** Do you have a receipt for your purchase of SuperStay LipColor?
> **A.** No, I do not.  I just have the date that I was there and my debit.
> **Q.** What do you mean by your debit?
> **A.** My debit card, the bank statement showing where I was in Walgreens that day.
> **Q.** Other than a debit card statement, do you have any other documents that would confirm how much you paid for SuperStay LipColor that day?
> **A.** No, I do not.
> **Q.** Do you normally keep your receipts for purchases of cosmetics?
> **A.** No, I do not.[122]

62.     In addition to not having documentary evidence of their respective purchases, the price allegedly paid by Ms. Algarin for the SuperStay 24 2-Step Color differs from the corresponding prices in the IRI data I reviewed.  Ms. Algarin stated that she purchased the SuperStay 24 2-Step Color for $10 from a Wal-Mart in Lemon Grove, CA in September 2012.  However, according to IRI data I reviewed, Wal-Mart's non-promotion price in 2012 ranged between $7.92 and $7.93 across its various business divisions.[123]  Moreover, assuming Ms. Algarin purchased the product at Wal-Mart, the price paid would not be broadly representative of the prices paid by others in the putative Class.

63.     As discussed previously, sales data indicate that SuperStay 24 Products are sold through different sales channels, at different retailers, in different geographic markets, and with and without promotions.  Consequently, purchasers of SuperStay 24 Products have paid a wide range of prices for their purchases.  Complicating this diversity in prices paid is the likelihood that putative Class members would not be able to produce documentary evidence to substantiate their purchases of SuperStay 24 Products, including the quantity

_____

[122] Murdock Deposition, pp. 49 – 50.

[123] IRI Data.  ("Copy of Maybelline Superstay 24 HR Pricing Details (11-4-13) Updated  Formatted  .xlsx")

Expert Report of Keith R. Ugone, Ph.D.
December 9, 2013
_____

of purchase and the actual prices paid.  In the absence of such evidence, it would not be possible to reliably determine the economic damages allegedly suffered by individual putative Class members, especially on a Class-wide basis.  For example, it would be difficult to determine if individual putative Class members were repeat purchasers or one-time purchasers, an important distinction as repeat purchasers have demonstrated that they have not suffered any harm and thus should not receive any compensation from Maybelline.  In this matter, the facts and circumstances indicate that the appropriate analyses concerning alleged economic inquiry are not amenable to Class-wide proof, which is compounded by a lack of evidence that would be needed to determine the alleged economic injury on an individual putative Class member basis.[124]

\* \* \* \* \* \*

64.    My analyses and opinions contained in this report are based upon information available to date.  I reserve the ability to review documents, deposition transcripts, or other information still to be produced by the Parties to this dispute and to supplement my opinions based upon that review.


*Keith R. Ugone*

Keith R. Ugone, Ph.D.
December 9, 2013

_____

[124] Additionally, I understand that some purchasers of SuperStay 24 Products have been dissatisfied with their respective duration experiences and have communicated their dissatisfaction with Maybelline directly.  It is my understanding that these purchasers have contacted L'Oreal's Customer Care Center about their experiences with the SuperStay 24 Products and that many of these purchasers were compensated for their dissatisfaction by Maybelline.  The presence of a channel for dissatisfied purchasers to be compensated for their purchases of the SuperStay 24 Products indicates that there exists an alternative means of compensation to putative Class members and that some putative Class members have already been compensated by Maybelline, providing further evidence that the appropriate analyses concerning alleged economic inquiry are not amenable to Class-wide proof. (Declaration of Patricia Erin DeVincenzo dated September 20, 2013, pp. 1 – 2. MAYB_ALG_010025_CONFIDENTIAL.xls; MAYB_ALG_010026_CONFIDENTIAL.xls.)

# Exhibit  1

CONFIDENTIAL



Main 1 214 523 1400    Fax 1 214 523 1401    www.analysisgroup.com

2911 Turtle Creek Boulevard    Suite 600    Dallas, TX    75219

# KEITH R. UGONE, PH.D.
**Managing Principal**
Phone: (214) 523-1405
kugone@analysisgroup.com

Dr. Keith R. Ugone has provided economic and damages consulting services in antitrust cases, breach of contract cases, business interruption cases, employment / loss of earnings cases, intellectual property cases, lender liability cases, professional negligence cases, and securities-related cases, among others. He specializes in the application of economic principles to complex business disputes and is generally retained in cases requiring economic analyses and/or damages-related analyses. Damage models constructed or evaluated by Dr. Ugone have had as components revenue analyses, lost sales analyses, cost analyses, assessments of the capacity to produce additional units, assessments of profitability, the competitive business environment in which the damages claim was being made, claimed lost profits, claimed lost business value, and claimed reasonable royalties. During the course of Dr. Ugone's career, he has frequently evaluated lost profits and valuation-related damages using large databases of information and complex computer models. Dr. Ugone also has performed economic liability analyses in antitrust matters including defining relevant markets, assessing market power, and evaluating alleged anticompetitive behavior. Dr. Ugone has testified at trial and in deposition over 200 times.

Dr. Ugone has a PhD in Economics from Arizona State University, an MA in Economics from the University of Southern California, and a BA in Economics from the University of Notre Dame. Subject areas of expertise include microeconomics, macroeconomics, industrial organization, antitrust/regulation, and econometrics. He is a member of the American Economic Association, the American Statistical Association, the National Association of Forensic Economists, and the Western Economics Association.

## EDUCATION

| 1983 | Ph.D., Economics, Arizona State University. |
| 1979 | M.A., Economics, University of Southern California. |
| 1977 | B.A., Economics, University of Notre Dame. |

## PROFESSIONAL EXPERIENCE

| 2004 - Present | Analysis Group, Dallas, Texas – Managing Principal. |
| 1985 – 2003 | PricewaterhouseCoopers LLP (and legacy firms) – Partner (Principal) 1992 – 2003; Senior Manager 1989 – 1992; Manager 1987 – 1989; Senior Consultant 1985 – 1987. Member of United States Admissions Committee (2003). Chairman of PricewaterhouseCoopers Intellectual Property Leadership Forum (2000 – 2003). |
| 1983 – 1985 | California State University, Northridge - Assistant Professor/Lecturer in Department of Economics, Full-time: 1983 – 1985, Part-time: 1986 – 1992. |
| 1979 – 1983 | Arizona State University - Faculty Associate/Teaching Assistant in Department of Economics. |
| 1977 – 1979 | Jet Propulsion Laboratory - Economic/Energy Analyst. |

## PROFESSIONAL AND BUSINESS AFFILIATIONS

American Economic Association
American Statistical Association
National Association of Forensic Economists
Western Economics Association

## SELECTED LITIGATION CONSULTING EXPERIENCE (by Nature of Suit)

### Securities:  10b-5 / Section 11 Cases

- Evaluated the economic damages being asserted by shareholders and debt holders of a bankrupt energy trading company against a brokerage firm.  Plaintiffs alleged the brokerage firm recommended the stock and debt securities associated with the company even though it knew or should have known the deteriorating pre-bankruptcy financial condition of the company.  Analyzed the trading patterns of the brokerage account customers and the stock price movements of the company upon issuance of analyst reports, and researched confounding events contributing to investors' trading of the securities-in-question.  Demonstrated an economic causal link did not exist between the alleged wrongful conduct and the claimed trading patterns.  Also evaluated the event study conducted by Plaintiffs' damages expert and the claimed inflation component embedded in the company's stock price.  Demonstrated Plaintiffs' damages expert failed to remove the economic impact of confounding events.  Performed an alternative damages evaluation.

- Evaluated shareholder and debt holder claimed damages against a major accounting firm relating to the issuance of allegedly false and misleading financial statements that did not identify certain assets of a communications company as impaired.  Researched industry reports and analyst reports regarding the company's common stock and debt securities, evaluated an event study conducted by Plaintiff's damages expert, analyzed loss causation in accordance with *Dura*, studied the company's stock price movements before and during the claimed class period, and analyzed the company's stock price movement on the day of the alleged corrective disclosure.  Demonstrated Plaintiffs' event study did not appropriately isolate the stock price movement associated solely with the alleged corrective disclosure as confounding events were not removed from the analysis.  Performed an alternative damages calculation.

- Evaluated Plaintiffs' damages claim in a shareholder suit relating to the manufacturer of decoding equipment used in the wireless cable industry.  Analysis demonstrated Plaintiffs' financial expert did not consider market speculation related to the wireless cable industry or Defendant's higher-than-expected earnings when calculating claimed damages.  Additional errors included aggregating into claimed damages stock price increases unrelated to Plaintiffs' allegations and on "no announcement days".

- Evaluated damages claim against a major investment banking/underwriting firm relating to an aborted initial public offering in the temporary staffing industry.  Analysis demonstrated methodological and conceptual errors in Plaintiff's econometrically-based claim that the projected post-IPO stock price of the company justified proceeding with the IPO.  Also evaluated various components of Plaintiff's damages claim, including the profitability of Plaintiff's business, projected use of funds raised, ownership percentages in the company, and the funds that would have inured to the original owners of the company.

- Evaluated Plaintiffs' damages claim in a shareholder suit involving an international airline carrier.  At issue were alleged misrepresentations concerning the airline's ability to reduce its maintenance costs.  Demonstrated that the fifty percent decline in the company's stock price over a one-month period was for reasons unrelated to corrective disclosures concerning maintenance costs.  Also reconstructed Plaintiffs' trading history, comparing the trading pattern to public announcements concerning the airline, and demonstrating a trading pattern inconsistent with Plaintiffs' theory of reliance on the alleged misrepresentations.

- <u>General Overview</u>.  Performed an "event study" and/or evaluated claimed damages in various securities litigation cases involving firms in industries such as:  airlines, biotechnology, computer software, commodities, banking, real estate development, life insurance, entertainment, communications, energy trading, investment banking, computer printers, health care, medical equipment, hotels, non-traditional automotive insurance, information technology services, workmen's compensation insurance, computer hardware, camera and photo finishing, intelligent disk drives, market research, trucking, temporary staffing, real estate investment trusts, computer networking, specialty stores, skilled nursing facilities, wireless cable encoding devices, the provision of software computer services to insurance companies, and the provision of professional services to power plants and large scale industrial facilities.  Analyses included development of an appropriate peer group and isolation of economy-wide, industry-specific, and company-specific factors impacting the particular firm's stock price.  Company-specific events often included unfavorable news announcements unrelated to the alleged misrepresentations and the ending of potential takeover bids.  Also involved was a comparison of the firm's actual stock price to its "true value" line, the construction of a matrix to track ins-and-outs traders and retention shareholders, and an evaluation of damages under Section 10b-5 and Section 11 claims.

**Securities:  Merger/Takeover Related Cases**

- Evaluated claimed damages against a major accounting firm by a transportation company that acquired another transportation company in alleged reliance upon the audited financial statements of the acquired company and its Mexican subsidiary.  Plaintiff wrote down its investment in the Mexican subsidiary after the acquisition and based its damages claim on a subsequent decline in its stock price.  Analyses included researching competing transportation companies, considerations associated with consummating the merger, analyst reports regarding the merger announcement and the investment write-down announcement, and earnings announcements from comparable companies.  Demonstrated Plaintiff's damages expert did not establish an economic causal link between the alleged wrongful conduct of the Defendant and the claimed economic damages suffered by the Plaintiff and that confounding events were not taken into account appropriately.

- Evaluated Plaintiffs' damages claim relating to a merger in the banking industry.  At issue was whether material adverse changes regarding loan loss reserves had occurred but were not disclosed.  Analyzed whether the complained of events were related to conditions and circumstances in the banking industry.  Also analyzed the value of alternative offers for the target bank and the pre-merger volatility in the acquiring bank's stock price.

- Evaluated Plaintiffs' claimed damages in a breach of contract matter involving the aborted sale of assisted living facilities.  Analyzed current trends in the assisted living industry, the financial condition of the target company, the projected financial results of certain to-be-constructed properties, and the target company's performance relative to projections.  Also at issue was whether a material adverse change had occurred in the target company's operations and business.  Lost profit damages, interest-related damages, lost contract fees, and diminution-in-value damages were evaluated.

- Evaluated Plaintiffs' damages claim in a merger/acquisition-for-stock litigation in the information technology services industry.  At issue was whether material adverse changes had occurred in the business condition of the acquiring company prior to the closing of the merger.  Damages issues included investigating the nature of the agreed upon warranties and representations contained in the merger agreement, the stock price performance of similarly-situated firms, the length of the alleged damages period, the appropriate length of certain event windows, industry downturns, and the failure to account for the proper mitigation of damages.

- Analyzed a major entertainment company's stock price movement to determine the takeover premium paid by an acquiring company.  Involved was quantifying the impact of takeover rumors prior to the takeover announcement to isolate that portion of the company's pre-acquisition increase in stock price due to takeover speculation as opposed to general industry trends.

*Keith R. Ugone, page 4*

- Served as financial advisor to a Special Litigation Committee ("SLC") investigating a shareholder approved merger vote in the telecommunications industry. The merger was not consummated, but the vote triggered the acceleration of vesting of options owned by the officers and directors of the target company. Assisted the SLC in analyzing the acceleration of options and various alternative settlement strategies.

## Securities/Commodities:  Other Cases

- Evaluated Plaintiff's claimed lost enterprise value damages relating to Defendants' allegedly fraudulent conduct resulting in an artificial acceleration of income, restatement of income, and ultimate bankruptcy of a food distribution company. Analyses included isolating the dollar magnitude of the alleged artificial acceleration of income allegedly created by Defendant's actions compared to other artificial accelerations of income, an assessment of alternative reasons for Plaintiff's business decline and ultimate bankruptcy, and evaluation of Plaintiff's valuation approaches.

- Evaluated the spot price of a base metal in a major commodities-related market manipulation matter. Developed an econometric model to explain the spot price movements of the base metal in an un-impacted period. Used the econometric model to evaluate what the spot price of the base metal would have been in the absence of the alleged manipulation.

- Calculated short-swing trading profits under Section 16(b) of the Securities Exchange Act of 1934 relating to the stock trading activities of an officer of a long distance telecommunications company. Issues analyzed included allocating stock purchases to stock sales of differing numbers of shares and accounting for a 3-for-1 reverse stock split during the period under consideration.

- Evaluated damages in an alleged lack of suitability, lack of supervision, and failure to execute matter in the securities industry. At issue was an investment strategy of selling short the same stock in which a restricted long position was also held. Demonstrated errors in Plaintiff's damages claim, including the failure to recognize that the financial objectives stated at the time of the development of the investment strategy were in fact met.

- Evaluated the stock price performance of a major distiller over a forty-year period. At issue was whether a portion of the increase in the stock price could be attributed to the efforts of one senior official in the corporation. Company-specific, industry-specific, and economy-wide factors were investigated to determine the reasons for the stock price performance of the distilling company.

## Antitrust:  Monopolization/Attempted Monopolization Cases

- Evaluated claimed antitrust damages asserted by a major airline company against a global distribution system ("GDS") operator for alleged anticompetitive behavior relating to the provision of booking services to travel agencies. Evaluated Plaintiff's claimed damages relating to claimed lost profits resulting from the Defendant's alleged actions to impede the rollout of a competing technology for booking services, contractual restrictions allegedly preventing the airline from offering targeted discounts to price-sensitive customers, allegedly imposing retaliatory booking fee increases, and allegedly biasing fare search results displayed to travel agencies.

- Analyzed Plaintiff's allegations that Defendant monopolized or attempted to monopolize the market for magnetic brakes for amusement park rides. Evaluated Plaintiff's assessment of the relevant product market, allegations of market power, and the impact of Defendant's alleged anti-competitive conduct. Also evaluated claimed damages, including assumptions underlying Plaintiff's claimed damages model and economic causal connection between the alleged wrongful conduct and claimed losses. Determined that Plaintiff's expert failed to account for alternative explanations for Plaintiff's claimed losses. Also demonstrated that Plaintiff's expert made inappropriate assumptions regarding growth in the claimed relevant product market and whether Plaintiff was damaged in perpetuity.

- Evaluated Plaintiff's economic liability arguments in an antitrust matter relating to a restriction on the registration of cloned American Quarter Horses with the American Quarter Horse Association. Evaluated Plaintiff's expert's theoretical economic model. Demonstrated that there was no economic harm to the market as a result of the at-issue registration restriction. Also identified numerous flaws in Plaintiff's expert's assumptions regarding the supply and demand of high quality American Quarter horses (including excess breeding capacity). Evaluated Plaintiff's damages claim relating to lost sales of cloned American Quarter horses and lost breeding opportunities.

- Evaluated the claimed anticompetitive impact of an alleged conspiracy by a major oil and gas exploration company to monopolize the market for Helicopter Underwater Egress Training ("HUET"). Evaluated the relevant product and geographic markets and the alleged market power of the Defendant. Demonstrated that the Defendant lacked the market power necessary to monopolize the relevant market. Also demonstrated the flaws in Plaintiffs' damages claim, including but not limited to, loss of Plaintiffs' market share for reasons other than the alleged anticompetitive acts (e.g., self-imposed price increases and the loss of a large customer unrelated to the alleged wrongful conduct), failure to take into account the general economic downturn in the U.S. economy during the relevant period, the use of an inappropriate discount rate for quantifying claimed future damages, and the use of an inappropriate assumption relating to future claimed market shares in the absence of the alleged wrongful conduct.

- Evaluated the competitive impact of certain covenants not to compete associated with restricted stock unit awards issued to operations management employees by a major dairy processor. Evaluated the relevant product and geographic markets. Concluded that the covenants not to compete were overly broad and restrictive, outweighing any precompetitive benefits associated with the covenants. Concluded that the covenants did not contain reasonable limitations as to time frame and scope of activity. The covenants effectively restricted competition and raised rivals' costs in the relevant market.

- Evaluated Plaintiff's damages claim associated with the assertion that certain freight forwarders engaged in bid rigging, price fixing, group boycott, and illegal tying arrangements in a traffic channel for transporting military household goods. Demonstrated the flaws in Plaintiff's damages claim, including but not limited to, declines in revenues and profits prior to the alleged conspiracy period, alternative reasons for the Plaintiff's poor performance during the claimed damages period (e.g., the closing of military bases and increased competition in one leg of the channel), and the use of an inappropriate benchmark period for quantifying claimed damages.

- Evaluated the anticompetitive impact of an alleged conspiracy between a distributor and manufacturer whereby the manufacturer refused to ship certain aftermarket automotive exhaust systems and catalytic converters to a competing distributor in Washington and Oregon. Analyses included evaluating the relevant product and geographic markets for aftermarket automotive exhaust products and the damages suffered by the competing distributor. Also evaluated the competing distributor's direct and indirect price discrimination claims (including differential discounts in areas where shipments did occur) and associated claimed damages.

- Analyzed various monopolization allegations in an antitrust counterclaim to a patent infringement matter in the home lighting control systems industry. Analyzed the trade practices of the home lighting control system manufacturers (e.g., sales channels, advertising and promotion, etc.), product and geographical markets, and the potential substitutes to the products at issue. Analyses demonstrated counterclaim Defendant did not possess the ability to monopolize the relevant market for home lighting control products given the channels through which manufacturers made sales and the availability of close substitute products.

- Evaluated Plaintiff's economic liability arguments in an antitrust counterclaim relating to a supply agreement for an ingredient (i.e., larch arabinogalactan) contained in certain patented dietary and nutritional supplements for the promotion and maintenance of good health.  Concluded that (a) the sales agreement in question did not constitute an unreasonable restraint on trade, (b) the Defendant did not possess monopoly power, and (c) the Defendant did not engaged in anticompetitive behavior in any properly defined relevant market.  Observed that the prices of dietary supplements containing arabinogalactan did not increase since the signing of the sales agreement, the output of dietary supplements containing arabinogalactan did not decline since the signing of the sales agreement, (c) the capacity to produce additional arabinogalactan had been increasing, and (d) Plaintiff did not face a dangerous probability of being harmed by the supply agreement.

- Evaluated claimed antitrust damages asserted by the holder of certain common packet channel ("CPCH") technology patents against a group of handheld mobile device hardware and infrastructure manufacturers for an alleged conspiracy to deprive the patent holder of the value of its patented technology in the third generation partnership project ("3GPP").  The patent holder's technology had been removed as an optional standard.  Damages-related analyses included conducting a *Georgia-Pacific* analysis and analyzing the licenses identified by Plaintiff's expert as comparable to the patents at issue.  Also determined that Plaintiff's expert had not established an economic causal link between the alleged wrongful conduct and the damages being claimed.

- Evaluated the claimed anticompetitive activities of Defendant hospital's alleged exclusionary arrangements and practices relating to managed care contracts.  Evaluated the relevant antitrust markets (product and geographic) for primary care services provided by physicians to managed care-covered patients in Smith County, Texas.  Also evaluated the volume of commerce impacted by the claimed exclusionary practices and the impact of these claimed exclusionary practices on competition in the relevant markets.  In addition, evaluated the economic damages suffered by the Plaintiff hospital as a result of Defendant's alleged anticompetitive activities.

- Evaluated Plaintiff's claim of antitrust injury in the markets for orthodontic brackets and orthodontic services allegedly due to the advertising guidelines promulgated by a national orthodontic trade association.  Analysis demonstrated the advertising guidelines were efficiency enhancing (by lowering consumer search costs), promoted competition, and did not stifle innovation in the relevant markets.  Also empirically demonstrated that legitimate advertising through a variety of media was not impacted by the advertising guidelines.

- Evaluated distributors' claims of past lost profits, future lost profits, and reductions in franchise values in a carbonated soft drink antitrust litigation.  Defendants allegedly entered into a series of anti-competitive marketing agreements with retailers relative to the promotion and sale of national brand carbonated beverages.  Analysis demonstrated Plaintiffs' expert did not take into account the brand composition of Plaintiffs' case sales, underestimated variable costs of distribution, did not adjust for increased competition from private-label brands and other drinks, and failed to account for the lack of advertising and other promotional support from the distributors' parent company.

- Analyzed the impact of a proposed merger of two insurance companies on the long term care and medicare supplement insurance markets in the state of Oklahoma.  Evaluated whether the merger would substantially lessen competition or have a tendency to create a monopoly.  Evaluated the number of competitors, the reasonable interchangeability of the insurance products offered, insurance company sizes, ease of entry, the impact of regulation, and the ability of consumers to acquire price information in a low-cost manner.

- Analyzed the alleged anticompetitive impact of an exclusive provider arrangement between a hospital and a group of anesthesiologists on the market for anesthesia services.  Analyses included determining inpatient services market shares, anesthesia procedures market shares, and recent entry into the hospital service area.  Also evaluated the damages claims being alleged by a group of Certified Registered Nurse Anesthetists.

- Conducted an economic analysis in a vertical non-price (advertising) restraint antitrust case dealing with tennis ball throwing machines. Analysis demonstrated the pro-competitive nature of the advertising restraint and that the termination of a non-complying dealer did not substantially reduce competition in the relevant market.

- General Overview. Provided economic analyses and developed damages models and/or critiqued the opposition's damages models in various antitrust cases involving the following industries and/or markets: anesthesia services, printed circuit boards, nutritional supplements, carbonated soft drinks, aftermarket automotive exhaust systems, telecommunications switching equipment, dairy processing, radio control model airplanes, local area networks, entertainment lighting, integrated casino bonusing software, home lighting control systems, medicare supplement/long term care insurance, commercial air conditioning units, disposable dust/mist respirators, immunodiagnostic tests, in-patient hospital services and managed care contracts, PBX systems, military freight forwarding, underground storage tanks, long distance telephone lines, tennis ball throwing machines, check processing readers/sorters, local television advertising, personal watercraft, automobile refinishing paint, Christian music, subsea horizontal extraction wells, orthodontic braces, DRAM microcomputer chips, women's designer clothes, single point of contact telecommunication services, non-prescription reading glasses, and the provision of temporary electrical services to convention centers. Damages models were constructed or critiqued that involved lost sales analyses, incremental cost analyses, and assessments of capacity increases. Also investigated were economic forces external to the company that may have impacted the company's performance. Economic analyses included defining the relevant market, assessing the presence or absence of market power, evaluating whether a business activity was pro-competitive or anti-competitive, and/or evaluating the level of competition in a particular market.

## Antitrust: Price Fixing Cases

- Evaluated Plaintiffs' claimed damages relating to allegations of an industry-wide price fixing conspiracy among the defendant manufacturers of polyether polyol products. At issue were the alleged overcharges relating to sales of TDI, MDI, and polyether polyols during the alleged conspiracy period. Analyses included evaluating Direct Action Plaintiffs' and Class Plaintiffs' econometric pricing models which purported to show alleged overcharges (and the unreasonableness of the claimed overcharges in light of existing profitability levels). Also assessed indicators of competition in the relevant market, including evidence of supplier switching by Plaintiffs, changes in defendants' market shares, and pricing patterns of the at-issue products.

- Evaluated allegations of price-fixing among freight companies relating to bids to ship the household goods of U.S. Armed Forces' members and civilian employees of the U.S. Department of Defense between Germany and the U.S. Analyses included an investigation of the efficiency-enhancing economic benefits provided by the at-issue "landed rate" pricing system. Also evaluated Plaintiff's claimed damages allegedly associated with elevated rates and alternative factors contributing to claimed elevated rates unrelated to claimed conspiracy. Evaluated Plaintiff's econometric model used to purportedly identify claimed overcharges.

## Antitrust: Predatory Pricing/Price Discrimination Cases

- Evaluated differences in prices paid by a plaintiff distributor relative to those paid by a competitor in a price discrimination case involving the distribution of aftermarket exhaust systems. Analyses included an evaluation of the relevant product and geographic market for the at-issue products as well as damages caused by the alleged anticompetitive behavior.

- Evaluated the relevant product and geographic markets and impact on competition in a price discrimination case involving a manufacturer of lighting products and the prices charged to various distributors. Analyses included an investigation of the primary-line market (i.e., competition among manufacturers of lighting products) and the secondary-line market (i.e., competition among distributors). The impact on competition among the distributors of lighting products was investigated (and whether a substantial lessening of competition occurred) given the pricing policies of the manufacturer.

- Reviewed the newly proposed pricing structure of a major magazine distributor to identify the efficiency enhancing attributes of the proposed pricing structure as well as potential discriminatory effects. The proposed pricing structure was a major change from industry practices and included per copy distribution fees and excess return fees.

- Evaluated the economic and damages-related claims made in a major price discrimination case in the pharmaceutical industry. At issue were the additional sales and profits that would have been made by grocery drug stores and retail drug chains in the absence of the alleged price discrimination.

- Conducted various industry and firm-specific analyses in a major wholesale bread predatory pricing case. Bread industry studies included analyses of industry profitability rates, the changing size distribution of firms in the industry, and general trends in wholesale bread prices. Firm-specific studies included analyses of advertising rates, "cripple" (i.e., reject) rates, and "stale" (i.e., return) rates. Also involved was a critique of Plaintiff's calculation of Defendant's average variable cost of producing and distributing a loaf of bread.

- Calculated the average cost of servicing a three-yard bin of trash in a solid waste disposal predatory pricing case. Also included was an analysis of number of routes and bin pickups per route.

## Antitrust: Tying Cases

- Evaluated certain economic and damages claims made by a local television station against a television program syndicator. At issue was an alleged unlawful tying arrangement relating to the claimed requirement to license *Becker* in order to license *Judge Judy* and *Judge Joe Brown*. Demonstrated the syndicator did not possess market power in a properly defined market since substitution existed between different genre of television programs, between different syndicators, between different demographic groups, and between different types of syndicated programming (i.e., first-run, off-network, and evergreen programming). Also demonstrated that the pricing patterns of the syndicator were inconsistent with the antitrust claims being made.

- Evaluated an unlawful tying claim brought by a pizza franchisee against its franchisor. Franchisees were required to purchase equipment and supplies from an approved supplier owned by the pizza franchisor. Plaintiff alleged the claimed unlawful tying arrangement was enforced through threats of termination of the franchise agreement. Demonstrated that the pizza franchisor did not possess market power in the consumer market for pizza, in the provision of equipment and supplies to franchisees, or in the market for pizza franchises. Also demonstrated the economic justifications for the requirement (i.e., maintaining quality standards, uniformity of operations, and protection of brand name).

- Critiqued Plaintiff's damage model in an alleged tying case dealing with automotive CAD/CAM design software (the "tying" good) and mainframe timesharing (the "tied" good). At issue was the total size of the market, the likelihood of entry, and the market share of the Plaintiff in the absence of the alleged tie. Also investigated was the likelihood that design vendors would place the software on their own mainframes rather than timeshare.

- Analyzed the fast food point-of-sale ("POS") equipment and software industry in an alleged tying case. Demonstrated that a particular POS product was not a relevant market based on the reasonable interchangeability of various brands of fast food POS equipment from the perspective of the consumer (fast food restaurants). Also analyzed the degree of price competition, non-price competition, ease of entry, and relative market shares of fast food POS equipment manufacturers.

## Business Interruption/Interference Cases

- Evaluated Plaintiffs' claimed damages in a tortious interference, business disparagement, and breach of contract matter dealing with the licensing of testing equipment in the petrochemical piping inspection industry. Demonstrated Plaintiff's expert committed errors relating to the duration of the contracts in dispute, system license fees, cost of replacement systems, pricing of services, utilization of the test systems, and mitigation of future damages.

- Evaluated Plaintiff's claimed damages from a lost bid to retrofit a refinery in Pakistan. Analyzed Plaintiff's allegations that Defendants made untrue statements to the bid evaluation team concerning Plaintiff's net worth, working capital, and profitability trends. Evaluated Plaintiff's claimed damages using as a benchmark prior engineering projects completed by Plaintiff.

- Calculated damages suffered by the owner of numerous mobile home parks due to the actions of a Defendant in a case involving alleged intentional interference with contractual relations. Involved was an analysis of occupancy rates, a projection of park revenues in the absence of the alleged interference, and an analysis of mobile home park incremental profitability rates.

- Evaluated the damages sustained by a cosmetic company as a result of defective decorated glass containers being furnished for its new therapy products. Evaluated and/or verified product retrieval costs, retrieval program administration costs, customer goodwill replacement gift costs, waste disposal costs, and lost profits on the therapy products. The lost profits analysis included assessing the life cycle sales pattern of new cosmetic products introduced by the company.

- Evaluated damages relating to the introduction of a new popcorn product line in a business interruption dispute. The introduction of the new popcorn product line was aborted due to defective containers. Analyses undertaken included determining the cost of popcorn, the cost of popcorn bags, freight costs, as well as the projected revenues associated with popcorn sales. An assessment was also made of the supermarket outlets and territories in which the popcorn would have been sold.

- Evaluated Plaintiffs' damages claim relating to the installation of an allegedly defective computer software system at an automobile dealership. Plaintiffs contended the software had defects adversely affecting the accounting system and day-to-day operations of the dealership, and submitted an "increased cost" damages claim. Analysis demonstrated Plaintiffs' expert used an inappropriate methodology for measuring damages and submitted cost increases unrelated to the allegedly defective software.

- <u>Other Matters</u>. Provided deposition questions, economic analyses, and a critique of opposing economists' damage models in various business interruption cases resulting from (e.g.) fires, "lockouts", electrical outages, defective products, and/or injuries to key personnel. Businesses evaluated included a workout facility (gym), a pediatric practice, a balloon manufacturing plant, a radiology practice, and a packaging machine manufacturer.

## Intellectual Property:  Patent Infringement and Patent-Related Cases

- Evaluated the claimed royalty damages the owners of a patent related to the processing of documents with arbitrary XML elements were asserting against a major software manufacturer for allegedly incorporating the patented technology into its software applications. Based upon an evaluation of the historical financial performance of the Plaintiffs before and after the time of the hypothetical negotiation, market demand for and supply of products similar to the allegedly embodying products, the respective economic contributions of the Parties to the successful commercialization of the accused products, and the *Georgia-Pacific* factors, opined to an alternative royalty damages estimate. Also evaluated the four factors outlined in *eBay Inc. v. Mercexchange L.L.C.* and opined that based upon economic considerations an injunction against the accused products was not warranted.

- Analyzed Plaintiff's lost profits and reasonable royalty damages in two separate patent infringement matters relating to scanning, counting, and counterfeit detection technologies in currency discriminators. In both matters, analyzed the *Panduit* and *Georgia-Pacific* factors, constructed a hypothetical negotiation framework, conducted market and industry research, and compiled an accused product sales database. With respect to Plaintiff's lost profits-related damages, performed incremental profit analyses on lost unit sales and ancillary sales. Evaluated Plaintiff's reasonable royalty-related damages taking into account the economics associated with currency discriminator sales. Evaluated damages under a variety of scenarios based upon potential findings of infringement on patents and claims contained in these patents.

*Keith R. Ugone, page 10*

- Evaluated the claimed damages of a foam ear sleeve manufacturer who brought suit against a high-performance professional and personal audio earphone manufacturer alleging patent infringement relating to ear pieces having disposable compressible polymeric foam sleeves. Evaluated Plaintiff claimed royalty damages using market and industry data, a *Georgia-Pacific* factor analysis, and the changing licensing policies of the patent holder over time. Provided an alternative royalty damages analysis. Also analyzed from an economic perspective Defendant's countersuit of alleged patent misuse. Reviewed the patent holder's licensing strategy and certain provisions contained in the licenses into which the patent holder entered. Analyses demonstrated the patent holder's licensing strategy and the provisions contained in its licenses were consistent with the allegation of patent misuse.

- Evaluated Plaintiffs' claimed royalty damages in two separate patent infringement matters relating to video game controllers. The first matter related to six degrees of freedom video controller technology; the second matter related to controller-to-processor voltage technology. In both matters, conducted market and industry research, performed a *Georgia-Pacific* analysis, and evaluated company-specific and controller-related licenses. Also evaluated the key drivers of Defendant's sales including its brand name, innovative products and games, and installed base of gaming console owners. Provided an alternative royalty damages figure.

- Evaluated Plaintiff's lost profits and price erosion damages in a patent infringement matter relating to a method for delivering internet content from a network of content delivery network ("CDN") servers. The suit was brought by a CDN services provider. Evaluated Plaintiff's lost profits-related damages using market share data, adjusting for customer and market segment differences and the likelihood of supplemental sales. Evaluated Plaintiff's price erosion-related damages for selected customers for whom Plaintiff was required to lower rates and/or renegotiate contracts based upon the alleged unlawful competition of the Defendant.

- Analyzed Plaintiff's lost profits and reasonable royalty damages in two separate patent infringement matters relating to status feedback in home lighting control systems. Performed analyses on a large database of invoices relating to sales of the accused products, analyzed end-user surveys, and identified ancillary sales based upon consumer purchasing patterns. Conducted *Panduit* and *Georgia-Pacific* analyses. Calculated Plaintiff's lost sales based upon market share data reflected in industry surveys. Calculated Plaintiff's royalty damages based upon comparable license analyses.

- In a patent infringement matter relating to the air interface protocol of UMTS/WCDMA cellular phone technology, evaluated whether the Plaintiff had offered Defendant a license to the patents-in-suit on fair, reasonable, and non-discriminatory ("FRAND") terms (as required by the European Telecommunications Standards Institute's intellectual property rights policy). Analyzed the economic benefits associated with patents, the economic benefits associated with standard setting organizations, and the economic evidence related to the FRAND principles. Concluded that none of Plaintiff's licensing offers comported with FRAND principles.

- Evaluated Plaintiff's claimed lost profits in a patent infringement suit against a medical device manufacturer producing trocars with floating septum seals. Analyzed market data relating to trocar products, competitors, and market share information. Also analyzed hospital data with respect to product use and conversion between different manufacturers. Demonstrated that Plaintiff had not demonstrated Defendant would have lost sales and Plaintiff would have gained sales in the absence of the alleged infringement. Concluded a claim for lost profits was not warranted.

- Evaluated Plaintiff's claimed royalty damages asserted against a major software manufacturer in a patent infringement matter relating to a pre-fetch concept allowing for the faster loading of operating systems and software applications. Analyzed the financial performance of the patent holder at the time of the hypothetical negotiation, the drivers of demand for the products allegedly embodying the patent-in-suit, the Parties' respective contributions to the successful commercialization of the accused products, the Parties patent licensing approaches, and the relevant *Georgia-Pacific* factors. Opined to an alternative royalty damages estimate.

- Evaluated the joint venture lost profits and reasonable royalty damages in a patent infringement suit brought by a natural gas producer against an energy producer relating to a system for producing natural gas from unconventional reservoirs. Constructed an economic model incorporating complex technical and economic relationships to determine the value of the natural gas likely to be captured from the reservoirs in question. Conducted a *Panduit* factor and a *Georgia-Pacific* factor analysis.

- Evaluated claimed royalty damages in a patent infringement suit against a nutritional supplement manufacturer and distributor for the alleged infringement of two patents relating to hydrosoluble organic salts and certain compositions and methods for enhancing muscle performance and recovery from fatigue in humans. Concluded Plaintiff's expert inappropriately constructed the hypothetical negotiation framework, failed to consider non-infringing alternative compositions, and overstated the claimed reasonable royalty rate in light of licensing evidence.

- Evaluated claimed damages in a patent infringement matter relating to course management system ("CSM") products and services using the Internet to facilitate the interaction of students and instructors. Conducted a *Panduit* and a *Georgia-Pacific* factor analysis. Calculated lost profits and reasonable royalty damages. Also analyzed Plaintiff's business model and revenue types, Defendant's infringing sales based upon customer licensing agreements and contracts, Plaintiff's prior relationship with Defendant's customers, and Plaintiff's incremental profitability.

- Evaluated Plaintiff's royalty damages claim in a suit brought by a patent holding company against a major software manufacturer relating to certain pivot table functionalities in software. Opined to an alternative royalty damages figure based upon an analysis of the *Georgia-Pacific* factors, the demand for the products allegedly embodying the patent-in-suit, the failed licensing attempts by the former owners of the patent-in-suit, and the relative contributions of the Parties to the commercialization of the accused products.

- Evaluated the royalty damages allegedly suffered by a patent holder against a major internet services provider relating to a method for streaming media over the internet (which facilitated the transmission of real-time, high-quality audio information over a communications network to multiple users simultaneously). Demonstrated that the patent holder's economic expert overstated the claimed reasonable royalty rate, overstated the claimed royalty base, and reached conclusions that failed numerous reliability tests. Also demonstrated that the patent holder's economic expert failed to properly recognize the economics associated with internet radio, leading to an incorrect conclusion as to the proper royalty base that would have been agreed upon at the hypothetical negotiation.

- Evaluated claimed damages in a patent infringement matter filed by an operator of a web-based market place against a competing company relating to the submission of automobile purchase requests over the internet. Analyzed market and industry data relating to Plaintiff's line of business, Plaintiff's and Defendant's financial performance, and Plaintiff's and Defendant's respective market shares. Estimated Plaintiff's lost profits damages.

- Evaluated claimed reasonable royalty damages in a patent infringement matter involving 5 defendants relating to congestion management in ATM networks. Analysis included an assessment of sales of ATM network products allegedly containing the patented feature, an analysis of the price of the integrated circuits embodying the accused functionality relative to the price of the entire ATM product, and a review of industry license agreements. Provided alternative reasonable royalty damages based upon the *Georgia-Pacific* factors in addition to a determining the important negotiating points in a hypothetical licensor / licensee negotiation.

- Evaluated claimed reasonable royalty damages in a patent infringement matter relating to implantable rate responsive pacemakers and implantable cardioverter devices ("ICDs"). Analysis included an assessment of alleged infringing sales of pacemakers and ICDs, a review of license agreements, and an analysis of the defendant's cost savings associated with the allegedly infringing technology as compared to its next best alternative. Determined reasonable royalty damages based upon the *Georgia-Pacific* factors, and the important negotiating points in a hypothetical licensor / licensee negotiation.

- Evaluated Plaintiff's lost profits and reasonable royalty damages in a patent infringement matter relating to DVR technology. Analysis included an assessment of Plaintiff's sales of DVR products and monthly subscriptions in the absence of the alleged infringement and an incremental revenue and cost analysis. Determined reasonable royalty damages based upon the *Georgia-Pacific* factors and a determination of important negotiating points in a hypothetical licensor / licensee negotiation.

- Evaluated lost profit damages in a patent infringement matter involving blasting hole drilling rigs. At issue were the lost profits stemming from lost rig sales and lost replacement part sales. With respect to lost rig sales, evaluated the model types, geographic sales coverage, and model prices of the entities involved. Also evaluated the capacity of the Plaintiff to make the additional claimed sales. With respect to lost replacement part damages, evaluated the likely stream of replacement part sales over the life of the drilling rig. Royalty calculations were performed on sales not subject to lost profit calculations.

## Intellectual Property: Theft of Trade Secrets Cases

- Evaluated Plaintiff's claimed damages in a trade secret theft case in the golf equipment industry. Plaintiff claimed disgorgement of global profits and other unjust enrichment due to the alleged misappropriation of certain golf club design trade secrets through the Defendant's sale of the company and assets to a large sporting goods company. Analysis included calculating net profits from the sale of the accused golf clubs and evaluating claimed reasonable royalty damages.

- Evaluated Defendant's assessment of the incremental costs associated with a contract to provide integrated bonusing software to a casino. The contract allegedly was won through the use of misappropriated trade secrets from the Plaintiff. At issue was the allocation of development and common costs to the contract in dispute. Also evaluated Plaintiff's antitrust counterclaim to Defendant's patent infringement suit relating to the technology used as a foundation for the integrated bonusing software.

- Evaluated damages in a theft of trade secrets matter dealing with next generation switching equipment in the telecommunications industry. At issue was the alleged theft of trade secrets when the Defendant firm hired nine employees of the Plaintiff firm. Analyzed Plaintiff's claimed inability to maintain its projected market share, the alleged accelerated entry of the Defendant firm into the next generation switching equipment market, disgorgement measures of damages, and reasonable royalty measures of damages.

- Evaluated damages suffered by a Plaintiff in the business of installing systems delivering ultra-high purity air, water, gas and chemicals to companies manufacturing integrated circuits. Plaintiff alleged a former managerial employee breached his fiduciary duty by engaging in wrongful use of trade secrets, wrongful solicitation of employees and customers, and unfair competition with the original employer. Analysis involved estimating the lost sales and lost profits to the original employer by estimating the number of bid opportunities missed because of the alleged actions of the former employee, adjusting for changing industry conditions.

- Critiqued Plaintiff's damage model in a trade secrets case in the printed circuit board industry. Plaintiff was claiming lost profits due to the misappropriation of trade secrets through Defendant's hiring of four key management personnel from the Plaintiff's company. Issues evaluated included the appropriateness of the "proxy/yardstick" approach undertaken to estimate lost revenues, and the incremental profit rates used to translate lost revenues into lost profits.

## Intellectual Property: Copyright/Trademark/Trade Dress Infringement/False Advertising Cases

- Evaluated Plaintiff's claimed damages relating to the alleged failure of a TV station to deliver contracted gross rating points over a 6-year period. Plaintiff was claiming lost sales and lost profits based upon a regression analysis used to isolate a relationship between sales revenues and advertising. Demonstrated Plaintiff's regression omitted important explanatory variables (e.g., consumer income, promotions, discounts, competitors' prices, and other print and TV advertising conducted by the Plaintiff). Also demonstrated a failure to account for diminishing returns to advertising. Each of these errors served to increase the magnitude of the claimed relationship between sales revenues and advertising.

- Evaluated Plaintiff's unjust enrichment damages claims in a copyright infringement matter brought against a hospital and a construction company relating to a medical building design. Compared budgeted construction costs to actual construction costs and analyzed the revenues received by the construction company associated with the copyrighted attributes of the building design as opposed to unrelated construction costs. Also analyzed the likely demand-related reasons for revenues that would accrue to the hospital unrelated to the design of the hospital.

- Evaluated claimed damages in a false advertising matter involving tooth-whitening products between two large consumer product companies. At issue were allegedly false, misleading, and disparaging statements about Plaintiff's tooth-whitening products in comparative advertisements shown on television. Plaintiff sought to recover lost profits damages associated with reduced sales resulting from the alleged false advertising. Analyses included an evaluation and critique of Plaintiff's expert's claimed damages model including analysis of A.C. Nielsen scanner data and CMR media data. Analysis demonstrated that Plaintiff's expert did not measure properly the impact of the alleged misleading content, failed to account for alternative reasons for Plaintiff's sales declines, and implemented an incorrectly specified econometric model.

- Provided economic analysis relating to claims of unfair competition and misleading advertising in the pizza industry. Using economic indicia such as dollar sales revenue, trends in market share, growth in number of stores opened, same-store sales data, and store closure rates, evaluated whether the commercial success of a particular pizza company was due to customer acceptance of its pizza product or allegedly deceptive advertising. Also investigated the buying patterns of pizza consumers with respect to cross-chain patronage.

- Critiqued Plaintiff's damage claim in a matter involving alleged tortious interference with business relations and allegations of trade dress infringement. At issue was the projected sales and profitability of Plaintiff's tape dispensing machines during a period of alleged tortious interference by the Defendant and Plaintiff's simultaneous alleged trade dress infringement.

- Analyzed the lost profits of a Plaintiff in a trademark infringement case involving a law enforcement product sold through a mail-order catalog. Also analyzed the profits of the alleged infringer and the cost of remedial advertising.

- Assessed damages resulting from the alleged infringement of copyrighted training manuals. Analysis included identifying the corporate clients of the Plaintiff and Defendant firms and the reasons for customer switching unrelated to the use of the proprietary training manuals.

## Intellectual Property: Commercial Success Cases

- Evaluated indicators of commercial success relating to a surgical hernia mesh fixation device employing a patented helical tacker design. Demonstrated that the patented device had achieved significant and sustained sales and sales growth. Also demonstrated that the sales of the patented device had grown faster than the sales of other hernia mesh fixation devices and achieved a majority share of sales when compared to staplers and other hernia mesh fixation products.

- Submitted a rebuttal declaration to the U.S. Patent and Trademark Office relating to the claimed commercial success of intrusion prevention system ("IPS") products asserted to practice a patent undergoing an *Inter Partes* reexamination. Opined that an economic nexus had not been established between the claimed teachings of the patent and the commercial success of stand-alone IPS products. The patent holder had not demonstrated that the claimed teachings of the patent were commercially successful separate and apart from (a) features not claimed by the patent, (b) economic factors extraneous to the claimed invention, or (c) features covered by other patents present in the IPS products.

- Evaluated Plaintiff's analysis regarding the claimed nexus between a patented technology and the commercial success of the accused devices in this patent infringement matter relating to text messaging using a limited keypad such as those found on cell phones. Analyses demonstrated Plaintiff's failed to consider many factors that lead to the commercial success of the accused devices unrelated to the patent in dispute.

## Breach of Contract / Breach of Fiduciary Duty Cases

- Evaluated Counter-Plaintiff's claimed damages arising from Counter-Defendant's failure to honor a most-favored licensee provision in a licensing agreement relating to a semiconductor patent portfolio. Opined as to the economic interpretation of certain licensing terms and the differences and similarities between lump sum, per unit, and percentage of revenue royalty payments. Compared the licensing terms between the Counter-Defendant and another party with the licensing terms between Counter-Defendant and Counter-Plaintiff.

- Evaluated Plaintiffs' claimed damages arising from an alleged breach of contract related to the sale of a community club house and other recreational facilities in an age-restricted residential neighborhood. Plaintiffs' claimed that since they were not given the opportunity to exercise their right-of-first refusal to purchase the contested real estate assets, they lost the value of the equity associated with the real estate assets and they were required to make excessive operating expense payments. Determined that Plaintiffs' expert failed to properly consider the economic factors driving the value of the real estate assets in question.

- Evaluated Plaintiff's breach of contract damages claim relating to the use of a national brand name and other support for the development of a time share resort. Concluded Plaintiff had not demonstrated an economic causal link between Plaintiff's allegations and the quantum of damages being claimed. Adjusted Plaintiff's claimed damages for various conceptual and computational errors, including alternative actions that might have been undertaken by the Plaintiff in the absence of the alleged wrongful conduct.

- Evaluated claimed damages in an alleged breach of fiduciary duty matter between a franchisee and a major fast food franchisor relating to the development and managing of fast-food franchises. Plaintiff claimed economic harm due to franchisor's refusal to grant certain additional franchisees to Plaintiff that Plaintiff claimed would otherwise be in competition with the Plaintiff's existing franchises. Concluded Plaintiff's impact analysis failed to take into account many factors affecting the performance of the Plaintiff's existing franchises that were unrelated to the alleged wrongful conduct.

- Evaluated claimed breach of contract and misrepresentation damages in a suit brought by a global information technology company against a global professional services company relating to a joint venture agreement under which a human resources outsourcing company was formed. Analysis included conducting a client-by-client analysis regarding the specific wrongful conduct associated with each client of the joint venture and estimated the associated economic damages. Based upon certain parameters contained in the contract, also calculated the purchase price overpayment had certain performance issues come to light prior to the closing of the joint venture agreement.

- Evaluated a developer's/franchisee's damages claim against a major sandwich franchisor for the alleged breach of a five-state area development agreement. Reviewed the area development agreement, analyzed the revenues, costs, and profitability associated with franchised outlets, and estimated the Plaintiff's lost franchise fees and lost royalty income based upon various alternative scenarios discussed by the Parties.

- Evaluated the claimed damages of a calling card distribution company due to Defendant's alleged breach of a contract relating to the servicing of the calling cards. Conducted market research on the calling card industry, analyzed alternative reasons for the alleged decline in calling card sales, and evaluated Plaintiff's damages expert's report.

- Evaluated Plaintiff's damages claim concerning the alleged failure of a call center to properly process inquiries relating to the newspaper and television marketing of a collectible doll in the likeness of a recently deceased public figure.  Analyzed advertising expenditures, response rates across cities, major news announcements related to the marketing of such merchandise, and contributing problems caused by Plaintiff's actions.  Estimated damages by comparing sales in an unimpacted period with sales in the alleged impacted period.

- Evaluated Plaintiffs' damages claim relating to the underwriting and loan servicing of subprime automobile loans.  Plaintiffs' contended the servicing company did not properly administer the portfolio of subprime automobile loans thereby causing excessive loan losses.  Analysis demonstrated that Plaintiffs' financial experts failed to take into account alternative reasons for Plaintiffs' performance. Analysis of Plaintiffs' loan volume, interest income, loan loss rate, and deteriorating industry conditions also demonstrated that Plaintiffs' business plan did not provide a reasonable basis from which to calculate claimed damages.

- Evaluated Plaintiff's claim of lost profits relating to the collection of ballots for a Mexican telecommunication company in Mexico's Equal Access program.  Analyzed a database of telephone customers, including statistics such as the length of service, average monthly consumption patterns, current billing status, and differences between residential and commercial customers.  Developed an alternative claimed damages model taking into account consumption patterns and the turnover rate of customers, among other factors.

- Evaluated Plaintiffs' claim of lost success fees, lost closing fees, and underpayment of value relating to Defendant's acquisition of an oncology laboratory and the alleged failure to consummate additional acquisitions.  Analysis demonstrated Plaintiffs' projections regarding the profitability of the proposed acquisitions were not reasonable given the historical financial performance of the targets.  Also demonstrated Plaintiffs were not underpaid for the assets of the acquired laboratory since no investor or buyer was willing to provide funds to Plaintiffs pre-acquisition and since Plaintiffs in their valuation approach inappropriately assigned all post-acquisition synergies and gains to the Plaintiffs.

- Evaluated Plaintiff's damage claim arising from an alleged misappropriated opportunity to develop a computer superstore franchise in Mexico based on the equivalent U. S. concept.  Demonstrated Plaintiffs overstated per store revenue, understated store-level costs, and used inappropriate financial and strategic assumptions regarding the number of stores opened, the amount of capital required, outside investor contribution, equity shares, and strategic acquisitions.  Plaintiffs also conducted a valuation based on companies bearing little or no resemblance to a computer superstore.

- Evaluated Plaintiff's claim of lost profits arising from an alleged breach of contract involving two tubular inspection equipment manufacturing companies.  Analyses demonstrated that Plaintiff's expert overstated the projected utilization rate of the company's equipment and associated revenue and understated the projected incremental costs that would have been incurred by Plaintiff.  Analyses demonstrated market demand would not support the equipment utilization rate projected by Plaintiff's expert.

- Evaluated Plaintiff's claim of damages in a breach of contract matter in the magazine publishing and distribution industry.  Plaintiff claimed Defendants breached a distribution agreement by suspending distribution pending the resolution of a trademark infringement dispute.  Plaintiff abandoned the magazine, claiming lost profits and the estimated lost value of the magazine had it been sold after its fourth year of publication.  Analysis demonstrated Plaintiff's expert overstated subscription-based revenues, distorted the cost/revenue structure that would have existed for the magazine, and overstated the likelihood of success by ignoring the failure of similar genre magazines.

- Evaluated the damages sustained by the public safety division of an information technology services firm due to the early termination a ten-year services agreement to provide enhanced 9-1-1 services to a governmental agency. One-time up-front implementation costs in setting up the 9-1-1 system and ongoing operational costs were compiled in constructing a cost reimbursement damage claim. Also evaluated the reasonableness of an early termination charge schedule designed to represent the one-time buyout total if the governmental entity opted to terminate the contract before the ten-year term expired.

- Evaluated the damage claim of a bank arising from an allegedly defective conversion of the bank's data processing system. Areas investigated included the softening macroeconomic environment surrounding the bank during the relevant time period, the changing financial services market, internal bank ratios, and technical flaws contained in Plaintiff's damage calculations.

- Estimated lost sales and lost royalty payments to a "thick" potato chip producer due to a breach of contract. Involved was the construction of a damage model, analyses of the market for potato chips and per capita potato chip consumption, and projecting the rate of introduction of a new potato chip into regional markets.

- Calculated damages and provided other economic analyses in a "lack of best efforts" breach of contract case in the carbonated soft drink industry. At issue was the impact on sales due to the "lack of best efforts" vs. the impact on sales from contemporaneous new entrants into the market.

- Calculated damages in a breach of contract matter involving an association of nephrologists and a management company operating 12 kidney dialysis clinics. Areas of investigation included the "profitability available for distribution" from the clinics, the projected rate of growth in patients, the rate of introduction of new clinics, and the costs associated with running the clinics. A damage model was developed which projected the profits that would have been distributed to the management company over the life of the contract in the absence of the breach.

- Evaluated claimed damages against a hospital for allegedly breaching a contract allowing hyperbaric oxygen services on hospital premises. Investigations included assessing the local market for hyperbaric services, evaluating Plaintiff's business growth potential given the physical space constraints at the hospital, and demonstrating Plaintiff had fully mitigated claimed future damages through the establishment of an alter ego firm at a nearby local hospital.

## Class Certification Engagements

- Evaluated Plaintiff's position that the claimed economic injury suffered by putative Class members could be quantified on a Class-wide basis in a class action matter relating to anti-aging skin care products marketed as preventing and repairing signs of aging "in just one week." Demonstrated that the approaches proposed by the opposing expert to calculate Class-wide damages would not yield reliable or relevant estimates of the alleged harm suffered by individual Class members. Arguments presented included that the large number of repeat buyers, the wide variations in the retail prices associated with the accused products, and the wide variations in the retail price differences relative to other anti-aging products would prevent a reliable calculation of putative Class members' damages on a Class-wide basis.

- Evaluated Plaintiffs' position that the claimed economic injury allegedly suffered by putative Class members could be quantified on a Class-wide basis in a matter brought by an institutional investor against a bank associated with the bank's securities lending program. Demonstrated that a class-wide approach would obfuscate important differences among putative Class members' individual investment expectations and tolerances. Differences requiring individualized inquiry included the variability in maturity guidelines, credit-quality guidelines, prohibited investments, and diversification requirements.

- Evaluated Plaintiffs' position that the claimed economic injury allegedly suffered by putative Class members could be quantified on a Class-wide basis in a matter where a beverages company marketed certain beverages as containing beneficial vitamins and allegedly failed to disclose the sugar content of the beverages. Evaluated the wide variations in the beverages' retail prices across distribution outlets, across geographic areas, and across the time periods considered. A comparison of the average retail prices of the at-issue beverages relative to identified benchmark products did not support the allegation that the at-issue beverages possessed a systematic price premium as a result of the company's allegedly misleading marketing campaign.

- Evaluated Plaintiffs' position that the claimed economic injury allegedly suffered by putative Class members could be quantified on a class-wide basis in a matter where an automobile company allegedly did not inform purchasers that actual vehicle miles per gallon performance could vary from the 40 miles per gallon EPA estimated fuel efficiency. Demonstrated that individualized inquiry would be required to ascertain consumers' valuation of vehicle characteristics (including their expected fuel economy) when purchasing an accused vehicle, actual prices paid, driving patterns, driving conditions, and whether putative Class members' expectations were influenced by the company's alleged wrongful conduct. Evaluated Plaintiffs' class certification expert's opinion that alleged damages could be evaluated on a class-wide basis using a hedonic regression methodology.

- Evaluated Plaintiffs' position that the claimed economic injury allegedly suffered by putative Class members could be quantified on a class-wide basis in a matter relating to the issuance of a special assessment fee by a timeshare vacation club. Demonstrated that potential damages-related conflicts were likely to arise among putative Class members (including among the Named Plaintiffs) – making Class-wide proof an unreliable measure of economic injury for each putative Class member. Also demonstrated that evaluating claimed damages on a Class-wide basis would result in potentially awarding damages to putative Class members who suffered no injury.

- Evaluated Plaintiffs' position that the economic injury allegedly suffered by putative class members could be quantified on a class-wide basis in a matter where a beverages company marketed certain beverages as "All Natural" when they contained high fructose corn syrup ("HFCS"). Demonstrated that wide variations existed in the beverages' retail prices across distribution outlets, across geographic areas, and across the time periods considered. Also demonstrated that wide variations existed in the beverages' retail prices because of promotional discounts and coupons and because the company did not sell directly to consumers. Consequently, whether consumers paid a price premium because of the "All Natural" labeling (and how much, if any) could not be determined by proof common to the proposed class. A comparison of the average retail prices of the "All Natural" beverages in dispute to identified benchmark products did not support the allegation that the "All Natural" beverages possessed a systematic price premium as a result of the "All Natural" labeling.

- Evaluated the commonality of purchasing circumstances of proposed Class members in a class action matter against a national quick service restaurant ("QSR") chain. Plaintiffs alleged the QSR misrepresented the trans fat levels contained in the QSR's french fries. Plaintiffs also alleged the proposed Class paid a price premium for certain food products based upon the alleged misrepresentations. After reviewing survey data, marketing materials, and pricing data, concluded that individual inquiries were required to establish different customer's awareness of the alleged misrepresentations, different customer's reliance upon the alleged misrepresentations in their purchasing decisions, and other important economic factors impacting each customer's purchase decision.

- Evaluated Plaintiffs' claim that Class members' alleged damages could be "mechanically calculated" in a class action matter against a payphone company's auditor. The payphone company had filed bankruptcy and the Class members alleged the auditor misrepresented the company's financial statements, upon which the Class members allegedly relied. Conducted economic and market research and identified factors that caused a general decline in the payphone industry which contributed to the bankruptcy of the company. Analyzed the claimholders' database and identified issues relating to the database that precluded Plaintiffs' expert from mechanically calculating the damages allegedly suffered by class members.

## Lender Liability Cases

- Evaluated Plaintiff's allegations that it was capital constrained and consequently economically damaged as a result of its loans being placed into the special assets department of its lender. Analyzed the Plaintiff's unused cash, credit, and other available funds. Also analyzed Plaintiff's successful access to the capital markets, acquisition spending, R & D spending, sales performance, and profitability relative to peer companies.

- Analyzed Plaintiffs' damage claim in a lender liability suit relating to Defendant's alleged failure to fund certain residential housing development and construction loans. Evaluated Plaintiffs' changing five-year business plan projections, including revenue growth, geographic expansion, market share, salesmen coverage, cost structure, and profitability assumptions. Also evaluated Plaintiffs' strategy for "exiting" the business and the alleged value of their ownership at that time.

- Evaluated damages in a lender liability case involving the bankruptcy of a gear manufacturing company. The bankruptcy was allegedly due to the failure of a bank to fully fund a previously committed loan. Investigations included researching alternative market-related reasons for the decline in the gear manufacturer's business as well as evidence of internal mismanagement on the part of the company's owners.

- Other Matters. Evaluated damages, causation issues, and liability issues in various lender liability cases involving the calling in of loans, the failure to fund previously committed loans, the failure to release collateral, and the misappropriation of loan payments. Cases involved firms in the wire and cable, drywall/construction, PVC piping, and auto dealership industries, among others.

## Professional Negligence (Non-Securities / Non-Merger) Cases

- In an alleged professional negligence matter, a lender to distressed companies sought $40 million in damages from an auditor in connection with a $130 million credit facility extended to an HDTV company. The lender failed to collect when the borrower filed for bankruptcy. The auditor was alleged to have made negligent misrepresentations associated with the borrower's financial statements; the lender asserted it had relied upon the borrower's financial statements when entering into the credit facility. Performed economic causation and damages-related analyses. Identified the known or knowable risks associated with providing a credit facility to the borrower, including certain accounts receivable collection risks and market softness risks. Opined that it was the materialization of these known and knowable risks that caused the lender's claimed losses.

- Evaluated claimed damages against a major law firm for alleged professional negligence when filing a patent for the treatment of septic shock. Researched (among other things) the FDA approval process, associated statistics regarding the product category allegedly covered by Plaintiff's patent, and various industry projections regarding the category growth. Performed a discounted cash flow analysis, an incremental profitability analysis, a licensing analysis, and provided an alternative calculation of claimed damages.

- Evaluated Plaintiffs' claimed damages relating to an alleged failure by a law firm to properly file certain patent applications relating to a video processor recorder. Plaintiffs' business opportunities and licensing fees in the United States and Europe were allegedly lost due to the ensuing delays. Analyzed Plaintiffs' causation linkages to claimed damages, length of the claimed damages period, forecasted units sold, forecasted market share, forecasted costs of production, and claimed licensing rate.

- Evaluated claims by a Department of Insurance appointed liquidator that alleged the auditor of a bankrupt insurance company breached its fiduciary duty, resulting in a $100 million deficit on the insurance company's books. Conducted various analyses of a claims register database, including a comparison of indemnity payments and reserves per claim before and after the appointed liquidator took control of the liquidation process. Analyses demonstrated both the indemnity payments and reserves per claim were higher after the appointed liquidator took over the liquidation process, implying the liquidator over-paid and over-reserved claims.

## Entertainment/Sports-Related Engagements

- Evaluated the claimed damages of a movie production company against a major home video rental company. At issue was the claim that the refusal of the home video rental company to commit to carry a particular movie in its stores caused the movie production company to suffer lost profits when its distributor then refused to release the movie theatrically. Demonstrated that Plaintiff's methodology for estimating lost box office revenues was inappropriate and failed to account for important determinants of movie attendance.

- Analyzed Plaintiffs' lost profits and reasonable royalty damages in a patent infringement matter relating to offset head lacrosse sticks. Analysis included an assessment of Plaintiffs' sales in the absence of the infringement, the distribution of the lost sales to the models that would have been sold in the absence of the infringement, and an incremental revenue and cost analysis. Also analyzed Plaintiffs' competitors, pricing patterns, productive capacity, and geographic coverage in support of the lost profits claim. Reasonable royalty damages were assessed using the *Georgia-Pacific* factors and a determination of important negotiating points in a hypothetical licensor / licensee negotiation.

- Estimated the diminished box office revenues suffered by a theatrical release due to the breach of a quick service restaurant promotional tie-in arrangement with a major pizza chain. Developed a database of recently released films and related film characteristics such as genre, rating, critics review, box office revenues, media spending, production budget, season of release, and talent. A regression model was then developed to quantify the relationship between media spending and box office revenue. An industry review of quick service restaurant promotional tie-in arrangements was also conducted.

- Evaluated Plaintiffs' claimed damages in a breach of contract matter involving the sale of certain minority interests in a National Basketball Association team. At issue were Plaintiffs' tag-along rights whereby limited partnership interests could be included in any sale by the general partner on the same terms and conditions. Damages were calculated as the difference between the formulaic value of the minority interests versus the market value of the minority interests when sold separately. Discounts for lack of control and reduced marketability were analyzed.

- Evaluated Plaintiff's damages claim relating to a NASCAR racing team sponsorship agreement. Plaintiff contended the Internet service provider sponsor interfered with the racing team's ability to sell advertising banners that were part of the sponsorship agreement. Analyses included assessing the appropriate methodology for valuing a NASCAR race team and assessing comparable transactions. Also analyzed the financial performance of the race team, the economic terms of the sponsorship agreement, and the risks associated with a barter arrangement.

- Estimated damages arising from a breach of contract claim between an electronic retailer and a local television station. At issue was the lost profits to the electronic retailer when the local television station discontinued broadcasting the electronic retailer's programming.

- Analyzed the market and evaluated damages on behalf of a television station denied access to a cable system. At issue was whether the cable operator was attempting to monopolize the market for local television advertising. Analysis included an estimation of the advertising revenues that would have been received by the local television station had it been allocated a channel on the cable system.

- Estimated damages arising from a breach of contract claim between a video-cassette manufacture/distributor and a theatrical motion picture producer/distributor. At issue was whether the motion picture distributor manipulated the theatrical release of certain titles distorting the films the video-cassette producer could distribute under the terms of the agreement.

**Tax-Related Engagements**

- Participated in an analysis of the impact on tax revenues to the State of Texas from a change in tax laws relating to pension fund managers. Helped demonstrate that changing the apportionment rule from "location in which the investment services were performed" to "residence of the investment beneficiaries" would not result in a negative fiscal impact.

- Served as consulting partner on an engagement estimating qualifying research and expenditure costs in response to certain expenses disallowed by the IRS. Analysis included developing a methodology to estimate qualifying hours and qualifying costs for groupings of employees with missing data.

- Analyzed whether the salaries paid to the owners/managers of a heavy and highway construction company were reasonable in a matter before the IRS. Areas investigated included the cyclical nature of the construction industry, the resulting cyclical nature of compensation paid to construction industry executives, and the 50th and 75th percentile salaries paid to various types of executives in the construction industry.

- Participated in an analysis of the tax benefit versus detriment to a Plaintiff as a result of ownership in certain partnership interests over the 1982-1998 time period. Also involved was an analysis of cumulative suspended tax losses, partnership income available for distribution, and changing tax rates over time.

- Quantified the net out-of-pocket cash position of investors who purchased limited partnership interests in nine real estate partnerships in an alleged non-disclosure matter. Also quantified the impact caused by changes in the Federal income tax laws. Supporting analyses included comparing the actual and projected performance of the partnerships taking into account restructurings, refinancings, and dissolutions.

**Personal Injury and Wrongful Death Cases**

- <u>General Overview (Personal Injury)</u>. Assessed damages and lost earnings in various personal injury cases involving movie production workers, management consultants, financial consultants, nurses, medical doctors, chiropractors, secretaries, truck drivers, airline stewardesses, mechanics, engineers, maintenance personnel, carpenters, masonry workers, crane operators, machine operators, actresses, military aircraft production workers, tankermen, teachers, film editors, portfolio managers, hair stylists, automobile assemblers, landscape architects, sole proprietors, and real estate agents (among others). In each case, issues investigated included an assessment of the projected undamaged income, damaged income, expected work life of the individual, and appropriate discount rate to use. Assistance to the attorney included the preparation of deposition questions, economic analyses, and a critique of the opposing economist's damage model.

- <u>General Overview (Wrongful Death)</u>. Developed numerous damage models in wrongful death cases. Issues investigated included the projection of lost earnings, the projected personal consumption expenditures of the decedent, and projected lost pension benefits. Professions of the decedents included various types of entrepreneurs (e.g., boat store owners, etc.), white-collar workers (e.g. attorneys, architects, etc.), and blue-collar workers (e.g., demolition contractors, grocery store clerks, etc.). Ages of the decedents ranged from adults to teenagers to children.

- Evaluated claims of damages submitted by the family members of 88 decedents from an airplane crash. Family members were seeking damages in state and federal courts against the airline and certain parts manufacturers. Most of the decedents resided and worked in Asian countries. Researched various data sources for information regarding social security benefits, interest rates, and the relevant economic statistics for workers in these countries. Evaluated four Plaintiff damages experts' reports and testimonies, summarized our evaluation of these damage models, and calculated alternative damages figures. Analysis included evaluating lost earnings, lost business value, lost non-salary benefits, lost retirement funds, and lost savings.

## Wrongful Termination Cases

- Evaluated Plaintiff's alleged lost earnings and lost future earnings capacity in a matter against a major shipping company in which the Plaintiff claimed to have resigned his legal counsel position due to the Defendant's alleged criminal conduct and its refusal to conduct an independent investigation. Analyzed various employee benefits offered by the Defendant including but not limited to the salaries of similarly-situated employees, long term incentive plans, 401(k) plan, paid vacation, stock options, and retirement benefits. Also analyzed promotion criteria, similar benefits received by the Plaintiff at alternative employment, and the lower cost of living associated with the geographical location of the alternative employment.

- Evaluated Plaintiff's claimed economic harm in a wrongful termination / negligent misrepresentation matter. Plaintiff claimed that pre-termination certain representations by the company dissuaded him from resigning and selling his stock holdings, thereby causing economic harm from the subsequent decline in the company's stock price. Analysis included quantifying the salary, bonuses, pension benefits, and severance pay the Plaintiff received during the additional time spent with the company as compared to the stock price declines that formed the basis of Plaintiff's damages claim.

- Evaluated Plaintiff's loss of earnings claim in an alleged wrongful termination matter in the long distance telecommunications industry. Plaintiff was an independent representative with a "downline" working for a company using a multilevel marketing sales approach. Analyzed the Plaintiff's historical earnings, business expenses, and the earnings of Plaintiff's peers to evaluate Plaintiff's net earnings in the absence of the alleged wrongful termination.

- Evaluated Plaintiff's damage claim in a wrongful termination matter involving an insurance broker/branch manager. Evaluated Plaintiff's alleged damage period, earnings in the absence of the termination, fringe benefits, business expenses, and offsetting earnings. The sales patterns of the relevant insurance products at the state and national level were incorporated into the analysis. Also analyzed trends within the company with respect to branch manager positions.

- Evaluated the damages suffered by the manager of an over-the-counter trading department in an alleged wrongful termination action. Since the compensation of the manager was based on the profitability of the department, one issue investigated was the reason for the decline in the post-termination performance of the department.

- Other Matters. Assessed damages and lost earnings in other wrongful termination cases involving internal medicine specialists, neurosurgeons, anesthesiologists, entertainment company executives, brokers/traders, secretaries, accountants, attorneys, quality assurance managers, company presidents, real estate brokers, property managers, insurance brokers/managers, and military aircraft production workers. Areas investigated include many of the same items as described in personal injury cases.

**Other Economic Engagements**

- Conducted an economic analysis of historical and projected lost revenues due to SEC-related independence constraints for an information technology consulting entity. The analysis demonstrated that SEC rules requiring SEC registrants to disclose the amount of non-audit fees paid to its auditor, as well as constraints on the consulting entity's ability to perform outsourcing or managed application services for audit clients significantly impacted business growth relative to the market and its closest competitors. The analysis also demonstrated that certain revenue projections assuming independence relief were appropriate in light of market conditions and the independence constraints.

- Conducted an economic cost/benefit analysis of the SEC's proposed rule changes relating to non-audit services performed by auditing firms for audit clients. Analyses demonstrated that public accounting firms have an incentive to protect their brand name capital and that purchasers of non-audit services have an incentive to maintain investor confidence in the reliability of the audited financial statements.

- Performed an economic impact analysis on behalf of a major pipeline corporation seeking to gain regulatory approval for the construction of an oil pipeline in the Pacific Northwest. Evaluated the net economic impact of the project on employment, income, and consumer expenditures in the region. New employment opportunities resulting from construction and maintenance of the pipeline were compared to the potential lost jobs associated with the alternative means of transporting the petroleum.

- Participated in a major antitrust risk assessment exercise for a large industrial corporation. Work performed included evaluating the major litigation risks in the areas of monopolization, price discrimination, price fixing, illegal tying, and exclusive dealing. A detailed questionnaire designed to collect relevant economic data and identify potential risks was constructed and sent to the corporation's division managers.

- Evaluated revenue projections relating to an electronic toll collection system. The system was designed to recover lost toll revenue and other administrative fees from toll violators traveling along a consortium of tollways in New York, New Jersey, and Delaware. Analyzed four critical revenue drivers in the projections (number of transactions, violation rates, citation rates, and collections rates) and the potential variability of certain components of the projections by compiling comparative data through interviews with industry participants. Analysis was used in assisting lenders evaluating the economic viability of the project.

- In a bankruptcy matter, analyzed the expected rate of return that could be earned on a portfolio of assets. Included in the analysis was determining the investment portfolio of a prudent pension fund manager and the historical risk premiums earned on each category of assets in the portfolio. The assets were being held to meet future pension plan liabilities.

- Conducted an analysis of low-cost housing in Los Angeles County (CA) to determine whether sufficient housing was available to house the County's general relief recipient population. In separate engagements, conducted similar studies for San Bernardino County (CA) and Alameda County (CA). The Alameda County study also analyzed earned income incentives and food stamp allotments as a source of income in addition to the County's monthly general relief assistance. An affordable housing analysis was also conducted for the State of New Jersey's Department of Health relating to the state's child exclusion policy and AFDC recipients.

- Conducted an economic analysis on behalf of the California Public Utilities Commission. Tasks included incorporating elasticities into alternative rate design and pricing models, analyzing subsidies accruing to various residential consumer groups under alternative rate designs, and estimating the relative welfare loss associated with each alternative rate design.

*Keith R. Ugone, page 23*

## Fraud/Criminal-Related Engagements

- Evaluated claimed damages in a suit brought by Plaintiff relators against a major information technology company for allegedly submitting false and fraudulent claims to the U.S. government under a Medicaid program providing health-cost reimbursements to school districts.  Conducted various benchmarking analyses including analyzing a "claimed amount" versus "paid" pattern analysis and a reimbursement rate analysis across Defendant-administered school districts and non-Defendant-administered school districts.  Also conducted a reimbursement rate benchmarking analysis associated with school districts before and after administration by the Defendant.  Concluded there was no economic evidence of a systematic effort to defraud the U.S. government.

- Evaluated Plaintiff's claim of damages stemming from the alleged embezzlement of funds and falsification of income statements by a bank official relating to a mortgage lending division of a bank.  Analysis identified errors made by the bank in specifying the length of the damage period and not properly accounting for accounts receivable collections made post-discovery of the alleged illegal acts.

- Analyzed skilled nursing facility nursing ratios in a criminal health care fraud matter relating to Medicare reimbursements.  At issue was Defendant's ratio of skilled nursing costs to unskilled nursing costs alleged to be outside of governmental guidelines.  Analyzed facility-level ratios by establishing peer groups of facilities based upon size of facility, number of participating beds, skilled utilization percentage, state location, average length of stay, and facilities with similar levels of acuteness.

- Estimated freight overcharge damages on behalf of a major multinational information technology services firm.  Analysis required the utilization of a database of all freight shipments made over a five-year period, including incorporating subsequent credit memos, discounts, and dimensional weight charges.  Analysis compared actual freight charges to rates charged by alternative carriers for shipments of identical ship method (e.g., ground, next day, two day), weight, and destination.

- Performed economic analysis relating to a health care criminal matter in which a group of doctors and a hospital were alleged to have conspired to receive remuneration in return for the referral of Medicare-eligible patients.  Analyze included evaluating the savings from reduced admissions rates and from reduced average length of stays.  Also analyzed the profitability of certain laboratory-related work.

## TEACHING EXPERIENCE

### Macroeconomic Principles and Intermediate Macroeconomics

Topics covered included unemployment/full employment, inflation/price stability, economic growth/gross domestic product, determination of national income, and monetary and fiscal policies.

### Microeconomic Principles and Intermediate Price Theory

Topics covered included functioning of markets (demand and supply analysis), elasticities, theory of the firm (profit maximization), industry performance, allocation of resources, and government regulation.

### Companies In Crisis

Topics covered included companies, markets, and industries in contemporary crisis situations from external or internal changes in the operating environment or significant conflict. Topics included case studies focusing on solutions for companies facing competitive issues, management issues, or litigation-related issues.

## PUBLICATIONS

"An Economic Framework for Analyzing Covenants Not to Compete" (with Elaine Fleming and Steven Herscovici), Expert Witnesses, ABA Section of Litigation, Spring/Summer 2011, Vol. 7 No. 1.

"Financial Expert Witness Challenges and Exclusions:  Results and Trends in Federal and State Cases Since Kumho Tire" (with Lawrence F. Ranallo), Accountants' Handbook, Tenth Edition 2004 Supplement, *forthcoming*, edited by D.R. Carmichael, New York: John Wiley & Jones, Inc., 2004.

"Accounting for Damages in Intellectual Property Litigation" (with Tony Samuel and John Davis), Building and Enforcing Intellectual Property Value – an International Guide for the Boardroom 2003.

"Challenges to the Admissibility of Financial Expert Witness Testimony" (with Lawrence F. Ranallo), Litigation Services Handbook, 2002 Supplement, edited by Roman L. Weil, Michael J. Wagner, and Peter B. Frank, 2A.1 – 2A.17, New York:  John Wiley & Sons, Inc., 2001.

"Calculation of Lost Earnings" (with Carlyn R. Taylor and Randi L. Firus), Litigation Services Handbook, edited by Roman L. Weil, Michael J. Wagner, and Peter B. Frank, 11.1 – 11.16, New York:  John Wiley & Sons, Inc., 2001.

"Preparing the Financial Expert or Economist" (with George G. Strong, Jr.), Witness Preparation, V. Hale Starr, 13.4 – 13.4.1, New York: Aspen Law & Business, A Division of Aspen Publishers, Inc., 1998.

"The Effect of Institutional Setting on Behavior in Public Enterprises:  Irrigation Districts in the Western States" (with John M. McDowell), Arizona State Law Journal, Vol. 1982, No. 2, 453 – 496.

## SELECTED CLIENTS OVER THE PAST FIVE YEARS

Selected clients over approximately the past five years include but are not limited to: Abbott Laboratories; Akamai Technologies, Inc.; America Online, Inc.; Apple Inc; Autobytel Inc.; Blackboard Inc.; Blackstone Group; Blockbuster Inc.; Bioengineered Supplements & Nutrition, Inc.; CDX Gas; Chrysler; Cigna; Coca Cola Company; Covidien; Crane Co.; Cummins-Allison Corp.; DirecTV, Inc.; Dow Chemical Company; Electronic Data Systems; Ernst & Young LLP; GoDaddy.com, Inc.; Google; Gorlick Distribution Centers; Haggar; Halliburton; Hyundai Motor America; Idearc; Ingenico Inc.; Juniper; LG Electronics, Inc.; Lutron Electronics Co., Inc.; McDonald's Corporation; Medtronic, Inc.; Merial Limited; Microsoft Corporation; National Dairy Holdings, L.P.; New York Times, Company; Nike, Inc.; Nintendo; Nortel Networks Inc.; Research in Motion; Rohm Co. Ltd.; Sabre Inc.; Samsung; Shure, Inc.; Shell Exploration & Production Company; SIGA Technologies; Snapple Beverage Corporation; St. Jude Medical, Inc.; Stolt Nielson; TiVo Inc; T-Mobile USA, Inc.; Tyco Heathcare; UBS; United States Surgical Corporation; VeriFone Systems, Corp.; Verizon; Versata (f/n/a Trilogy); Volkswagen Group of America, Inc.; Waste Management; Wachovia Corporation; Wells Fargo & Company; Wendy's; Wyndham International, Inc.; Yahoo!

# Exhibit  2

CONFIDENTIAL

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

### KEITH R. UGONE, PH.D.
### TRIAL, HEARING, AND ARBITRATION TESTIMONY[1]

Lake Cherokee Hard Drive Technologies, L.L.C. vs. Bass Computers, Inc., LSI Corporation, **Marvell Semiconductor, Inc.**, Samsung Semiconductor, Inc., and Tech Data Corporation (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:10-cv-216 (TJW-CE)) (2013)

Abraham & Veneklasen Joint Venture, Abraham Equine, Inc. and Jason Abraham vs. **American Quarter Horse Association** (In The United States District Court For The Northern District Of Texas, Amarillo Division, Civil Action No. 02:12-cv-00103-J) (2013)

Hitachi Consumer Electronics Co., Ltd. and Hitachi Advanced Digital, Inc. vs. **Top Victory Electronics (Taiwan) Co. Ltd., TPV Int'l (USA), Inc., Envision Peripherals, Inc., Top Victory Electronics (Fujian) Co. Ltd., TPV Electronics (Fujian) Co. Ltd., TPV Technology Ltd., and VIZIO, Inc.** (United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:10-CV-260) (2013)

**e**Plus Inc., vs. Lawson Software, Inc. (In The United States District Court For The Eastern District Of Virginia, Richmond Division, Civil Action No. 3:09-CV-620 (RFP)) (2013)

Alexsam, Inc. vs. **IDT Corporation** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:11-CV-362-RSP) (2013)

In Re: Urethanes Antitrust Litigation (Class) – Seegott Holdings, Inc., et al. vs. **The Dow Chemical Company** (In The United States District Court For The District Of Kansas, MDL-04-1616 (JWL/JPO), No. 05-2265-JWL) (2013)

**FLIR Systems, Inc.** vs. Sierra Media, Inc. and Fluke Corporation (The United States District Court, District Of Oregon, Portland Division, Case No. 3:10-CV-971-HU) (2012) (two trial testimonies: affirmative case and counterclaim)

I/P Engine, Inc. vs. **AOL, Inc., Google Inc., IAC Search & Media, Inc., Gannett Company, Inc., and Target Corporation** (In The United States District Court For The Eastern District Of Virginia, Norfolk Division, Civil Action No. 2:11-cv-512-RAJ) (2012)

DDR Holdings, LLC vs. **Hotels.com, L.P.**; **Expedia, Inc.**; **Travelocity.com, L.P.**; Site59.com, LLC; Internetwork Publishing Corporation d/b/a Lodging.com; Neat Group Corporation; Orbitz Worldwide, LLC; **International Cruise & Excursion Gallery, Inc.; OurVacationStore.com, Inc.**; **National Leisure Group, Inc. / World Travel Holdings, Inc.**; and **Digital River, Inc.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:06-CV-42-JRG) (2012)

---

[1] Trial, hearing, and arbitration testimony over the 1990-2013 time period.  Case citations and dates subject to verification.  **Clients bolded.**  Deposition testimony begins on page 9.

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

**Tyco Healthcare Group LP and United States Surgical Corporation** vs. Ethicon Endo-Surgery, Inc. (In The United States District Court For The District Of Connecticut, Civil Action No: 3:10-cv-00060 (JBA)) (2012)

CardSoft, Inc. and CardSoft (Assignment For The Benefit Of Creditors), LLC vs. **VeriFone Systems Corporation; Hypercom Corporation; Ingenico S.A.; Ingenico Corp.; Ingenico Inc.**; Shera International Ltd.; and Blue Bamboo (UUSA), Inc. (United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:08-cv-00098) (2012)

**Merial Limited and Merial SAS** vs. Cipla Limited, Velcera, Inc., and FidoPharm, Inc. (In The United States District Court For The Middle District Of Georgia, Athens Division, Case No. 3:07-CV-125 (CDL)) (2012; injunction hearing)

Geoffrey L. Berman, Trustee of the SB Liquidation Trust vs. **Ernst & Young LLP** (International Institute For Conflict Prevention & Resolution, New York, NY) (2012)

CEATS, Inc. vs. **Continental Airlines, Inc.; Ticketmaster, L.L.C.; Tickets.com, Inc.; TicketNetwork, Inc.; TicketsNow.com, Inc.; AirTran Airways, Inc.; Alaska Airlines, Inc.; Delta Air Lines, Inc.; Jet Blue Airways Corporation; United Air Lines, Inc.; US Airways, Inc.; and Virgin America, Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:10-cv-120 LED) (2012)

**Halliburton Energy Services, Inc.** vs. Weatherford International, Inc. and BJ Services Company (In The United States District Court For The Northern District Of Texas, Dallas Division, Civil Action No. 307-cv-2144-K) (2012)

Convolve, Inc. vs. Dell, Inc., Western Digital Corporation, **Hitachi Global Storage Technologies, Inc., and Hitachi, Ltd.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:08-cv-244) (2011)

Personal Audio, LLC vs. **Apple Inc.**; Sirius XM Radio, Inc.; XM Satellite Radio, Inc.; Coby Electronics, Corp.; Archos, Inc. (United States District Court For The Eastern District Of Texas, Lufkin Division, Case 9:09-cv-00111-RC) (2011)

Bedrock Computer Technologies LLC vs. **Yahoo! Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:09-cv-269) (2011)

Bedrock Computer Technologies LLC vs. **Google Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:09-cv-269) (2011)

Cheetah Omni LLC vs. **Verizon Services Corporation, Verizon Business Network Services Inc., and Verizon Enterprise Delivery LLC** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:09-cv-260-LED) (2011)

Alexsam, Inc. vs. **IDT Corporation** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:07-CV-420-TJW) (2011)

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

PharmAthene, Inc. vs. **SIGA Technologies, Inc.** (In The Court Of Chancery In The State Of Delaware, Civil Action No. 2627-VCP) (2011)

**St. Jude Medical, Inc. and St. Jude Medical Puerto Rico LLC** vs. Access Closure, Inc.  (In The United States District Court For The Western District Of Arkansas, Texarkana Division, Case No. 4:08-cv-04101-HFB) (2010)

Affinity Labs of Texas, LLC vs. BMW North America, LLC; BMW Manufacturing Co., LLC; Hyundai Motor America, Inc.; Hyundia Motor Manufacturing Alabama, LLC; Kia Motors America, Inc.; Mercedes-Benz USA, LLC; Mercedes-Benz U.S. International, Inc.; **Volkswagen Group of America, Inc.** (In The United States District Court For The Eastern District Of Texas, Lufkin Division, Civil Action No. 9:08-cv-164-RC) (2010)

Mirror Worlds, LLC vs. **Apple, Inc.** (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:08-CV-88-LED) (2010)

VirnetX Inc. and Science Applications International Corporation vs. **Microsoft Corporation** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 607CV80 (LED)) (2010)

Carpathia Hosting, Inc., Carpathia Hosting, Inc. as nominee and trustee, for Triumviri, Inc., and Triumviri, Inc. vs. **Electronic Data Systems, LLC**  (JAMS Arbitration, Washington, D.C., No. 1410005118) (2010)

**Cummins-Allison Corp.** vs. Shinwoo Information & Telecommunications Co., Ltd., n/k/a SBM Co., Ltd., and Amro-Asian Trade, Inc. (In The United States District Court For The Eastern District Of Texas, Lufkin Division, Civil Action No. 9:07cv196 and Civil Action No. 9:07cv228, Consolidated) (2009)

i4i Limited Partnership and Infrastructures for Information Inc. vs. **Microsoft Corporation** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:07-CV-113-LED) (2009)

**Paradox Security Systems, Ltd., Shmuel Hershkovitz, and Pinhas Shpater** vs. ADT Security Services, Inc., Digital Security Controls, Ltd., Monitronics International, Inc., and Protection One, Inc. (In The United States District Court For The Eastern District Of Texas, Marshall Division, C. A. No. 2:06-CV-462 (TJW)) (2009)

Hearing Components, Inc. vs. **Shure, Inc.** (In The United States District Court For The Eastern District of Texas, Lufkin Division, Civil Action No. 9:07-cv-104 (RHC)) (2009)

Rambus, Inc. vs. **Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Semiconductor, Inc., and Samsung Austin Semiconductor, L.P.** (United States District Court, Northern District Of California – San Jose Division, Case No. 05 02298 RMW) (2008)

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

**Abbott Laboratories and TheraSense, Inc.** vs. Becton, Dickinson and Company and Nova Biomedical Corp. (In The United States District Court, Northern District of California, Civil Action No. C04-2123 WHA) (2008)

In the Matter of Certain 3G Wideband Code Division Multiple Access (WCDMA) Handsets and Components Thereof (InterDigital Communications Corporation and InterDigital Technology Corporation vs. **Samsung Electronics Co., Ltd, Samsung Electronics America, Inc., and Samsung Telecommunications America LLC**; The United States International Trade Commission, Washington, D.C., Investigation No. 337-TA-601) (2008)

**Bueno Conato, LLC** vs. Bajio LLC, Bajio National LLC, Bajio Franchising LLC, and Doctor's Associates, Inc. (American Arbitration Association, Western Case Management Center, Case No. 77 114 Y 00254 06 WYGI) (2008)

**Akamai Technologies, Inc. and Massachusetts Institute of Technology** vs. Limelight Networks, Inc. (In The United States District Court, District of Massachusetts, Civil Action No. 06 CA 11109 RWZ and Civil Action No. 06 CA 11585 RWZ) (2008)

**Blackboard Inc.** vs. Desire2Learn Inc. (In The United States District Court For The Eastern District of Texas, Lufkin Division, Case No 9:06CV155) (2008; trial and injunction hearing)

Applied Medical Resources Corp. vs. **United States Surgical Corporation** (In The United States District Court For The Central District Of California, Southern Division, Case No. SACV 03-1267 CJC (MLGx)) (2008)

**Electronic Data Systems Corporation** vs. Towers, Perrin, Forster & Crosby, Inc. (American Arbitration Association Northeast Case Management Center, Case No. 13 489 Y 00146 07) (2007)

Computer Acceleration Corporation vs. **Microsoft Corporation** (In the United States District Court for the Eastern District of Texas, Lufkin Division, Civil Action No. 9:06-CV-140-RHC) (2007)

YC Partners, LTD. d/b/a Yantis Company vs. Zach Hall; **Rodman Excavation, Inc. d/b/a Rodman Companies, San Antonio Division; Rodman Utilities, L.P.; Rodman Power & Communications, LLC; Rodman Natural Resources, Inc.; Rodman Paving, Inc.** (In The District Court, Bexar County, Texas, 285th Judicial District, No. 2007-CI-03027). (2007; hearing regarding Motion to Compel Plaintiff's Documents)

QPSX Developments 5 Pty Ltd vs. **Nortel Networks Inc.** (In the United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:05CV-268) (2007)

**AVID Identification Systems, Inc.** vs. Philips Electronics North America Corporation, Koninklijke Philips Electronics N.V., The Crystal Import Corporation, Medical Management International, Inc., and Datamars SA (In The Eastern District of Texas, Marshall Division, Case No. 2:04-CV-183) (2006)

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

**TiVo Inc.** vs. EchoStar Communications Corporation, EchoStar DBS Corporation, EchoStar Technologies, and Echosphere Limited Liability Company (United States District Court for the Eastern District of Texas, Marshall Division, Case No. 2 – 04CV01 DF) (2006)

William Ziegler and DenLou, Inc. vs. **Synergistic International, LLC** (American Arbitration Association, Dallas, Case No.: 71 114 E 00733 04) (2005)

Dr. Phillips, Inc. vs. **Control Laser Corporation and Excel Technology, Inc.** (In the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida, Case No. 02-CA-000075, Division: 32, Business Court) (2005)

**William A. Wise** vs. El Paso Corporation (American Arbitration Association, Houston, Case No. 70-Y-116-00327-04) (2005)

**Aviall Services, Inc.** vs. Honeywell International, Inc. and Kelly Aerospace, Inc.  (American Arbitration Association, Los Angeles, Arbitration No. 71 Y 181 00717 03) (2005)

**MCI Worldcom Network Services, Inc.** vs. Twister Communications Network, Inc. (In the District Court of Montgomery County, Texas, 221st Judicial District, Civil Action No. 00-05-03124CV) (2005)

Kathleen C. Cailloux, Kenneth F. Cailloux, Paula L. Heilman, and Robert Stephen Andresakis vs. **Baker Botts, L.L.P.**, Wells Fargo Bank Texas, N.A., William R. Goertz, S. Stacy Eastland, and Stephen T. Dyer (In the 198th Judicial District Court of Kerr County, Texas, Civil Action No. 03-603-B) (2005)

**Brooktrout, Inc.** vs. Eicon Networks Corporation, Eicon Networks, Inc. (In the United States District Court for the Eastern District of Texas, Marshall Division, Case Number 03-CV-59) (2004)

Colgate-Palmolive Company vs. **The Procter & Gamble Company** (In the United States District Court for the Southern District of New York, 03 Civ. 9348 (LLS) (DFE)) (2004)

**Electronic Data Systems Corp.** vs. Aspect Communications Corp. (American Arbitration Association, San Francisco, Case No. 74 Y 117 00586 03 GAP) (2004)

**PK Ventures, Inc. and Subsidiaries, PK Ventures Limited Partnership, and Robert M. Rose and Alice N. Rose** vs. Commissioner of Internal Revenue (United States Tax Court, Jacksonville, Florida, Docket Nos. 005836-99, 006395-99, and 10154-99) (2004)

**Brine, Inc. and Sports Licensing, Inc.** vs. STX, Inc. and STX, LLC (In the United States District Court for the District Massachusetts, Worchester Division, Civil Action No. 99-40167) (2003)

Teleplus, Inc., vs. **Avantel, S.A.** (In the United States District Court Western District of Texas, San Antonio Division, Civil Action No. SA-98-CA-0849 FB) (2003)

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

Cavalry Investments, L.L.C. vs. **Sunstar Acceptance Corporation and NationsCredit Commercial Corporation** (County Court at Law, Number 4, Dallas County, Texas, Cause No. 99-02296-D) (2003)

Steven R. Keene d/b/a Pagers Plus vs. **AT&T Wireless, Inc., a/k/a AWS National Accounts, L.L.C., and First Cellular Group of Shreveport, Inc. d/b/a AT&T Wireless Services** (Judicial Arbitration and Administration Services, Inc.) (2003)

**Poly-America, Inc.** vs. Serrot International, Inc. (In the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:00CV1457-D) (2002)

Morgan Howard, L.L.C. vs. **Immedient, Inc.** (In the County Court at Law No. 3, Dallas County, Texas, Cause No. 01-899-C) (2002)

Andrew Cumming vs. **J. C. Penney Company, Inc.** (In the District Court of Dallas County, Texas, 160th Judicial District, Civil Action No. 71-160-00077-01) (2002)

Inter-Tel, Incorporated vs. **Bank of America, Arizona** (In the Superior Court of the State of Arizona in and for the County of Maricopa, Case No. CV 96-00867) (2002)

COC Services, Ltd. vs. **CompUSA, Inc., Grupo Carso S.A. de C.V., Grupo Sanborns S.A. de C.V., TPC Acquisition Corp., Carlos Slim Helu and James Halpin** (In the District Court 116th Judicial District of Dallas County, Texas, Case No. 0000023) (2001)

United States of America vs. **Dan Anderson** (In the United States District Court for the District of Kansas, Civil Action No. 2:99mc205 and 2:99mc207) (2000)

Scott K. Ginsburg vs. **Goldman, Sachs & Co.** (Before the National Association of Securities Dealers, Inc., Dallas) (2000)

**TCP Holdings, LLC, Robert Neely, and David Thomas** vs. Tim Kirk (Before the American Arbitration Association, Dallas, Case No. 71 18000564 98) (2000)

United States of America vs. **Dan Anderson and Baptist Medical Center** (In the United States District Court for the District of Kansas, Civil Action No. 2:99mc205 and 2:99mc207) (1999; Sentencing Hearing)

In the Matter of Application No. 96-1, **Olympic Pipe Line Company**: Cross Cascade Pipeline Project (Before the State of Washington Energy Facility Site Evaluation Council) (1999)

Magnetic Technologies, S.P.R.L. vs. **Connectware, Inc.** (In the District Court Dallas County, Texas, 68th Judicial District) (1998; Daubert/Robinson Hearing Testimony and Trial Testimony)

Jeannean Heller, CRNA; Joanne Lewis, CRNA; Harold Newsom, CRNA; and Lola H. Wright, CRNA vs. **Raymond M. Dunning, Jr. and Columbia Medical Center of Lewisville Subsidiary L.P., d/b/a Columbia Medical Center of Lewisville, Dallas, Texas** (American Arbitration Association, Dallas, Texas Region) (1998)

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

Proposed Form A Acquisition of Control of Universal Fidelity Life Insurance Company, an Oklahoma Domestic stock insurer, by **Conseco, Inc.**, A Delaware Corporation (Before the Insurance Commissioner of the State of Oklahoma, Case No. 97-207-TRN) (1998)

Sledge W. Killion vs. **Metropolitan Life Insurance Company**, et al. (Before the National Association of Securities Dealers, Inc., Dallas, NASD Arbitration No. 95-05997) (1997)

**Reedrill Corporation** vs. Driltech, Inc. (U.S. District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:95CV189) (1997)

Robert Tuck vs. **Westec Security, Inc.** (Superior Court of the State of California for the County of Los Angeles, Case No. BC131221) (1996)

Exar Corporation vs. **SGS-Thomson Microelectronics Srl** (Court of International Arbitration of the International Chamber of Commerce, New York) (1996)

Nationwide Business Telephones and Team Centrex vs. **Introlink Communications System, Inc. and Pacific Bell, Inc.** (Superior Court of the State of California for the County of Los Angeles, Case No. BC009783) (1996)

TriCom, Inc. vs. **Electronic Data Systems Corporation** (U.S. District Court for the Eastern District of Michigan, Southern Division, Civil Action No. 2:92CV76374) (1995)

**Rauscher, Pierce, Refsnes, Inc.** vs. Alfred W. Anderson, Jr. (Before the National Association of Securities Dealers, Inc., Dallas) (1995)

**Ivy Goth** vs. City of Los Angeles and Department of Water and Power (Superior Court of the State of California for the County of Los Angeles, Case No. SC013502) (1995)

**Bio-Medical Applications Management Company, Inc.** vs. Dallas Nephrology Associates (U.S. District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:94CV37) (1995)

Cybor Corporation vs. **FAS Technologies, Inc.** (U.S. District Court for the Northern District of California, San Jose, Civil Action No. 5:93CV20712) (1995)

Phillips Petroleum Company vs. **Rexene Corporation** (U.S. District Court for the District of Delaware, Civil Action No. 1:90CV208) (1994)

**Donald J. Dougher**, et al. vs. Gerard J. Dougher, Sr., et al. (Superior Court of the State of California for the County of Orange, Case No. 677451) (1994)

Texas State Bank, et al. vs. **Electronic Data Systems Corporation** (206th District Court of Hidalgo County, Texas) (1994)

**Union Oil Company of California** vs. International Insurance Company, et al. (Superior Court of the State of California) (1993)

Trial, Hearing, and Arbitration Testimony of Keith R. Ugone, Ph.D.

Chroma Lighting and Charles T. Von Der Ahe vs. **GTE Products Corporation and Sylvania Lighting Services Corporation** (U.S. District Court for the Central District of California, Civil Case No. 2:91CV6424) (1993)

Arley Del Gado vs. **County of Los Angeles** (Superior Court of the State of California for the County of Los Angeles) (1993)

**Villarreal** vs. East Union High School District (Superior Court of the State of California) (1993)

**Sunbelt Television, Inc.** vs. Jones Intercable, Inc. (U.S. District Court for the Central District of California, Civil Case No. 2:91CV3506) (1992)

**Clayton Jacobson** vs. Kawasaki Heavy Industries, Ltd., Japan; Kawasaki Motors Corporation, USA; and Kawasaki Motors Manufacturing Corporation, USA (U.S. District Court for the Central District of California) (1991)

Advanced Building Maintenance, Inc. vs. **Premier Ventures, Inc., dba Premier Building Maintenance** (Superior Court of the State of California for the County of Los Angeles) (1990)

**Southwest Tank Liners** vs. Joor Manufacturing, Inc. (U.S. District Court for the Central District of California) (1990)

CONFIDENTIAL

Deposition Testimony of Keith R. Ugone, Ph.D.

# KEITH R. UGONE, PH.D.
## DEPOSITION TESTIMONY[2]

PharmAthene, Inc. vs. **SIGA Technologies, Inc.** (In The Court Of Chancery In The State Of Delaware, Civil Action No. 2627-VCP) (2013)

SimpleAir, Inc. vs. Microsoft Corporation, **Motorola Mobility, Inc., Google Inc.**, et al. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:11-cv-00416) (2013)

Ethicon Endo-Surgery, Inc. and Ethicon Endo-Surgery, LLC vs. **Covidien, Inc. and Covidien, LP** (In The United States District Court For The Southern District Of Ohio, Western Division, Civil Case No.: 1:11-cv-871) (2013)

Applied Medical Resources Corporation vs. **Tyco Healthcare Group LP d/b/a Covidien** (In The United States District Court For The Central District of California, Southern Division, Civil Action No.: SACV11-01406JVS (ANx)) (2013)

**Microsoft Corporation** vs. LBS Innovations LLC and LBS Innovations LLC, a Texas LLC (In the United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:12-cv-759-JRG) (2013)

**Magnum Oil Tools International, Ltd.** vs. Tony D. McClinton, JayCar Energy Group. L.L.C., Surf Frac Wellhead Equipment Company, Inc., McClinton Energy Group, L.L.C., Motors Mills Snubbing, L.L.C., and Stan Keeling (In The United States District Court For The Southern District Of Texas, Corpus Christi Division, Civil Action No: 2-12-cv-00099) (2013)

NeuStar, Inc. and Quova, Inc. vs. **F5 Networks, Inc.** (In The United States District Court For The Northern District Of California, San Jose Division, Case No. CV12-02574) (2013)

Sabatino Bianco, M.D. vs. **Globus Medical, Inc.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:12-cv-147-JRG) (2013)

**Swivelpole Group Pty Ltd. and Swivelpole Patent Pty Ltd** vs. Swivelpole USA, Ltd., Swivelpole Holdings, LLC, Swivelpole Canada Holdings, Inc., ILS Products, LLC, ILS Products Holdings, LLC, ILS Manufacturing, LLC, and Andrew Grant (In The District Court Of Harris County, Texas, 164th Judicial District, Cause No. 2012-42402) (2013)

In The Matter Of Certain Wireless Devices With 3G And/Or 4G Capabilities And Components Thereof (InterDigital Communications, Inc., InterDigital Technology Corporation, et al. vs. **Samsung Electronics Co., Ltd., Samsung Electronics American, Inc., and Samsung Telecommunications America, LLC**; United States International Trade Commission, Washington, D.C., Investigation No. 337-TA-868) (2013)

---

[2] Deposition testimony over the 1990-2013 time period.  Case citations and dates are subject to verification.  **Clients bolded.**

Deposition Testimony of Keith R. Ugone, Ph.D.

Lodsys, LLC, et al. vs. **Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Telecommunications America, LLC**, et al. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No.: 2:11-CV-90) (2013)

**One Technologies, L.P.** vs. Profinity, LLC and Chad D. Ertel (In The District Court Dallas County, Texas, 14th Judicial District, Cause No. 12-03980-A) (2013)

Eidos Display, LLC and Eidos III, LLC vs. AuOptronics Corporation, AU Optronics Corporation America, **Chimei Innolux Corporation, Chi Mei Optoelectronics USA, Inc.**, Chunghwa Picture Tubes, Ltd., Hannstar Display Corporation, and Hannspree North America, Inc. (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:11-cv-201) (2013)

Brightstar Corp. and Flipswap Services, LLC vs. **Flipswap, Inc.** (Judicial Arbitration And Mediation Services, Case No. 1460000526) (2013; two depositions)

SFA Systems, LLC vs. **Amazon.com, Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:11-cv-00052) (2013)

Palomar Medical Technologies, Inc. and The General Hospital Corporation vs. **TRIA Beauty, Inc.** (In The United States District Court, District Of Massachusetts, Civil Action No. 09-CV-11081-RWZ) (2013)

Maureen Stewart, Kelly Lamicella, and Nicole Bello vs. **Beam Global Spirits & Wine, Inc., Jim Beam Brands Co., SGC Global, L.L.C., Skinny Girl Cocktails, L.L.C., and Bethenny Frankel** (United States District Court For The District Of New Jersey, Civil Action No. 1:11-cv-05149 (NLH) (KMW) (2013)

Securities and Exchange Commission vs. **Life Partners Holdings, Inc.**, Brian Pardo, R. Scott Peden, and David M. Martin (The United States District Court For The Western District of Texas, Austin Division, Civil Action No.: 1-12-cv-00033-JRN) (2013)

**St. Jude Medical, Cardiology Division, Inc., St. Jude Medical Systems AB, and St. Jude Medical S.C., Inc.** vs. Volcano Corporation (In The United States District Court For The District Of Delaware, C.A. No. 10-631-RGA) (2013)

In Re **Dial Complete** Marketing and Sales Litigation (MDL No. 2263) (United States District Court, District of New Hampshire, MDL Docket No. 11-md-2263-SM ALL CASES) (2013)

**Sound Design Technologies, Ltd.** vs. Oticon, Inc., SeboTech Hearing Systems, LLC, and Gennum Corp. (The United States District Court For The District Of Arizona, No. CV11-1375-PHX-SRB) (2013)

Lake Cherokee Hard Drive Technologies, L.L.C. vs. Bass Computers, Inc., LSI Corporation, **Marvell Semiconductor, Inc.**, Samsung Semiconductor, Inc., and Tech Data Corporation (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:10-cv-216 (TJW-CE)) (2013)

Deposition Testimony of Keith R. Ugone, Ph.D.

Abraham & Veneklasen Joint Venture, Abraham Equine, Inc. and Jason Abraham vs. **American Quarter Horse Association** (In The United States District Court For The Northern District Of Texas, Amarillo Division, Civil Action No. 02:12-cv-00103-J) (2013)

Hitachi Consumer Electronics Co., Ltd. and Hitachi Advanced Digital, Inc. vs. **Top Victory Electronics (Taiwan) Co. Ltd., TPV Int'l (USA), Inc., Envision Peripherals, Inc., Top Victory Electronics (Fujian) Co. Ltd., TPV Electronics (Fujian) Co. Ltd., TPV Technology Ltd., and VIZIO, Inc.** (United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:10-CV-260) (2013)

SmartPhone Technologies, LLC vs. Research In Motion, Corp., **Apple, Inc.**, et al. (The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:10-CV-74-LED) (2013)

**Lutron Electronics Co., Inc.** vs. Crestron Electronics, Inc., Face Group, Inc. d/b/a Lifestyle Electronics, Lava Corp., Audio Vision Systems, LLC (In The United States District Court, District Of Utah, Central Division, Case: 2:09-cv-707) (2012)

Oasis Research, LLC vs. AT&T Corp., **Carbonite, Inc., EMC Corp., Decho Corp., IOMEGA Corp., GoDaddy.com, Inc., Iron Mountain Incorporated, Iron Mountain Information Management, Inc., Pro Softnet Corp.**, et al. (In The United States District Court For The Eastern District Of Texas, Sherman Division, Civil Action No. 4:10-cv-00435-MHS-ALM) (2012)

Secure Axcess, LLC vs. Bank of America Corp., **Arvest Bank, Bank of the Ozarks, Inc., Compass Bancshares, Inc., First National Bank Texas, First National Bank of Omaha, Zions Bancorporation**, et al. (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:10-cv-00670) (2012)

Kehlie R. Espinosa, Lillian E. Levoff, Thomas Ganin, and Daniel Baldeschi vs. **Hyundai Motor America** (United States District Court, Central District Of California, Case No. 2:12-cv-00800 GW (FFMx)) (2012)

Axcess International, Inc. vs. **Savi Technology, Inc.** (In The United States District Court For The Northern District Of Texas, Dallas Division, Case No. 3:10-cv-01033-F) (2012)

American Airlines, Inc. vs. **Sabre Inc.**, et al. (In The Judicial District Of Tarrant County, Texas, 67th Judicial District, No. 067-249214-10) (2012)

I/P Engine, Inc. vs. AOL, Inc.; **Google Inc.**; IAC Search & Media, Inc.; Gannett Company, Inc.; and Target Corporation (In The United States District Court For The Eastern District Of Virginia, Norfolk Division, Civil Action No. 2:11-cv-512-RAJ) (2012)

Deposition Testimony of Keith R. Ugone, Ph.D.

Realtime Data, LLC d/b/a IXO vs. MetroPCS Texas, LLC; MetroPCS Communications, Inc.; MetroPCS Wireless, Inc.; AT&T, Inc.; AT&T Mobility LLC; **Cellco Partnership d/b/a Verizon Wireless International, Inc.;** Leap Wireless International, Inc.; Cricket Communications, Inc. a/k/a Cricket Wireless, Inc.; Sprint Nextel Corp.; and T-Mobile USA, Inc. (United States District Court, Eastern District of Texas, Tyler Division, Case No. 6:10-cv-00493-LED) (2012)

Realtime Data, LLC d/b/a IXO vs. MetroPCS Texas, LLC; MetroPCS Communications, Inc.; MetroPCS Wireless, Inc.; AT&T, Inc.; AT&T Mobility LLC; Cellco Partnership d/b/a Verizon Wireless International, Inc.; Leap Wireless International, Inc.; Cricket Communications, Inc. a/k/a Cricket Wireless, Inc.; Sprint Nextel Corp.; and **T-Mobile USA, Inc.** (United States District Court, Eastern District of Texas, Tyler Division, Case No. 6:10-cv-00493-LED) (two depositions: 2012 and 2013)

Technical Resource Services, Inc., et al. vs. **Shell Exploration & Production, Company** (In The United States District Court For The Eastern District Of Louisiana, Civil Action No. 09-7339) (2012)

U.S. Bank National Association, Litigation Trustee of the Idearc Inc. et al. Litigation Trust vs. **Verizon Communications Inc., Verizon Financial Services, LLC, GTE Corporation**, and John W. Diercksen (In The United States District Court For The Northern District Of Texas, No. 3:10-CV-1842-G) (2012)

Eon Corp. IP Holdings, LLC vs. T-Mobile USA, Inc., Research In Motion Corporation, **Cellco Partnership d/b/a Verizon Wireless**, et al. (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:10-cv-00379-LED) (2012)

My485, Inc. vs. **Riverside Partners, LLC, d/b/a The Riverside Company and HealthcareFirst, Inc.** (In The District Court, 67th Judicial District, Tarrant County, Texas, Cause No. 067 251767 11) (2012)

In Re Glaceau Vitamin Water Marketing and Sales Practice Litigation (No. II): **The Coca Cola Company and Energy Brands, Inc.** (In The United States District Court, Eastern District Of New York, Case No. 1:11-md-02215-DLI-RML) (2012)

**FLIR Systems, Inc.** vs. Sierra Media, Inc. and Fluke Corporation (The United States District Court, District of Oregon, Portland Division, Case No. 3:10-CV-971-HU) (2012; two depositions)

In Re: Urethanes Antitrust Litigation (Direct Action) – Carpenter Co., Woodbridge Foam Corporation, Dash Multi-Corp, Inc., et al. vs. Bayer AG, **The Dow Chemical Company, Huntsman International LLC, Lyondell Chemical Company, BASF Corporation**, et al. (In The United States District Court For The District Of Kansas, 04-MD-1616 (JWL), No. 08-2617, No. 09-2026, No. 10-2077) (2012)

Deposition Testimony of Keith R. Ugone, Ph.D.

In Re: Urethanes Antitrust Litigation (Class) – Seegott Holdings, Inc., et al. vs. Bayer AG, **The Dow Chemical Company, Huntsman International LLC, Lyondell Chemical Company, BASF Corporation**, et al. (In The United States District Court For The District Of Kansas, MDL-04-1616 (JWL/JPO), No. 05-2265-JWL) (2012)

LSQ Funding Group, L.C. vs. **EDS Field Services n/k/a HP Enterprise Services, LLC** (United States District Court, Middle District Of Florida, Orlando Division, Case No.: 6:10-CV-1246-ORL-ACC-DAB) (2012)

*e***Plus Inc.**, vs. Lawson Software, Inc. (In The United States District Court For The Eastern District Of Virginia, Richmond Division, Civil Action No. 3:09-CV-620 (RFP)) (2012)

CardSoft, Inc. and CardSoft (Assignment For The Benefit Of Creditors), LLC vs. **VeriFone Systems Corporation; Hypercom Corporation; Ingenico S.A.; Ingenico Corp.; Ingenico Inc.**; Shera International Ltd.; and Blue Bamboo (UUSA), Inc. (United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:08-cv-00098) (2012)

**Mitsubishi Heavy Industries, Ltd.** vs. General Electric Co. (In The United States District Court, Middle District Of Florida, Orlando Division, Civil Action No. 6:10-cv-812) (2012)

CEATS, Inc. vs. **Continental Airlines, Inc.; Ticketmaster, L.L.C.; Tickets.com, Inc.; TicketNetwork, Inc.; TicketsNow.com, Inc.; AirTran Airways, Inc.; Alaska Airlines, Inc.; Delta Air Lines, Inc.; Jet Blue Airways Corporation; United Air Lines, Inc.; US Airways, Inc.; and Virgin America, Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:10-cv-120 LED) (2012)

W.L. Gore & Associates, Inc. vs. **GI Dynamics, Inc.** (United States District Court, District Of Arizona, No. CV 10-8088 PCT GMS) (2011)

LML Patent Corp. vs. JPMorgan Chase & Co.; **Wells Fargo Bank, N.A.; Wachovia Bank, N.A.**; Citigroup, Inc.; HSBC Bank USA, N.A.; Capital One National Association; Northern Trust Company; Deutsche Bank Trust Company; PayPal, Inc. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:08-cv-448 DF) (2011)

**Halliburton Energy Services, Inc.** vs. Weatherford International, Inc. and BJ Services Company (In The United States District Court For The Northern District Of Texas, Dallas Division, Civil Action No. 307-cv-2144-K) (2011; two depositions)

**Tyco Healthcare Group LP and United States Surgical Corporation** vs. Ethicon Endo-Surgery, Inc. (In The United States District Court For The District Of Connecticut, Civil Action No: 3:10-cv-00060 (JBA)) (2011 and 2012; two depositions)

Curtis Berrien; Rose Huerta; Tina Musharbash; Fern Prosnitz; Michael Andler; Marcus Boness; Timothy Bonnell; Richard Buford; Elaine Cefola; Kenneth Davis; Jerome Garoutte vs. **New Raintree Resorts International, LLC; RVC Members, LLC; Douglas Y. Bech** (In The United States District Court For The Northern District Of California, Oakland Division, Case No. CV10-3125 CW) (2011)

Deposition Testimony of Keith R. Ugone, Ph.D.

Convolve, Inc. vs. Dell, Inc., Western Digital Corporation, **Hitachi Global Storage Technologies, Inc., and Hitachi, Ltd.** (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2:08-cv-244) (2011)

United States of America *ex rel*. Kurt Bunk and Daniel Heuser v. Birkart Globistics GMBH & Co. Logistik Und Service KG, et al. and United States of America *ex rel*. Ray Ammons v. The Pasha Group, **Gosselin World Wide Moving, N.V., and Gosselin Group, N.V.** (In The United States District Court For The Eastern District Of Virginia, Alexandria Division, No. 1.02cv1168 (AJT/TRJ)) (2011)

Cheetah Omni LLC vs. **Verizon Services Corporation, Verizon Business Network Services Inc., and Verizon Enterprise Delivery LLC** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:09-cv-260-LED) (2011)

Eon Corp. IP Holdings, LLC vs. **Sensus USA Inc.** (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:09-cv-00116) (2011)

Bedrock Computer Technologies LLC vs. **SoftLayer Technologies, Inc.; CitiWare Technology Solutions, LLC; Google Inc.; Yahoo! Inc.; MySpace Inc.; Amazon.com Inc.; PayPal Inc.; Match.com, LLC; and AOL Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 6:09-cv-269) (2011)

Personal Audio, LLC vs. **Apple Inc.**; Sirius XM Radio, Inc.; XM Satellite Radio, Inc.; Coby Electronics, Corp.; Archos, Inc. (United States District Court For The Eastern District Of Texas, Lufkin Division, Case 9:09-cv-00111-RC) (2011)

Beneficial Innovations, Inc. vs. Blockdot, Inc.; CareerBuilder, LLC; CNET Networks, Inc.; Digg, Inc.; Ebaums's World, Inc.; Jabez Network, Inc.; **The New York Times Company**; The Washington Post Company; and The Weather Channel Interactive, Inc. (United States District Court For The Eastern District Of Texas, Marshall Division, Case No. 2:07-CV-263-TJW-CE) (2010)

**St. Jude Medical, Inc. and St. Jude Medical Puerto Rico LLC** vs. Access Closure, Inc. (In The United States District Court For The Western District Of Arkansas, Texarkana Division, Case No. 4:08-cv-04101-HFB) (2010)

Eon Corp. IP Holdings, LLC vs. **Verizon Clinton Center Drive Corp.** (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:08-cv-00385) (2010)

**Tyco Healthcare Group LP** vs. C.R. Bard, Inc. and Davol, Inc. (In The United States District Court For The District Of Delaware, C.A. No. 09-264 (SLR)(MPT)) (2010)

Affinity Labs of Texas, LLC vs. BMW North America, LLC; BMW Manufacturing Co., LLC; Hyundai Motor America, Inc.; Hyundia Motor Manufacturing Alabama, LLC; Kia Motors America, Inc.; Mercedes-Benz USA, LLC; Mercedes-Benz U.S. International, Inc.; and **Volkswagen Group of America, Inc.** (In The United States District Court For The Eastern District Of Texas, Lufkin Division, Civil Action No. 9:08-cv-164-RC) (2010)

CONFIDENTIAL

Deposition Testimony of Keith R. Ugone, Ph.D.

Mirror Worlds, LLC vs. **Apple Inc.** (United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:08-CV-88-LED) (2010)

SP Syntax LLC and SP3 Syntax LLC vs. James Ching Hua Li, Man Kit (Thomas) Chow, Michael K. Chan, Vincent F. Sollitto, Jr, Wayne A. Pratt, John S. Hodgson, David P. Chavoustie, Christopher C. L. Liu, Alice Phang, **Ernst & Young LLP**, and Grobstein, Horwath & Company LLP (Superior Court Of The State Of California, County Of Los Angeles, Case No. BC402910) (2010)

**Gorlick Distribution Centers, LLC** vs. Car Sound Exhaust System, Inc. and Allied Exhaust Systems, Inc. (United States District Court, Western District of Washington at Seattle, Case No. C07-1076 RAJ) (2010)

Stacy Holk, on behalf of Herself and all others similarly situated vs. **Snapple Beverage Corporation** (United States District Court, District of New Jersey, Civil Action No. 3:07-cv-03018-MJC-JJH) and Evan Weiner and Timothy McCausland on behalf of themselves and all others similarly situated vs. Snapple Beverage Corporation (United States District Court For The Southern District Of New York, Civil Action No. 07-cv-08742) (2010)

PharmAthene, Inc. vs. **SIGA Technologies, Inc.** (In The Court Of Chancery In The State Of Delaware, Civil Action No. 2627-VCP) (2010; two depositions)

Good Sportsman Marketing, LLC and IP Holdings, Inc. vs. **Non Typical, Inc., Mark Cuddeback, and Richard Scales Advertising Associates, Inc.** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Case No. 06:07-cv-00177-LED) (2010)

DataTreasury Corporation vs. **Wachovia Corporation, Wachovia Bank National Association**, et al. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2-06CV-072) (2009)

DataTreasury Corporation vs. **Wells Fargo & Company, Wells Fargo Bank, National Association**, et al. (In The United States District Court For The Eastern District Of Texas, Marshall Division, Civil Action No. 2-06CV-072) (2009)

Carpathia Hosting, Inc., Carpathia Hosting, Inc. as nominee and trustee, for Triumviri, Inc., and Triumviri, Inc. vs. Brookshire Enterprises, LLC, Custom Computer Cable, Inc., Jackson Browne, LLC, Courtney Matthews, and **Electronic Data Systems, LLC** (Virginia: In The Circuit Court For Loudoun County, Civil Case No. CL 46964) (2009)

Deposition Testimony of Keith R. Ugone, Ph.D.

MHL Tek, LLC vs. Nissan Motor Co., Nissan North America, Inc., Nissan Technical Center North America, Inc., Hyundai Motor Co., Hyundai Motor America, Hyundai Motor Manufacturing Alabama, LLC, Kia Motors Corporation, Kia Motors America, Inc., Dr. Ing. H.C.F. Porsche AG, Porsche Cars North America, Inc., Bayerische Motoren Werke AG, BMW of North America LLC, BMW Manufacturing Co., LLC, Isuzu Motors Ltd., Isuzu Motors America, Inc., Subaru of America, Inc., Subaru of Indiana Automotive, Inc., **Audi AG, Volkswagen AG, and Volkswagen Group of America, Inc.** (In The United States District Court For The Eastern District of Texas, Marshall Division, Civil Action No. 2:07-cv-289-TJW) (2009)

**Crane Co. and Dixie-Narco Inc.** vs. SandenVendo America, Inc. and Royal Vendors, Inc. (In The United States District Court For The Eastern District of Texas, Marshall Division, Civil Action No. 2:07-cv-42) (2009)

**LG Electronics Inc.** vs. Hitachi, Ltd., Hitachi Automotive Products (USA), Inc., Clarion Co. Ltd., Clarion Corporation of America and Xanavi Informatics Corporation. (In The United States District Court, Eastern District Of Texas, Texarkana Division, Civil Action No. 5:07-CV-90) (2009)

**Paradox Security Systems, Ltd., Shmuel Hershkovitz, and Pinhas Shpater** vs. ADT Security Services, Inc., Digital Security Controls, Ltd., Monitronics International, Inc., and Protection One, Inc. (In The United States District Court For The Eastern District Of Texas, Marshall Division, C. A. No. 2:06-CV-462 (TJW)) (2009)

i4i Limited Partnership and Infrastructures for Information Inc. vs. **Microsoft Corporation** (In The United States District Court For The Eastern District Of Texas, Tyler Division, Civil Action No. 6:07-CV-113-LED) (2009)

**The Compliance Source, Inc. and Digital Docs, Inc.** vs. GreenPoint Mortgage Funding, Inc. (In The United States District Court, Northern District Of Texas, Dallas Division, Civil Action No. 3-06-cv1057-L (ECF)) (2008)

Hearing Components, Inc. vs. **Shure, Inc.** (In The United States District Court For The Eastern District of Texas, Lufkin Division, Civil Action No. 9:07-cv-104 (RHC)) (2008)

**Lutron Electronics Co. Inc.** vs. Control4 Corporation (In The United States District Court For The District Of Utah, Central Division, Civil Action No. 2-03-CV-00401 DAK) (2008)

ELB Enterprises of Dallas, L.P. and Bai-Mac, Inc. vs. **McDonald's Corporation, McDonald's USA, LLC, and Golden Arch of Texas, Inc., and Ricardo Colon** (In The Court At Law, Court No. 4, Dallas County, Texas, Cause No. CC-06-17226-D) (2008)

Rambus, Inc. vs. **Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Semiconductor, Inc., and Samsung Austin Semiconductor, L.P.** (United States District Court, Northern District Of California – San Jose Division, Case No. 05 02298 RMW) (2008)

Deposition Testimony of Keith R. Ugone, Ph.D.

**TiVo Inc.** vs. EchoStar Communications Corporation, EchoStar DBS Corporation, EchoStar Technologies, and Echosphere Limited Liability Company (United States District Court for the Eastern District of Texas, Marshall Division, Case No. 2 – 04CV01 DF) (2008)

Iovate Health Sciences, Inc., University of Florida Research Foundation, Inc. and Flamma SpA vs. **Bio-Engineered Supplements & Nutrition, Inc., d/b/a BSN, Inc.** and Medical Research Institute (In The United States District Court For The Eastern District Of Texas, Lufkin Division, Case No. 9:07-cv-46) (2008)

Ronald A. Katz Technology Licensing, L.P. vs. **The DIRECTV Group, Inc., DIRECTV, Inc., DIRECTV Holdings, LLC, DIRECTV Enterprises, LLC, and DIRECTV Customer Services, Inc.** (In The United States District Court, Central District of California, Case No. 2:07-CV2322 RGK (FFMx) and Case No. 2:07-ML-1816-B RGK (FFMx), originally filed in the Eastern District of Texas as Case No. 9:06-CV-00193-RHC) (2008)

Quantum Unlimited, LLC, Quantum of Troon North, LLC, and Redsky Resorts of Troon North, LLC n/k/a Redsky Resorts, LLC vs. **Wyndham International, Inc.**, Tempus Resorts International, Ltd, **The Blackstone Group L.P.**, et al. (In The District Court Of Dallas County, Texas, 298th Judicial District) (2008)

In the Matter of Certain 3G Wideband Code Division Multiple Access (WCDMA) Handsets and Components Thereof (InterDigital Communications Corporation and InterDigital Technology Corporation vs. **Samsung Electronics Co., Ltd, Samsung Electronics America, Inc., and Samsung Telecommunications America LLC**; The United States International Trade Commission, Washington, D.C., Investigation No. 337-TA-601) (2008; two depositions)

**Bueno Conato, LLC** vs. Bajio LLC, Bajio National LLC, Bajio Franchising LLC, and Doctor's Associates, Inc. (American Arbitration Association, Western Case Management Center, Case No. 77 114 Y 00254 06 WYGI) (2008)

O$_2$Micro International Limited vs. **Rohm Co. Ltd.**, Sony Corporation, Sony EMCS Corporation, Sony Corporation of America, and Sony Electronics Inc. (In The United States District Court For The Eastern District of Texas, Marshall Division, Case No. 2-05-CV-00211-TJW) (2008)

**Blackboard Inc.** vs. Desire2Learn Inc. (In The United States District Court For The Eastern District of Texas, Lufkin Division, Case No 9:06CV155) (2008)

**Abbott Laboratories and Abbott Diabetes Care Inc.** vs. Roche Diagnostics Corporation, Roche Diagnostics Operations, Inc., and Bayer Healthcare LLC; Abbott Laboratories and TheraSense, Inc. vs. Becton, Dickinson and Company and Nova Biomedical Corp. (In The United States District Court, Northern District of California, Civil Action No. C04-2123 MJJ, Civil Action No. C04-3327 MJJ, Civil Action No. C04-3732 MJJ, and Civil Action No. C05-3117 MJJ) (2008; two depositions)

Deposition Testimony of Keith R. Ugone, Ph.D.

United States of America, ex rel Toni R. Barron and Vicky J. Scheel vs. Deloitte & Touche, LLP, Deloitte Touche Consulting Group, LLC, Deloitte & Touche Consulting Group Holding, LLC, Medicaid Solutions of Texas, and **National Heritage Insurance Company** (In The United States District Court, Western District of Texas, Civil Action No. SA-99-CV-1093FB) (2007)

**Akamai Technologies, Inc. and Massachusetts Institute of Technology** vs. Limelight Networks, Inc. (In The United States District Court, District of Massachusetts, Civil Action No. 06 CA 11109 RWZ and Civil Action No. 06 CA 11585 RWZ) (2007)

**Electronic Data Systems Corporation** vs. Towers, Perrin, Forster & Crosby, Inc. (American Arbitration Association Northeast Case Management Center, Case No. 13 489 Y 00146 07) (2007)

Computer Acceleration Corporation vs. **Microsoft Corporation** (In The United States District Court For The Eastern District of Texas, Lufkin Division, Civil Action No. 9:06CV140-RHC) (2007)

**Tinkers & Chance** vs. LeapFrog Enterprises, Inc. (In The United States District Court, Eastern District of Texas, Marshall Division, Civil Action No. 2-05cv-349-TJW) (2007)

**DEJ Productions, Inc., Blockbuster Inc., and First Look Studios, Inc.** vs. Media 8 Entertainment and MDP Distribution, Inc. (In The District Court of Dallas County, Texas, M-298th Judicial District, Cause No. 06-01887) (2007)

Art International Forwarding, Inc. vs. **The Pasha Group and Gosselin Worldwide Moving, N.V.** (In The United States District Court, Eastern District of Missouri, Eastern Division, Case No. 4:05-CV-01410-RWS) (2007)

Applied Medical Resources Corp. vs. **United States Surgical Corporation** (In The United States District Court For The Central District Of California, Southern Division, Case No. SACV 03-1267 CJC (MLGx)) (2007)

**Nike, Inc.** vs. adidas Salomon North America, Inc., adidas America Inc. d/b/a adidas International, and adidas Promotional Retail Operations Inc. (In The United States District Court For The Eastern District of Texas, Lufkin Division, Case No. 9:06-cv-43-RHC) (2007)

**BIAX Corporation** vs. Intel Corporation and Analog Devices, Inc. (In The United States District Court For The Eastern District of Texas, Marshall Division, Civil Action No. 2-05cv-184-TJW) (2007)

Two-Way Media, LLC vs. **America Online, Inc.** (In The United States District Court For The Southern District of Texas, Corpus Christi Division, Civil Action No. C-04-089) (2007)

In re Enron Corporation Securities Litigation; Kevin Lamkin, Janice Schuette, Robert Ferrell and Stephen Miller vs. **UBS Financial Services, Inc. and UBS Securities LLC** (Civil Action No. H:02-CV-0851; Consolidated MDL) and Samuel Giancarlo vs. **UBS Financial Services, Inc., UBS Securities LLC., and UBS AG** (Civil Action No. H-03-4359; Consolidated MDL) (In The United States District Court For The Southern District of Texas, Houston Division) (2007)

Deposition Testimony of Keith R. Ugone, Ph.D.

O₂Micro International Limited vs. **Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.** (In The United States District Court For The Eastern District of Texas, Marshall Division, Case No. 2:04-CV-323 (Ward)) (2007)

CNX Gas Corporation and CNX Gas Company LLC vs. **CDX Gas Company LLC** vs. CONSOL Energy, Inc. (In The United States District Court For The Western District of Pennsylvania, Civil Action No. 05-CV-1574) (2007)

**Parkade Center, Inc.** vs. Simon Property Group (Texas), L.P. and Simon Property Group (Delaware), Inc. (In The District Court 398th Judicial District of Hildalgo County, Texas, Cause No. C-2584-06-1) (2007)

The Post Confirmation Trust (The Fleming Companies) vs. **Digital Exchange Systems, Inc.** (In The United States District Court for the Eastern District of Texas, Texarkana Division, No. 5:05-CV-165(TJW)) (2007)

Golden Bridge Technology, Inc. vs. **Nokia, Inc., Motorola, Inc., T-Mobile USA, Inc., Ericsson, Inc., Qualcomm Incorporated, and Lucent Technologies, Inc.** (In The United States District Court for the Eastern District of Texas, Tyler Division, Civil Action No: 6:06-cv-00163-LED) (2006)

John P. Rochon, Nick G. Bouras, Nu-Kote International, Inc., J.R. Investment Corporation, Richmont Corporation and Nu-Kote Acquisition Corporation vs. **Akin Gump Strauss Hauer & Feld, LLP and Alan Feld** (In The District Court of Dallas County, Texas, 192nd Judicial District, Cause No. 04-03311-K) (2006)

**Autobytel Inc.** vs. Dealix Corporation (United States District Court Eastern District of Texas, Marshall Division, Case No. 2:04-cv-338-LED) (2006)

**Electronic Data Systems Corporation and EDS Information Systems, L.L.C.** vs. MCI Communications Services, Inc. (Before the American Arbitration Association, Arbitration No. 13 181 00976 06) (2006)

Jeffrey A. Kozak vs. **Medtronic Sofamor Danek** (In The United States District Court for the Southern District of Texas, Houston Division, Civil Action Number H-03-4400) (2006)

Alcon Manufacturing, Ltd. and Alcon Laboratories, Inc. v. **Advanced Medical Optics, Inc.** (In The United States District Court for the Northern District of Texas, Fort Worth Division, Civil Action No. 4-05CV-496-A) (2006)

Eckhard U. Alt, MD vs. **Medtronic, Inc.** (In The United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:04CV370) (2006)

Deposition Testimony of Keith R. Ugone, Ph.D.

**AVID Identification Systems, Inc.** vs. Philips Electronics North America Corporation, Koninklijke Philips Electronics N.V., The Crystal Import Corporation, Medical Management International, Inc., and Datamars SA (In The Eastern District of Texas, Marshall Division, Case No. 2:04-CV-183) (2006)

In re: **Williams** Securities Litigation (WCG Subclass) (In The United States District Court for the Northern District of Oklahoma, Case No. 02-CV-72H(M)) (2006)

Immunocept, LLC, Patrice Anne Lee, and James Reese Matson vs. **Fulbright & Jaworski, LLP** (United States District Court Western District of Texas, Austin Division, Cause No. A 05 CA 334 SS) (2006)

Children's Medical Center of Dallas vs. **Columbia Hospital at Medical Center Dallas Subsidiary L.P.** (In The United States District Court Northern District Of Texas, Dallas Division, Civil Action No. 3:04-CV-2436-BD) (2006)

Vantage Controls, Inc. vs. **Lutron Electronics Co., Inc.** (In The United States District Court for the District of Utah, Central Division, Case No. 2:03-CV-00488TC) (2006)

Blueberry Sales, L.P., f/k/a Blueberry Confections, Inc. vs. **ED&F Man Sugar, Inc.** (United States District Court for the Western District of Texas, El Paso Division, EP-04-CA0193) (2005)

**Cummins-Allison Corp.** vs. Glory LTD., Glory Shoji Co., LTD., and Glory (U.S.A.), Inc. (United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2-03-CV-358 (TJW)) (2005)

Gilbert R. Sada and Victor L. Hernandez vs. **Jack In The Box Inc.** (United States District Court for the Western District of Texas, San Antonio Division. Civil Action No. SA04CA0541 (OG)) (2005)

Trinity Mother Frances Health System and Mother Frances Hospital vs. **East Texas Medical Center Regional Healthcare System and East Texas Medical Center** (United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:03CV464) (2005)

**TiVo Inc.** vs. EchoStar Communications Corporation, EchoStar DBS Corporation, EchoStar Technologies, and Echosphere Limited Liability Company (United States District Court for the Eastern District of Texas, Marshall Division, Case No. 2 – 04CV01 DF) (2005; two depositions)

William Rutledge Scott, Individually and as Independent Executor of the Estate of Mozelle Rutledge Scott, Deceased vs. **Hughes & Luce, L.L.P., Kathryn G. Henkel, and Laurel Stephenson** (In the County Court of Tom Green County, Texas, Cause No. 02P211-L) (2005)

Junitha Bee, et al. vs. Kavilico Corporation, ITT Neodyne, **Parker Hannifin**, and the Boeing Company (Superior Court of the State of California, County of Los Angeles, Case No. C99-589C) (2005)

**William A. Wise** vs. El Paso Corporation (American Arbitration Association, Houston, Case No. 70-Y-116-00327-04) (2005)

Deposition Testimony of Keith R. Ugone, Ph.D.

Dr. Phillips, Inc. vs. **Control Laser Corporation and Excel Technology, Inc.** (In the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida, Case No. 02-CA-000075, Division: 32, Business Court) (2005)

MOSAID Technologies Incorporated vs. **Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Semiconductor, Inc., and Samsung Austin Semiconductor, L.P.** (In the United States District Court for the District of New Jersey, Civil Action No. 01-4340 (WJM)) (2004)

Kathleen C. Cailloux, Kenneth F. Cailloux, Paula L. Heilman, and Robert Stephen Andresakis vs. **Baker Botts, L.L.P.**, Wells Fargo Bank Texas, N.A., William R. Goertz, S. Stacy Eastland, and Stephen T. Dyer (In the 198th Judicial District Court of Kerr County, Texas, Civil Action No. 03-603-B) (2004)

**Brooktrout, Inc.** vs. Eicon Networks Corporation, Eicon Networks, Inc. (In the United States District Court for the Eastern District of Texas, Marshall Division, Case Number 03-CV-59) (2004)

**MCI Worldcom Network Services, Inc.** vs. Twister Communications Network, Inc. (In the District Court of Montgomery County, Texas, 221st Judicial District, Civil Action No. 00-05-03124CV) (2004)

Colgate-Palmolive Company vs. **The Procter & Gamble Company** (In the United States District Court for the Southern District of New York, 03 Civ. 9348 (LLS) (DFE)) (2004)

Airbel Wireless, Inc. and JAVS Telecom, Inc. vs. **AT&T Wireless Services, Inc.** (American Arbitration Association, New York, Case No. 13 Y 199 00709 03) (2004)

**Electronic Data Systems Corp.** vs. Aspect Communications Corp. (American Arbitration Association, San Francisco, Case No. 74 Y 117 00586 03 GAP) (2003 and 2004; two depositions)

Anthony Stella and Mary S. Stella, Individually and on Behalf of all Persons Similarly Situated in the State of Texas vs. **Grant Thorton, L.L.P.** (In the District Court of Galveston County, 212th Judicial District) (2003)

Administaff, Inc. and Administaff of Texas, Inc. vs. **Aetna Life Insurance Company** (In the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. 4:01CV3802) (2003)

GATT Trading, Inc. vs. **Sears, Roebuck and Co.** (In the United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:01CV260) (2003)

**IEX Corporation** vs. Blue Pumpkin Software, Inc. (In the United States District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:01CV16) (2003 and 2005; two depositions)

Deposition Testimony of Keith R. Ugone, Ph.D.

Steven R. Keene d/b/a Pagers Plus vs. **AT&T Wireless, Inc., a/k/a AWS National Accounts, L.L.C., and First Cellular Group of Shreveport, Inc. d/b/a AT&T Wireless Services** (Judicial Arbitration and Administration Services, Inc.) (2003)

Teleplus, Inc., vs. **MCI Telecommunications Corporation, MCI International Telecommunications Corporation, MCI International Inc., MCI Communications Corporation, MCI Worldcom, Inc., MCI Global Support Corporation, MCI Global Access Corporation, and Avantel, S.A.** (In the United States District Court Western District of Texas, San Antonio Division, Civil Action No. SA-98-CA-0849 FB) (2003)

Cavalry Investments, L.L.C. vs. **Sunstar Acceptance Corporation and NationsCredit Commercial Corporation** (County Court at Law, Number 4, Dallas County, Texas, Cause No. 99-02296-D) (2002)

Customedia Technologies, LLC and William H. Lewis vs. Joby Hughes, Felsman, Bradley, Gunter & Dillon, Stephen Perkins, **Sidley & Austin**, Litigation Risk Management, Inc., and Granite Ventures, Inc. (In the District Court of Harris County, Texas, 125th Judicial District, Case No. 2000-26667) (2002 and 2003; two depositions)

Edward Ahearn vs. **Ernst & Young, L.L.P.** (Before the American Arbitration Association, Case No. 13-107-00136-01) (2002)

John H. Houser and Frederick A. Raffa vs. **Wachovia Corporation** (In the United States District Court, Middle District of Florida, Tampa Division, Case No. 8:01-CV1041-T-17MSS) (2002)

**Brine, Inc. and Sports Licensing, Inc.** vs. STX, Inc. and STX, LLC (In the United States District Court for the District Massachusetts, Worchester Division, Civil Action No. 99-40167) (2002 and 2003; two depositions)

Morgan Howard, L.L.C. vs. **Immedient, Inc.** (In the County Court at Law No. 3, Dallas County, Texas, Cause No. 01-899-C) (2002)

**Poly-America, Inc.** vs. Serrot International, Inc. (In the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:00CV1457-D) (2002)

Andrew Cumming vs. **J. C. Penney Company, Inc.** (In the District Court of Dallas County, Texas, 160th Judicial District, Civil Action No. 71-160-00077-01) (2002)

Inter-Tel, Incorporated vs. **Bank of America, Arizona** (In the Superior Court of the State of Arizona in and for the County of Maricopa, Case No. CV 96-00867) (2002)

Tyler Jet, L.L.C., TeamXtreme Racing, L.L.C., and Burl Outlaw vs. **Lycos, Inc.** (In the United States District Court for the Eastern District of Texas, Lufkin Division, Civil Action No. 9:00CV-179) (2001)

EPI Environmental Products, Inc. vs. **In-Line Plastics, L.C.** (In the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. 4:98CV4209) (2001)

Deposition Testimony of Keith R. Ugone, Ph.D.

Health Laboratories of North America, Inc., et al. vs. **Neodata Services, Inc.** (In the Superior Court of the State of Arizona In and For the County of Maricopa, Civil Action No. CV1998-008143) (2001)

Acres Gaming Inc. vs. Mikohn Gaming Corporation and **Casino Data Systems** (In the United States District Court District of Nevada, Civil Action No. CV-S-01462-PMP (RJJ)) (2000)

COC Services, Ltd. vs. **CompUSA, Inc., Grupo Carso S.A. de C.V., Grupo Sanborns S.A. de C.V.**, et. al. (In the District Court 116th Judicial District of Dallas County, Texas, Case No. 0000023) (2000)

Healthtech Diagnostics, Corporation and Oncogenetics, Inc. vs. **Impath, Inc. and Impath-HDC, Inc.** (In the District Court of Dallas County, Texas, L-193rd Judicial District, Case No. 97-08552) (2000)

Pacific Southwest Bank and NAFCO Holding Company, LLC vs. **Electronic Data Systems Corporation** (In the District Court of Dallas County, Texas, 191st Judicial District, Cause No. 98-5954) (2000)

Anthony D. Viazis, et. al. vs. **American Association of Orthodontists**, et. al. (In the United States District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:98-CV-245) (2000)

**Kvaerner Oilfield Products, Inc.** vs. Cooper Cameron Corp. (In the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. H-98-3369) (2000)

J.V. Smith, et al. vs. Randyl Louis Harrell, **Enterprise Products Company**, et. al. (In the District Court of Liberty County, Texas, 75th Judicial District) (2000)

Norman Yourish, et. al. vs. **California Amplifier**, et. al. (Superior Court of the State of California for the County of Ventura, Civil Action No. CIV173569) (2000)

David Kimberly Hackett, individually and Samuel G. Swope, individually and as Assignees of Courtesy Auto Group, Inc. vs. **Electronic Data Systems, Inc.** (In the United States District Court for the Northern District of Illinois, Eastern Division, Civil Action No. 98-1065-CIV-19-A) (2000)

County Council of Northampton County vs. **SHL Systemhouse Corp.** vs. Northampton County (In the United States District Court for the Eastern District of Pennsylvania, Civil Action No. 98-CV-0088) (1999)

**Natural Reserves Group, Inc.** vs. Baker Hughes, Inc., et. al. (In the United States District Court for the Southern District of Texas, Harris County Division, Civil Action No. 96-31380) (1999)

**BeautiControl, Inc.** vs. Ryco Packaging Corp. vs. Arrowpak, Inc. and Custom Decorative Systems, Inc. (In the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3-98CV1775-H) (1999)

Deposition Testimony of Keith R. Ugone, Ph.D.

Peoples National Bank, Peoples National Mortgage Corp., and Texas Peoples National Bancshares, Inc. vs. Russell A. McClendon, **St. Paul Mercury Insurance Company**, Smith-Reagan Life and Health Insurance Agency, Inc. and Gary Robertson (In the District Court Lamar County, Texas, 62nd Judicial District) (1999)

In the Matter of Application No. 96-1, **Olympic Pipe Line Company**: Cross Cascade Pipeline Project (Before the State of Washington Energy Facility Site Evaluation Council) (1999)

Petrofac, Inc. and Petrofac International, Ltd. vs. **Howe-Baker Engineers, Inc. and Omar J. Ghalayini** (In the County Court at Law; Smith County, Texas, Cause No. 39,839) (1998)

L & S Concrete Company, Inc., Gilliam Brothers, Inc., Webco, Inc., Charles T. Weaver, Gus Blass, III, Bob Townsell, Alex Lieblong, and Dr. Thomas Robinson vs. **Trans World Airlines, Inc.** (In the United States District Court for the Eastern District of Arkansas Western Division, Case No. Civ-97-378) (1998)

Magnetic Technologies, S.P.R.L. vs. **Connectware, Inc.** (In the District Court Dallas County, Texas, 68th Judicial District) (1998)

Jeannean Heller, CRNA; Joanne Lewis, CRNA; Harold Newsom, CRNA; and Lola H. Wright, CRNA vs. **Raymond M. Dunning, Jr. and Columbia Medical Center of Lewisville Subsidiary L.P., d/b/a Columbia Medical Center of Lewisville, Dallas, Texas** (American Arbitration Association, Dallas, Texas Region) (1998)

Proposed Form A Acquisition of Control of Universal Fidelity Life Insurance Company, an Oklahoma Domestic stock insurer, by **Conseco, Inc.**, A Delaware Corporation (Before the Insurance Commissioner of the State of Oklahoma, Case No. 97-207-TRN) (1997)

**Excel Telecommunications, Inc., Excel Communications, Inc., Steve Smith, and Kenny Troutt** vs. Linden Wood, Brad Campbell, Candy Campbell, Jerry Szeszulski, and Team Excel of Independent Representatives (American Arbitration Association, Dallas, Texas Region) (1997)

**Gourmet Award Foods** vs. Continental Extrusion, Genpak Corporation, and Heartland Packaging Corporation (Judicial District Court of Dallas County, Texas, D-95th Judicial District) (1997)

L. Anne H. Frazier vs. **Owsley Brown Frazier** (Jefferson Family Court, Division Eight; Louisville, Kentucky, Case No. 94-FD-01957) (1997)

Dodee Frost Crockett vs. **Randy Miller and Gina Kaiser** (In the District Court of Dallas County, Texas; 192nd Judicial District) (1996)

**Reedrill Corporation** vs. Driltech, Inc. (U.S. District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:95CV189) (1996)

Robert Tuck vs. **Westec Security, Inc.** (Superior Court of the State of California for the County of Los Angeles, Case No. BC131221) (1996)

Deposition Testimony of Keith R. Ugone, Ph.D.

James Hylsky and Terri Hylsky vs. **Fruehauf Trailer Corporation**, et. al. (In the Circuit Court Twentieth Judicial Circuit St. Clair County, Illinois) (1996)

In Re: **CSC Industries, Inc.** and In Re: **Copperweld Steel Company** (In the United States Bankruptcy Court for the Northern District of Ohio, Eastern Division, Civil Case No. 4:93bk41898) (1996)

Nationwide Business Telephones and Team Centrex vs. **Introlink Communications System, Inc. and Pacific Bell, Inc.** (Superior Court of the State of California for the County of Los Angeles, Case No. BC009783) (1996)

TriCom, Inc. vs. **Electronic Data Systems Corporation** (U.S. District Court for the Eastern District of Michigan, Southern Division, Civil Action No. 2:92CV76374) (1995)

Lacerta Enterprises, Inc. dba Frontline Systems, Inc. vs. **Geac Computers, Inc. and Fasfax Corporation** (U.S. District Court for the District of Arizona, Case No. CIV 95-0649 PHX (ROS)) (1995)

Bluebonnet Savings Bank, et. al. vs. **Federal Deposit Insurance Corporation**, et. al. (U.S. District Court for the Northern District of Texas, Dallas, Civil Action No. 3:91CV1066) (1995)

Circo Craft Company, Inc. vs. **AMP-AKZO Corporation**, et. al. (Superior Court of the State of California for the County of San Diego, North County District) (1995)

BancTec USA, Inc. vs. **Advanced Financial Solutions**, et. al. (U.S. District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:93CV1277) (1994)

**Ivy Goth** vs. Datsun-Nissan Motor Company, Ltd., et. al. (Superior Court of the State of California for the County of Los Angeles, Case No. SC013502) (1994)

Cybor Corporation vs. **FAS Technologies and FAStar Ltd.** (U.S. District Court for the Northern District of California, San Jose, Civil Action No. 5:93CV20712) (1994)

Texas State Bank, et. al. vs. **Electronic Data Systems Corporation** (206th District Court of Hidalgo County, Texas) (1994; two depositions)

Auto Color Specialists, Inc. and Polly Chen vs. **BASF** (Superior Court of the State of California for the County of Orange, Case No. 677861) (1994)

**Tactical Edge, Inc.** vs. Gall's, Inc. (District Court of the Fourth Judicial District of the State of Idaho in and for the County of Ada) (1994)

Arley Del Gado vs. **County of Los Angeles** (Superior Court of the State of California for the County of Los Angeles) (1993)

Dominquez vs. **Holy Cross Hospital** (Superior Court of the State of California for the County of Los Angeles) (1993)

Deposition Testimony of Keith R. Ugone, Ph.D.

**Union Oil Company of California** vs. International Insurance Company, et. al. (Superior Court of the State of California) (1993)

Maranatha Music! vs. **Capital Cities, Inc./ABC, Inc., and Word, Inc.** (U.S. District Court for the Western District of Texas, Waco Division) (1993)

**Villarreal** vs. East Side Union High School District (Superior Court of the State of California) (1993)

Official Committee of Creditors Holding Unsecured Claims on behalf of First Capital Holdings Corporation vs. **Shearson Lehman Brothers Holdings Inc.**, et. al. (U.S. District Court for the Central District of California) (1993)

Chroma Lighting and Charles T. Von Der Ahe vs. **GTE Products Corporation and Sylvania Lighting Services Corporation** (U.S. District Court for the Central District of California, Civil Case No. 2:91CV6424) (1993; three depositions)

**Sunbelt Television, Inc.** vs. Jones Intercable, Inc. (U.S. District Court for the Central District of California, Civil Case No. 2:91CV3506) (1992)

Holabird Sports Discounters vs. **Tennis Tutor, Inc.** (U.S. District Court for the District of Maryland, Civil Action No. 1:91CV2208) (1992)

Expo-Tech Electrical & Plumbing Services vs. **Greyhound Exposition Services** (1992)

**De Laurentiis Entertainment Group, Inc.** Securities Litigation; **De Laurentiis Film Partners** Securities Litigation (U.S. District Court for the Central District of California) (1991; two depositions)

James T. Ryan vs. **Crowley Towing and Transportation and Shell Oil Company** (Superior Court of the State of California for the County of Los Angeles) (1991)

**Clayton Jacobson** vs. Kawasaki Heavy Industries, Ltd., Japan; Kawasaki Motors Corporation, USA; and Kawasaki Motors Manufacturing Corporation, USA (U.S. District Court for the Central District of California) (1991)

Advanced Building Maintenance, Inc., vs. **Premier Ventures, Inc., dba Premier Building Maintenance** (Superior Court of the State of California for the County of Los Angeles) (1990)

Frank V. and Gloria Lumbert vs. **Robert C. Skinner and Lillian R. Skinner**, et. al. (Superior Court of the State of California for the County of Los Angeles) (1990)

Plaintiff vs. **Valley Hunt Club**, Tournament of Roses, et. al. (Superior Court of the State of California) (1990)

Kippy Thomas vs. **Mary Lendo and Circle K**, (Superior Court of the State of California for the County of Riverside) (1990)

**Exhibit  3**

CONFIDENTIAL

# Facts, Data, and Other Information Considered

| Description | Bates Prefix | Start | End |
|---|---|---|---|

### Legal Documents

Declaration of Ali Goldstein dated September 27, 2013 and Associated Exhibits

Declaration of Patricia Erin DeVincenzo dated September 20, 2013 and Associated Exhibits

Second Amended Complaint in the Yanira Algarin and Patsy Murdock, On Behalf of Themselves and All Others Similarly Situated v. Maybelline, LLC d/b/a Maybelline New York Matter (US District Court, Southern District of California, 12-cv-3000 AJB DHB)

### Deposition Transcripts and Associated Exhibits

30(b)(6) Deposition of Ali Goldstein taken November 5, 2013 and Associated Exhibits in the Yanira Algarin and Patsy Murdock, On Behalf of Themselves and All Others Similarly Situated v. Maybelline, LLC d/b/a Maybelline New York Matter (US District Court, Southern District of California, 12-cv-3000 AJBDHB)

Deposition of Patsy Murdock taken October 30, 2013 in the Yanira Algarin and Patsy Murdock, On Behalf of Themselves and All Others Similarly Situated v. Maybelline, LLC d/b/a Maybelline New York Matter (US District Court, Southern District of California, 12-cv-3000 AJB DHB)

Deposition of Yanira Algarin taken October 30, 2013 in the Yanira Algarin and Patsy Murdock, On Behalf of Themselves and All Others Similarly Situated v. Maybelline, LLC d/b/a Maybelline New York Matter (US District Court, Southern District of California, 12-cv-3000 AJB DHB)

### Expert Reports and Associated Documentation

Study of Consumer Perceptions of Maybelline SuperStay Products by Dr. Eli Seggev dated December 9, 2013

### Documents Supplied by Maybelline

| Description | Bates Prefix | Start | End |
|---|---|---|---|
| Copy of Maybelline Superstay 24 HR Pricing Details (11-4-13) Updated  Formatted  .xlsx ("IRI Data") | | | |
| Superstay Competitor Sales, 2009 - May 19, 2013 | | | |
| Total U.S. - Multi-Outlet Dollar Sales, 2012 | | | |
| IRI Infoscan, Current Year Ending 8/7/2011 Presentation by Synovate, 2011 | MAYB_ALG | 000658 | 000677 |
| Retail Sales Data for SuperStay 24 Lip Color Launch: January 2011 | MAYB_ALG | 010017 | 010017 |
| Retail Sales Data for SuperStay 24HR Makeup Launch: July 2009 | MAYB_ALG | 010018 | 010018 |
| Consumer Affairs Case Details, Case #6558559 | MAYB_ALG | 010019 | 010024 |
| Records for SuperStay 24HR Makeup (MAYB_ALG_010025_CONFIDENTIAL.xls) | MAYB_ALG | 010025 | 010025 |
| Records for SuperStay 24 Lip Color (MAYB_ALG_010026_CONFIDENTIAL.xls) | MAYB_ALG | 010026 | 010026 |
| L'Oreal Lip Color Early Trier Study Report Presentation by Synovate, September 2011 | MAYB_ALG | 010027 | 010162 |
| Ipsos InnoQuest Results: # of Times Ever Purchased | MAYB_ALG | 010163 | 010163 |
| L'Oreal Paris/Maybelline Lip Color Early Trier Study (Final QNR 6-30-11) Questions | MAYB_ALG | 010164 | 010187 |

# Facts, Data, and Other Information Considered

| Description | Bates Prefix | Start | End |
|---|---|---|---|
| Maybelline Superstay 24 2 Step LC and Maybelline Superstay 24 Hr FD Sales for the Four Weeks Ending Jan 21, 2009 - June 16, 2013 | MAYB_ALG | 010191 | 010194 |

## Documents Independently Obtained

"About Ulta Beauty," Ulta.com. (http://www.ulta.com/ulta/common/about.jsp, viewed on December 7, 2013.)

"Company Overview of Maybelline, LLC," Businessweek. (http://investing.businessweek.com/research/stocks/private/snapshot.asp?privcapId=321417, viewed on November 6, 2013.)

"Customer reviews: Maybelline New York Super Stay 24Hr Makeup," Amazon.com. (http://www.amazon.com/Maybelline-Super-Makeup-Porcelain-Ivory/product-reviews/B002LFQ6LO/ref=cm_cr_pr_btm_link_4?ie=UTF8&filterBy=addFiveStar&pageNumber=4&showViewpoints=0&sortBy=bySubmissionDateDescending, viewed on November 11, 2013.)

"Customer reviews: Maybelline New York Super Stay 24Hr Makeup," Amazon.com. (http://www.amazon.com/Maybelline-Super-Makeup-Porcelain-Ivory/product-reviews/B002LFQ6LO/ref=cm_cr_pr_hist_5?ie=UTF8&filterBy=addFiveStar&showViewpoints=0&sortBy=bySubmissionDateDescending, viewed on November 11, 2013.)

"Customer reviews: Maybelline New York SuperStay 24, 2-step Lipcolor," Amazon.com, (http://www.amazon.com/Maybelline-Superstay-2-step-Lipcolor-Sienna/product-reviews/B00467AYL8/ref=dp_top_cm_cr_acr_txt?showViewpoints=1, viewed on December 9, 2013.)

"Customer reviews: Maybelline New York Superstay 24, 2-step Lipcolor," Amazon.com. (http://www.amazon.com/Maybelline-Superstay-2-step-Lipcolor-Continuous/product-reviews/B00467D1TU/ ref=cm_cr_pr_btm_link_next_2?ie=UTF8&filterBy=addFiveS%E2%80%A6, viewed on November 11, 2013.)

"Customer reviews: Maybelline New York Superstay 24, 2-step Lipcolor," Amazon.com. (http://www.amazon.com/Maybelline-Superstay-2-step-Lipcolor-Continuous/product-reviews/B00467D1TU/ ref=cm_cr_pr_btm_link_next_3?ie=UTF8&filterBy=addFiveStar&pageNumber=3&showViewpoints=0&sortBy=bySubmissionDateDescending, viewed on November 11, 2013.)

"Customer reviews: Maybelline New York Superstay 24, 2-step Lipcolor," Amazon.com. (http://www.amazon.com/Maybelline-Superstay-2-step-Lipcolor-Continuous/product-reviews/B00467D1TU/ ref=cm_cr_pr_hist_5?ie=UTF8&filterBy=addFiveStar&showViewpoints=0&sortBy=bySubmissionDateDescending, viewed on November 11, 2013.)

"Customer reviews: Maybelline New York SuperStay 24, 2-step Lipcolor," Amazon.com. (http://www.amazon.com/Maybelline-Superstay-2-step-Lipcolor-Eternal/product-reviews/B0046798IS/ref=sr_1_2_cm_cr_acr_txt?ie=UTF8&showViewpoints=1, viewed on November 6, 2013.)

"Customer reviews: Maybelline New York SuperStay 24HR Makeup," Amazon.com, (http:// www.amazon.com/...akeup-Porcelain-Ivory/product-reviews/B002LFQ6LO/ ref=cm_cr_pr_top_link_2?ie=UTF8&pageNumber=2&showViewpoints=0&sortBy=byRankDescending, viewed on November 6, 2013.)

"Customer reviews: Maybelline New York SuperStay 24HR Makeup," Amazon.com, (http://www.amazon.com/ Maybelline-Super-Makeup-Porcelain-Ivory/product-reviews/B002LFQ6LO/ref=sr_1_1_cm_cr_acr_txt?ie=UTF8&showViewpoints=1, viewed on November 6, 2013.)

"Customer reviews: Maybelline New York SuperStay 24HR Makeup," Amazon.com, (http://www.amazon.com/Maybelline-Super-Makeup-Beige-Fluid/product-reviews/B002LFNWCU/ref=dp_top_cm_cr_acr_txt?showViewpoints=1, viewed on December 9, 2013.)

# Facts, Data, and Other Information Considered

| Description | Bates Prefix | Start | End |
|---|---|---|---|

"Customer reviews: Maybelline SuperStay 24hr 2-step Lipcolor," Walmart.com, (www.walmart.com/search/search-ng.do?ic=16_0&Find=Find&search_query=maybelline+superstay+24hr+ lipcolor&Find=Find&search_constraint=0, viewed on November 7, 2013.)

"Maybelline New York," L'Oreal Group.  (http://www.loreal.com/brands/consumer-products-division/ maybelline-new-york.aspx, viewed on November 6, 2013.)

"Maybelline Super Makeup: Customer reviews," Amazon.com. (http://www.amazon.com/Maybelline-Super-Makeup-Beige-Fluid/product-reviews/B002LFNWCU/ ref=sr_1_1_cm_cr_acr_txt?ie=UTF8&showViewpoints=1, viewed on November 12, 2013.)

"Maybelline Superstay 2-Step Lipcolor: Customer reviews," Amazon.com. (http://www.amazon.com/ Maybelline-Superstay-2-step-Lipcolor-Cherry/product-reviews/B004677628/ref=sr_1_2_cm_cr_acr_txt?ie=UTF8&& showViewpoints=1, viewed on November 12, 2013.)

"Supermarkets: 2012 Top 100 Power Players,"  Stores Magazine. (http://www.stores.org/STORES%20Magazine%20July%202012/supermarkets, viewed on November 15, 2013.)

"Superstay 24 Color – Lip Color by Maybelline," Maybelline.com. (www.maybelline.com/Products/Lip-Makeup/Lip-Color/Superstay-24-Color.aspx, viewed on November 18, 2013.)

"Superstay 24 Color," Maybelline.com, (www.maybelline.com/Products/Lip-Makeup/Lip-Color/Superstay-24-Color.aspx, viewed on November 7, 2013.)

"Superstay 24 Hour Makeup," Ulta.com. (http://www.ulta.com/ulta/browse/productDetail.jsp?productId=xls Impprod1620091&_requestid=300658, viewed on November 7, 2013.)

"SuperStay 24HR Makeup – Foundation by Maybelline," Maybelline.com. (www.maybelline.com/Products/Face-Makeup/Foundation/SuperStay-24HR-Makeup.aspx, viewed on November 18, 2013.)

"SuperStay 24HR Makeup," Maybelline.com, (www.maybelline.com/Products/Face-Makeup/Foundation/ SuperStay-24HR-Makeup.aspx, viewed on November 7, 2013.)

"Superstay Lipcolor," Ulta.com. (http://www.ulta.com/ulta/browse/productDetail.jsp?productId=xlsImpprod 2910099&_requestid=301044, viewed on November 7, 2013.)

Company Overview of Maybelline, LLC," Businessweek.  (http://investing.businessweek.com/research/stocks/ private/snapshot.asp?privcapId=321417, viewed on November 6, 2013.)

http://www.amazon.com/gp/search/ref=sr_nr_n_0?rh=n%3A3760911%2Cn%3A11058281%2Cn%3A11059111%2Ck%3Amaybelline+24&keywords=maybelline+24&ie=UTF8&qid=1384546863&rnid=11055981

http://www.amazon.com/s/ref=sr_nr_n_3?rh=n%3A3760911%2Cn%3A11058281%2Cn%3A11058871%2Ck%3Amaybelline+24&keywords=maybelline+24&ie=UTF8&qid=1384546863&rnid=11055981

http://www.cvs.com/search/_/N-0?searchTerm=maybelline+24&pt=global&navNum=40

http://www.drugstore.com/search/search_results.asp?Go.y=-126&Ntx=mode%2bmatchallpartial&CSRFToken=uE3QCD0zuGdLVOkrqFGhJvBtJVDDGGEl7zhRZBXbAI4%3d&Ntk=All&Go.x=-784&N=4294868189&Ntt=maybelline&srchtree=1&in_nav=1

http://www.drugstore.com/search/search_results.asp?N=0&Ntx=mode%2Bmatchallpartial&Ntk=All&srchtree=5&Ntt=maybelline+foundation&Go.x=-784&Go.y=-126&CSRFToken=uE3QCD0zuGdLVOkrqFGhJvBtJVDDGGEl7zhRZBXbAI4%3D

http://www.soap.com/buy?s=maybelline%20super%20stay#fromSearch=Y

# Facts, Data, and Other Information Considered

| Description | Bates Prefix | Start | End |
|---|---|---|---|
| http://www.ulta.com/ulta/a/Makeup-Lips-Lipstick/_/N-26ys?categoryId=cat80058&ciSelector=leaf | | | |
| http://www.ulta.com/ulta/browse/productDetail.jsp?productId=xlsImpprod1620091&_requestid=300658 | | | |
| http://www.walgreens.com/search/results.jsp?N=2000011352+2000010601+367176+371122&Ntt=maybelline | | | |
| http://www.walmart.com/search/search-ng.do?Find=Find&_refineresult=true&ic=16_0&search_constraint=0&search_query=maybelline+24&facet=brand%3AMaybelline%7C%7Cbrand%3ASUPERSTAY | | | |
| https://www.google.com/search?q=maybelline+superstay+24+lipcolor&sourceid=ie7&rls=com.microsoft:en-us:IE-Address&ie=&oe= | | | |
| Various Photos Taken by Dr. Ugone or At His Request | | | |

CONFIDENTIAL

**Exhibit  4**

CONFIDENTIAL

**Individuals Cited In The Expert Report Of Keith R. Ugone**

| Deponent | Deposition Taken On | Company | Position / Title | Context of Reference in Report |
|---|---|---|---|---|
| Yanira Algarin | October 30, 2013 | N/A | N/A | Price paid for purchase of Products At-Issue.  Lack of documentary evidence to substantiate price paid. Duration expectations and purchase factors. |
| Patsy Murdock | October 30, 2013 | N/A | N/A | Price paid for purchase of Products At-Issue.  Lack of documentary evidence to substantiate price paid. Duration expectations. |
| Ali Goldstein | November 5, 2013 | Maybelline | Senior Vice President of Marketing - Garnier Brand (Formerly Vice President of Marketing - Maybelline Brand) | Foundation and lip color markets.  IRI data definitions and SuperStay 24 Products' launch dates.  SuperStay 24 Product SKU information. |

CONFIDENTIAL

**Exhibit 5**

CONFIDENTIAL

**Reasons for Purchasing and/or Benefits Received from Accused Products Unrelated to Alleged Misrepresentations**

*Select Portions of Quotes from Amazon.com Reviews*

| Quote | Product | Reviewer Name | Review Date |
|---|---|---|---|
| **Colors/Coverage** | | | |
| This is my favorite shade, and my signature color!!!  I do wear other shades of superstay also! | SuperStay 24 2-Step Color | Darcy Melendez | 11/11/2013 |
| I do like the color of this superstay 24 lipstick. | SuperStay 24 2-Step Color | kathy1950 | 11/4/2013 |
| I have not found this color at all stores that carry Maybelline.  It is a great warm color.  Many long lasting lipcolors do not offer warm colors other than maybe browns which are too dull and harsh for my fair skin and white hair. | SuperStay 24 2-Step Color | Tom or Cheryl | 10/18/2013 |
| The colors are fantastic and the lip balm makes your lips smooth and adds just enough sheen. | SuperStay 24 2-Step Color | Ashley Amick | 3/22/2012 |
| The coverage is perfect and it'll make you look very natural. | SuperStay 24HR Makeup | SuperCool | 10/24/2013 |
| This creamy foundation makes my skin look like satin.  It covers everything while appearing to look as if you aren't wearing anything. | SuperStay 24HR Makeup | Debi S. | 9/12/2013 |
| First of all, there is a large range of colors, so it's easy to find a color that fits your skin.  I personally have a yellow undertone to my skin and it was so easy to find the perfect shade (Sand Beige). | SuperStay 24HR Makeup | Zully | 5/19/2012 |
| Love the color.  Skin looks smooth and natural. | SuperStay 24HR Makeup | Helen Harden | 3/18/2013 |
| **Feel of the Product** | | | |
| It stays on for hours, doesn't feel sticky after application, doesn't dry the lips out and is a beautiful color! | SuperStay 24 2-Step Color | Stacey Fournier | 9/12/2012 |
| The thing I usually hate about long wearing lip sticks is that they feel sticky and dry.  But this one doesn't.  It feels smooth. | SuperStay 24 2-Step Color | C. Cooper | 4/18/2011 |
| The best part is, it doesn't dry out your lips! | SuperStay 24 2-Step Color | A. Foster | 4/15/2011 |
| The best part is that this foundation is very comfortable to me. I never get the urge to wash it off immediately after work. I'm used to wearing foundation, but it drives me nuts when I can feel it sitting on my skin. Compared to Revlon, where by the end of the day my skin is slick and I just can't wait to wash it. | SuperStay 24HR Makeup | Roxy | 11/28/2012 |
| Lightweight and dries quickly but delivers full coverage without that sticky feeling. | SuperStay 24HR Makeup | Shorty425302 | 11/4/2012 |
| This makeup glides on like satin and blends into your skin, extremely well.  I think they've included a primer in the formulation.  Out of the bottle, it feels medium weight to touch.  After it's blended, it feels weightless on your skin. | SuperStay 24HR Makeup | Trend "jewelry nut" | 3/12/2011 |

CONFIDENTIAL

**Reasons for Purchasing and/or Benefits Received from Accused Products Unrelated to Alleged Misrepresentations**

*Select Portions of Quotes from Amazon.com Reviews*

| Quote | Product | Reviewer Name | Review Date |
|---|---|---|---|
| **No Transfer** | | | |
| I love not staining cups, glasses or anything. | SuperStay 24 2-Step Color | MagdaleneMaria | 5/10/2013 |
| [T]he color stayed exactly where I wanted it, on my lips.  Not my glass, or my teeth, or my daughter's cheek. | SuperStay 24 2-Step Color | bar | 4/16/2011 |
| This product really does stay on a long time and wont [sic] come off in places you don't [sic] want it to - even when you brush your teeth. | SuperStay 24 2-Step Color | Melissa Jackson | 4/15/2011 |
| My lipstick looked just as great after dinner as it did when we left the house - and my husband was able to kiss me without worrying about smudging my lipstick!  I even double-checked my wine glass throughout dinner - no lipstick marks! | SuperStay 24 2-Step Color | Dominique Choromanski | 4/15/2011 |
| I haven't had any problems with transfer, even with my oily skin the makeup stays in place. | SuperStay 24HR Makeup | Liv | 8/14/2012 |
| It doesn't transfer on clothes so that's good. | SuperStay 24HR Makeup | SuperCool | 10/24/2013 |
| I love this foundation so much because I don't have to worry about it melting off my face, or fading or transferring on anything, once you set it! | SuperStay 24HR Makeup | Baby girl | 10/10/2013 |
| It is light weight, does not transfer off on any cloth, but washes easily with soap and water or whatever you use to cleanse your face. | SuperStay 24HR Makeup | Debi S. | 9/12/2013 |
| **Prior Experience with the Brand** | | | |
| This is the only brand of lipstick and products I use…I have trusted and used Maybelline for years. | SuperStay 24 2-Step Color | Darcy Melendez | 11/11/2013 |
| Maybelline always brings good products. | SuperStay 24 2-Step Color | Karin | 8/21/2013 |
| I love maybelline [sic] products and this is one of them, this foundation covers great, I have worn foundation all my life and this is one of the best foundations yet. | SuperStay 24HR Makeup | Linda K. Damschroder | 3/18/2013 |

CONFIDENTIAL

**Reasons for Purchasing and/or Benefits Received from Accused Products Unrelated to Alleged Misrepresentations**
*Select Portions of Quotes from Amazon.com Reviews*

| Quote | Product | Reviewer Name | Review Date |
|---|---|---|---|
| **Price/Coupon/Sale** | | | |
| Will buy more at this great price. | SuperStay 24 2-Step Color | D. Reis | 8/12/2013 |
| I love this product, and the price was great! | SuperStay 24 2-Step Color | Walt Kiley | 5/20/2013 |
| The price was right and the product was as described. | SuperStay 24 2-Step Color | Aaron Madden | 3/6/2013 |
| Also, you can't beat the price!! | SuperStay 24 2-Step Color | Nicole "NRB" | 1/1/2013 |
| I find it still lasts better than any other lipstick and the price is right. | SuperStay 24 2-Step Color | C. Graham | 3/19/2013 |
| A great color selection for the price. | SuperStay 24 2-Step Color | MakeupAZ | 8/22/2011 |
| The best and long lasting coverage I've ever had and I've tried them all.  The only one which comes close is a very pricey department store named brand that costs 5 times as much. | SuperStay 24HR Makeup | Debi S. | 9/12/2013 |
| This product is ok, I recomended [sic], the service is fast, all rigth [sic], the price is the exact.  Very very good. | SuperStay 24HR Makeup | paulorojas | 11/21/2012 |
| And you can't beat the price!  I've been using Revlon Colorstay for years, and at almost $15 a pop at the local drugstore (though a bit cheaper on Amazon) I wanted to find something else a bit less pricey.  This foundation did the trick! | SuperStay 24HR Makeup | brooklynniteowl | 8/20/2012 |
| The price for this product is very reasonable and I think that you can usually get this on sale for a good price. | SuperStay 24HR Makeup | shopaholicanon | 12/28/2010 |

Sources:
1  http://www.amazon.com/Maybelline-Superstay-2-step-Lipcolor-Cherry/product-reviews/B004677628/ref=sr_1_2_cm_cr_acr_txt?ie=UTF8&showViewpoints=1, viewed on November 12, 2013.
2  http://www.amazon.com/Maybelline-Super-Makeup-Beige-Fluid/product-reviews/B002LFNWCU/ref=sr_1_1_cm_cr_acr_txt?ie=UTF8&showViewpoints=1, viewed on November 12, 2013.

CONFIDENTIAL

# Exhibit 6

CONFIDENTIAL

## Observed Prices of SuperStay 24 2-Step Color[1]

**Bed Bath & Beyond[2]**
**Dallas, TX - November 2, 2013**
**Unit Price (1 Unit Purchased): $7.79**
**Avg. Unit Price (2 Units Purchased): $7.00**



**U.S. Central Command/MacDill Air Force Base**
**Tampa, FL - November 29, 2013**

**Unit Price - $8.75**



**CVS**
**Ridgefield, CT - November 23, 2013**
**Unit Price - $10.99**



CONFIDENTIAL

## Observed Prices of SuperStay 24 2-Step Color[1]

**Duane Reade[3]**
**New York, NY - December 5, 2013**
**Unit Price (1 Unit Purchased): $10.99**
**Avg. Unit Price (2 Units Purchased): $8.24**



**Duane Reade**
**New York, NY - December 5, 2013**

**Unit Price - $10.49**



Notes:

1  Photos above were taken by Dr. Ugone or at his request.

2  Avg. Unit Price assumes the purchase of two units of SuperStay 24 2-Step Color in order to qualify for the promoted sale. The average unit price is equal to $14 divided by two units ($14 ÷ 2 = $7).

3  Avg. Unit Price assumes the purchase of two units of SuperStay 24 2-Step Color in order to qualify for the promoted sale. The average unit price is equal to $10.99 plus $5.50 ($10.99 x 50%) divided by two units ( ($10.99 + $5.50) ÷ 2 = $8.24).

# Exhibit 7

CONFIDENTIAL





**Maybelline SuperStay 24HR Makeup**
**Average Prices by IRI Sales Channel**
**January 2010 - October 6, 2013**

| Year | Wal-Mart | Grocery Stores | Drug Stores |
|------|----------|----------------|-------------|
| 2010 | $9.07 | $9.20 | $9.71 |
| 2011 | $9.06 | $9.25 | $10.37 |
| 2012 | $9.05 | $9.30 | $10.68 |
| 2013 | $9.05 | $9.26 | $10.99 |

☐ Wal-Mart   ☐ Grocery Stores   ■ Drug Stores

CONFIDENTIAL

**Maybelline SuperStay 24 2-Step Color and SuperStay 24HR Makeup**
**Average Prices by IRI Sales Channel[1]**
*January 2010 - October 6, 2013*

| Average Prices by Product[3] | 2010 | | | 2011 | | | 2012 | | | 2013[2] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Grocery Stores | Drug Stores | Wal-Mart | Grocery Stores | Drug Stores | Wal-Mart | Grocery Stores | Drug Stores | Wal-Mart | Grocery Stores | Drug Stores | Wal-Mart |
| SuperStay 24 2-Step Color | | | | $8.32 | $8.89 | $7.74 | $8.44 | $9.13 | $7.65 | $8.30 | $9.18 | $7.92 |
| SuperStay 24HR Makeup | $9.20 | $9.71 | $9.07 | $9.25 | $10.37 | $9.06 | $9.30 | $10.68 | $9.05 | $9.26 | $10.99 | $9.05 |

Notes:

1 Average prices for the multi-outlet sales channel have not been included above as the multi-outlet sales channel includes prices from the food ("grocery stores"), drug ("drug stores"), and Wal-Mart sales channels.

2 2013 prices reflect YTD data through October 6, 2013.

3 Maybelline Superstay 24 2-Step Color officially launched in January 2011; Maybelline Superstay 24HR Makeup officially launched in July 2009.

Source:

[1] IRI Data. ("Copy of Maybelline Superstay 24 HR Pricing Details (11-4-13) Updated  Formatted  .xlsx")

CONFIDENTIAL

**Maybelline SuperStay 24 2-Step Color and SuperStay 24HR Makeup**
**Differences in Average Prices by IRI Sales Channel[1]**
*January 2010 - October 6, 2013*

| Average Prices by Product[3] | 2010 | | 2011 | | 2012 | | 2013[2] | |
|---|---|---|---|---|---|---|---|---|
| | Difference (Wal-Mart vs. Drug Stores) | % Difference (Wal-Mart vs. Drug Stores) | Difference (Wal-Mart vs. Drug Stores) | % Difference (Wal-Mart vs. Drug Stores) | Difference (Wal-Mart vs. Drug Stores) | % Difference (Wal-Mart vs. Drug Stores) | Difference (Wal-Mart vs. Drug Stores) | % Difference (Wal-Mart vs. Drug Stores) |
| SuperStay 24 2-Step Color | | | $1.15 | 15% | $1.48 | 19% | $1.26 | 16% |
| SuperStay 24HR Makeup | $0.63 | 7% | $1.31 | 14% | $1.63 | 18% | $1.94 | 21% |

Notes:

1 Average prices for the multi-outlet sales channel have not been included above as the multi-outlet sales channel includes prices from the food ("grocery stores"), drug ("drug stores"), and Wal-Mart sales channels.

2 2013 prices reflect YTD data through October 6, 2013.

3 Maybelline Superstay 24 2-Step Color officially launched in January 2011; Maybelline Superstay 24HR Makeup officially launched in July 2009.

Source:

[1] IRI Data. ("Copy of Maybelline Superstay 24 HR Pricing Details (11-4-13) Updated  Formatted  .xlsx")

# Exhibit 8

CONFIDENTIAL





Maybelline SuperStay 24 2-Step Color
Average Prices at Rite Aid, Walgreens, and CVS Drug Stores
January 2011 - October 6, 2013





**Maybelline SuperStay 24HR Makeup**
**Average Prices at Rite Aid, Walgreens, and CVS Drug Store**
**January 2010 - October 6, 2013**

**Maybelline SuperStay 24 2-Step Color and SuperStay 24HR Makeup**
**Average Prices at Rite Aid, Walgreens, and CVS Drug Stores**
*January 2010 - October 6, 2013*

| Average Prices by Product[2] | 2010 | | | 2011 | | | 2012 | | | 2013[1] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rite Aid | Walgreens | CVS | Rite Aid | Walgreens | CVS | Rite Aid | Walgreens | CVS | Rite Aid | Walgreens | CVS |
| SuperStay 24 2-Step Color | | | | $8.24 | $8.75 | $9.40 | $8.49 | $9.08 | $9.48 | $8.30 | $8.94 | $9.86 |
| SuperStay 24HR Makeup | $8.97 | $9.43 | $10.34 | $9.54 | $10.14 | $11.05 | $9.81 | $10.82 | $10.86 | $9.76 | $11.31 | $11.15 |

Notes:
1  2013 prices reflect YTD data through October 6, 2013.
2  Maybelline Superstay 24 2-Step Color officially launched in January 2011; Maybelline Superstay 24HR Makeup officially launched in July 2009.

Source:
[1] IRI Data. ("Copy of Maybelline Superstay 24 HR Pricing Details (11-4-13) Updated  Formatted  .xlsx")

CONFIDENTIAL

**Maybelline SuperStay 24 2-Step Color and SuperStay 24HR Makeup**
**Differences in Average Prices at Rite Aid, Walgreens, and CVS Drug Stores**
*January 2010 - October 6, 2013*

| Average Prices by Product[2] | 2010 | | 2011 | | 2012 | | 2013[1] | |
|---|---|---|---|---|---|---|---|---|
| | Difference (Lowest vs. Highest) | % Difference (Lowest vs. Highest) | Difference (Lowest vs. Highest) | % Difference (Lowest vs. Highest) | Difference (Lowest vs. Highest) | % Difference (Lowest vs. Highest) | Difference (Lowest vs. Highest) | % Difference (Lowest vs. Highest) |
| SuperStay 24 2-Step Color | | | $1.15 | 14% | $0.98 | 12% | $1.56 | 19% |
| SuperStay 24HR Makeup | $1.37 | 15% | $1.51 | 16% | $1.05 | 11% | $1.55 | 16% |

Notes:

1  2013 prices reflect YTD data through October 6, 2013.

2  Maybelline Superstay 24 2-Step Color officially launched in January 2011; Maybelline Superstay 24HR Makeup officially launched in July 2009.

Source:

[1] IRI Data. ("Copy of Maybelline Superstay 24 HR Pricing Details (11-4-13) Updated  Formatted  .xlsx")

CONFIDENTIAL

# Exhibit 9

CONFIDENTIAL





CONFIDENTIAL



**Maybelline SuperStay 24 2-Step Color and SuperStay 24HR Makeup**
**2012 Average Prices at the Seven Largest United States Grocery Chains[1]**

| | Grocery Chains in Order of Largest to Smallest Revenues in 2011 | | | | | | |
|---|---|---|---|---|---|---|---|
| **Average Prices by Product** | **Kroger** | **Safeway** | **SuperValu** | **Publix** | **Ahold** | **Delhaize** | **HEB** |
| SuperStay 24 2-Step Color | $8.08 | $9.99 | $9.82 | $8.98 | $9.64 | $10.15 | $7.54 |
| SuperStay 24HR Makeup | $8.88 | $11.79 | $10.80 | $9.98 | $10.51 | $11.28 | $8.73 |

Note:
1  The seven grocery chains above are those with the highest retail sales in 2011, according to Stores Magazine, the official publication of the National Retail Federation.

Sources:
[1]  IRI Data. ("Copy of Maybelline Superstay 24 HR Pricing Details (11-4-13) Updated  Formatted  .xlsx")
[2]  "Supermarkets: 2012 Top 100 Power Players," Stores Magazine. (http://www.stores.org/STORES%20Magazine%20July%202012/supermarkets, viewed on November 15, 2013.)

CONFIDENTIAL

**Maybelline SuperStay 24 2-Step Color and SuperStay 24HR Makeup
Difference in 2012 Average Prices across the Seven Largest United States Grocery Chains[1]**

|  | Maximum Price | Minimum Price | Difference (Maximum vs. Minimum) | % Difference (Maximum vs. Minimum) |
|---|---|---|---|---|
| SuperStay 24 2-Step Color | $10.15 | $7.54 | $2.61 | 35% |
|  | Delhaize | HEB |  |  |
| SuperStay 24HR Makeup | $11.79 | $8.73 | $3.06 | 35% |
|  | Safeway | HEB |  |  |

Note:

1  The seven largest United States grocery chains are those with the highest retail sales in 2011, according to Stores Magazine, the official publication of the National Retail Federation.

Sources:

[1] IRI Data. ("Copy of Maybelline Superstay 24 HR Pricing Details (11-4-13) Updated  Formatted  .xlsx")

[2] "Supermarkets: 2012 Top 100 Power Players," Stores Magazine.
    (http://www.stores.org/STORES%20Magazine%20July%202012/supermarkets, viewed on November 15, 2013.)

CONFIDENTIAL

# Exhibit 10

CONFIDENTIAL



Maybelline SuperStay 24 2-Step Color
Advertised Online Retail Price as of November 15, 2013

CONFIDENTIAL



Maybelline SuperStay 24HR Makeup
Advertised Online Retail Price as of November 15, 2013

CONFIDENTIAL

**Maybelline Superstay 24 2-Step Color and Superstay 24HR Makeup**
**Advertised Online Retail Price[1] as of November 15, 2013**

| Online Retailer[2] | Superstay 24 2-Step Color | Superstay 24HR Makeup |
|---|---|---|
| Amazon.com[3] | $7.94 | $8.44 |
| CVS.com | $7.99 | $8.79 |
| Drugstore.com | $9.99 | $9.99 |
| Soap.com | $9.27 | $9.27 |
| Ulta.com[4] | $6.74 | $7.49 |
| Walgreens.com[5] | $7.34 | $8.62 |
| Walmart.com | $7.94 | $8.94 |

Notes:

1  Prices reflect the advertised "base price" which includes any discounts offered as of November 15, 2013, and excludes taxes and shipping.

2  The online retailers above were those that appeared in the first page of results for Google searches of "maybelline superstay 24 lipcolor" and "maybelline superstay 24 foundation". In addition to the retailers above, Target.com, ebay.com, and buymebeauty.com also appeared in the search results. However, target.com and buymebeauty.com were excluded as they did not sell both accused products, and ebay.com was excluded as it is not a retailer.

3  Amazon offers a wide range of prices for both SuperStay 24 2-Step Color and SuperStay 24HR Makeup. For the lipcolor, the price above is that of the first product listed in the results of a search with the terms "maybelline 24" within the Lipstick category of Amazon's Beauty department. For the makeup, the price above is that of the first product listed in the results of a search with the terms "maybelline 24" within the Foundation category of Amazon's Beauty department.

4  Ulta provided a list price of $8.99 for SuperStay 24 2-Step Color and $9.99 for SuperStay 24HR Makeup, but had an offer of "Buy 1, get 1 at 50% off" for both products. Therefore, each price above is equal to the average of the list price and the discounted price (50% off) of a second unit.

5  Walgreens provided a list price of $9.79 for SuperStay 24 2-Step Color and $11.49 for SuperStay 24HR Makeup, but had an offer of "Buy 1, Get 1 50% OFF" for both products. Therefore, each price above is equal to the average of the list price and the discounted price (50% off) of a second unit.

Sources:

[1] https://www.google.com/search?q=maybelline+superstay+24+lipcolor&sourceid=ie7&rls=com.microsoft:en-us:IE-Address&ie=&oe=

[2] https://www.google.com/search?q=maybelline+superstay+24+makeup&sourceid=ie7&rls=com.microsoft:en-us:IE-Address&ie=&oe=

[3] http://www.amazon.com/gp/search/ref=sr_nr_n_0?rh=n%3A3760911%2Cn%3A11058281%2Cn%3A11059111%2Ck%3Amaybelline+24&keywords=maybelline+24&ie=UTF8&qid=1384546863&rnid=11055981

[4] http://www.amazon.com/s/ref=sr_nr_n_3?rh=n%3A3760911%2Cn%3A11058281%2Cn%3A11058871%2Ck%3Amaybelline+24&keywords=maybelline+24&ie=UTF8&qid=1384546863&rnid=11055981

[5] http://www.cvs.com/search/_/N-0?searchTerm=maybelline+24&pt=global&navNum=40

[6] http://www.drugstore.com/search/search_results.asp?Go.y=-126&Ntx=mode%2bmatchallpartial&CSRFToken=uE3QCD0zuGdLVOkrqFGhJvBtJVDDGGEl7zhRZBXbAI4%3d&Ntk=All&Go.x=-784&N=4294868189&Ntt=maybelline&srchtree=1&in_nav=1

[7]
http://www.drugstore.com/search/search_results.asp?N=0&Ntx=mode%2Bmatchallpartial&Ntk=All&srchtree=5&Ntt=maybelline+foundation&Go.x=-784&Go.y=-126&CSRFToken=uE3QCD0zuGdLVOkrqFGhJvBtJVDDGGEl7zhRZBXbAI4%3D

[8] http://www.soap.com/buy?s=maybelline%20super%20stay#fromSearch=Y

[9] http://www.ulta.com/ulta/a/Makeup-Lips-Lipstick/_/N-26ys?categoryId=cat80058&ciSelector=leaf

[10] http://www.ulta.com/ulta/browse/productDetail.jsp?productId=xlsImpprod1620091&_requestid=300658

[11] http://www.walgreens.com/search/results.jsp?N=2000011352+2000010601+367176+371122&Ntt=maybelline

[12] http://www.walmart.com/search/search-ng.do?Find=Find&_refineresult=true&ic=16_0&search_constraint=0&search_query=maybelline+24&facet=brand%3AMaybelline%7C%7Cbrand%3ASUPERSTAY

**Maybelline SuperStay 24 2-Step Color and SuperStay 24HR Makeup
Difference in Advertised Online Retail Price as of November 15, 2013**

|  | Minimum Price | Maximum Price | Difference (Maximum vs. Minimum) | % Difference (Maximum vs. Minimum) |
|---|---|---|---|---|
| SuperStay 24 2-Step Color | $6.74 | $9.99 | $3.25 | 48% |
|  | Ulta.com | Drugstore.com |  |  |
| SuperStay 24HR Makeup | $7.49 | $9.99 | $2.50 | 33% |
|  | Ulta.com | Drugstore.com |  |  |

CONFIDENTIAL

**Exhibit 11**

CONFIDENTIAL







**Maybelline SuperStay 24 2-Step Color**
**Average Prices in the Multi-Outlet Sales Channel by Metropolitan Area**
**January 2011 - October 6, 2013**

**Maybelline SuperStay 24 2-Step Color**
**Average Prices in the Multi-Outlet Sales Channel by Metropolitan Area**
**January 2011 - October 6, 2013**



**Maybelline SuperStay 24HR Makeup**
**Average Prices in the Multi-Outlet Sales Channel by Metropolitan Area**
**January 2010 - October 6, 2013**



**Maybelline SuperStay 24HR Makeup**
**Average Prices in the Multi-Outlet Sales Channel by Metropolitan Area**
**January 2010 - October 6, 2013**

**Maybelline SuperStay 24 2-Step Color and SuperStay 24HR Makeup**
**Average Prices in the Multi-Outlet Sales Channel by Metropolitan Area[1]**
*January 2010 - October 6, 2013*

| | 2010 | | | | 2011 | | | | 2012 | | | | 2013[2] | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Min Price | Max Price | Difference | Percent Difference | Min Price | Max Price | Difference | Percent Difference | Min Price | Max Price | Difference | Percent Difference | Min Price | Max Price | Difference | Percent Difference |
| SuperStay 24 2-Step Color[3] | | | | | $7.58 Grand Rapids | $8.95 NYC | $1.38 | 18% | $7.77 Toledo | $9.12 NYC | $1.34 | 17% | $7.61 Grand Rapids | $9.27 NYC | $1.65 | 22% |
| SuperStay 24HR Makeup[4] | $8.78 Salt Lake City | $9.87 NYC | $1.09 | 12% | $8.93 Salt Lake City | $10.46 NYC | $1.54 | 17% | $9.10 Salt Lake City | $10.65 NYC | $1.55 | 17% | $9.04 Salt Lake City | $10.62 NYC | $1.57 | 17% |

**Excluding New York City Metropolitan Area**

| | 2010 | | | | 2011 | | | | 2012 | | | | 2013[2] | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Min Price | Max Price | Difference | Percent Difference | Min Price | Max Price | Difference | Percent Difference | Min Price | Max Price | Difference | Percent Difference | Min Price | Max Price | Difference | Percent Difference |
| SuperStay 24 2-Step Color | | | | | $7.58 Grand Rapids | $8.73 Boston | $1.15 | 15% | $7.77 Toledo | $8.83 Boston | $1.06 | 14% | $7.61 Grand Rapids | $8.98 Boston | $1.37 | 18% |
| SuperStay 24HR Makeup | $8.78 Salt Lake City | $9.85 Boston | $1.06 | 12% | $8.93 Salt Lake City | $10.28 Boston | $1.35 | 15% | $9.10 Salt Lake City | $10.46 Boston | $1.36 | 15% | $9.04 Salt Lake City | $10.44 Boston | $1.40 | 15% |

Notes:
1  IRI data provides sales prices for 51 metropolitan areas in the multi-outlet sales channel only.  Examples of available metropolitan areas include Boston, New York City, San Francisco/Oakland, and Seattle/Tacoma.
2  2013 prices reflect YTD data through October 6, 2013.
3  Maybelline Superstay 24 2-Step Color officially launched in January 2011.
4  Maybelline Superstay 24HR Makeup officially launched in July 2009.

Source:
[1] IRI Data. ("Copy of Maybelline Superstay 24 HR Pricing Details (11-4-13) Updated  Formatted  .xlsx")

**Exhibit 12**

CONFIDENTIAL



**Maybelline SuperStay 24 2-Step Color**
**Average Prices in the Multi-Outlet Sales Channel by California Metropolitan Area**
**January 2011 - October 6, 2013**

CONFIDENTIAL





CONFIDENTIAL

**Maybelline SuperStay 24 2-Step Color and SuperStay 24HR Makeup[1]**
**Average Prices in the Multi-Outlet Sales Channel by California Metropolitan Area[2]**
*January 2010 - October 6, 2013*

| | Average Prices for SuperStay 24 2-Step Color | | | |
|---|---|---|---|---|
| **California Metro Areas** | **2010** | **2011** | **2012** | **2013[3]** |
| Los Angeles | N/A | $8.34 | $8.39 | $8.45 |
| Sacramento | N/A | $8.23 | $8.20 | $8.30 |
| San Diego | N/A | $8.27 | $8.30 | $8.43 |
| San Francisco/Oakland | N/A | $8.56 | $8.65 | $8.71 |
| Difference (Highest vs. Lowest) | N/A | $0.33 | $0.45 | $0.41 |
| % Difference (Highest vs. Lowest) | N/A | 4% | 6% | 5% |

| | Average Prices for SuperStay 24HR Makeup | | | |
|---|---|---|---|---|
| **California Metro Areas** | **2010** | **2011** | **2012** | **2013[3]** |
| Los Angeles | $9.37 | $9.81 | $10.00 | $9.82 |
| Sacramento | $9.21 | $9.56 | $9.76 | $9.52 |
| San Diego | $9.37 | $9.74 | $9.83 | $9.65 |
| San Francisco/Oakland | $9.55 | $10.08 | $10.46 | $10.34 |
| Difference (Highest vs. Lowest) | $0.33 | $0.52 | $0.70 | $0.81 |
| % Difference (Highest vs. Lowest) | 4% | 5% | 7% | 9% |

Notes:

1  Maybelline Superstay 24 2-Step Color officially launched in January 2011; Maybelline Superstay 24HR Makeup officially launched in July 2009.

2  IRI data provides sales prices for 51 metropolitan areas in the multi-outlet sales channel only.  Examples of available metropolitan areas include Boston, New York City, San Francisco/Oakland, and Seattle/Tacoma.

3  2013 prices reflect YTD data through October 6, 2013.

Source:

[1]  IRI Data. ("Copy of Maybelline Superstay 24 HR Pricing Details (11-4-13) Updated  Formatted  .xlsx")

# Exhibit 13

CONFIDENTIAL





**Maybelline SuperStay 24 2-Step Color**
**Promoted and Non-Promoted Prices in the Grocery Store Sales Channel**
**January 2011 - October 6, 2013**





CONFIDENTIAL





CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL





CONFIDENTIAL

**Maybelline SuperStay 24 2-Step Color and SuperStay 24HR Makeup**
**Promoted and Non-Promoted Prices by IRI Sales Channel[1]**
*January 2010 - October 6, 2013*

**Non-Promoted Prices**

| Products[3] | 2010 | | | 2011 | | | 2012 | | | 2013[2] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Grocery Stores | Drug Stores | Wal-Mart | Grocery Stores | Drug Stores | Wal-Mart | Grocery Stores | Drug Stores | Wal-Mart | Grocery Stores | Drug Stores | Wal-Mart |
| SuperStay 24 2-Step Color | | | | $8.68 | $9.75 | $7.93 | $8.62 | $9.65 | $7.93 | $8.54 | $9.64 | $7.93 |
| SuperStay 24HR Makeup | $9.65 | $10.70 | $9.08 | $9.39 | $11.02 | $9.07 | $9.41 | $11.02 | $9.06 | $9.37 | $11.23 | $9.06 |

**Promoted Prices**

| Products | 2010 | | | 2011 | | | 2012 | | | 2013 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Grocery Stores | Drug Stores | Wal-Mart | Grocery Stores | Drug Stores | Wal-Mart | Grocery Stores | Drug Stores | Wal-Mart | Grocery Stores | Drug Stores | Wal-Mart |
| SuperStay 24 2-Step Color | | | | $7.46 | $8.51 | $7.01 | $7.78 | $8.93 | $6.97 | $7.46 | $9.01 | $7.29 |
| SuperStay 24HR Makeup | $8.02 | $9.06 | $8.58 | $8.68 | $10.00 | $8.14 | $8.86 | $10.52 | $8.95 | $8.79 | $10.88 | $8.24 |

Notes:
1  Average prices for the multi-outlet sales channel have not been included above because the multi-outlet sales channel includes prices from the food ("grocery stores"), drug ("drug stores"), and Wal-Mart sales channels.
2  2013 prices reflect YTD data through October 6, 2013.
3  Maybelline Superstay 24 2-Step Color officially launched in January 2011; Maybelline Superstay 24HR Makeup officially launched in July 2009.

Source:
[1]  IRI Data. ("Copy of Maybelline Superstay 24 HR Pricing Details (11-4-13) Updated  Formatted  .xlsx")

**Maybelline SuperStay 24 2-Step Color and SuperStay 24HR Makeup**
**Promoted and Non-Promoted Prices by IRI Sales Channel[1]**
*January 2010 - October 6, 2013*

| | SuperStay 24 2-Step Color[2] | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2010 | | | 2011 | | | 2012 | | | 2013[3] | | |
| | Grocery Stores | Drug Stores | Wal-Mart | Grocery Stores | Drug Stores | Wal-Mart | Grocery Stores | Drug Stores | Wal-Mart | Grocery Stores | Drug Stores | Wal-Mart |
| Difference (Promoted vs. Non-Promoted) | | | | $1.21 | $1.24 | $0.93 | $0.84 | $0.72 | $0.96 | $1.08 | $0.64 | $0.64 |
| % Difference (Promoted vs. Non-Promoted) | | | | 16% | 15% | 13% | 11% | 8% | 14% | 15% | 7% | 9% |

| | SuperStay 24HR Makeup | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2010 | | | 2011 | | | 2012 | | | 2013 | | |
| | Grocery Stores | Drug Stores | Wal-Mart | Grocery Stores | Drug Stores | Wal-Mart | Grocery Stores | Drug Stores | Wal-Mart | Grocery Stores | Drug Stores | Wal-Mart |
| Difference (Promoted vs. Non-Promoted) | $1.63 | $1.64 | $0.49 | $0.71 | $1.02 | $0.93 | $0.55 | $0.50 | $0.11 | $0.58 | $0.35 | $0.82 |
| % Difference (Promoted vs. Non-Promoted) | 20% | 18% | 6% | 8% | 10% | 11% | 6% | 5% | 1% | 7% | 3% | 10% |

Notes:
1  Average prices for the multi-outlet sales channel have not been included above because the multi-outlet sales channel includes prices from the food ("grocery stores"), drug ("drug stores"), and Wal-Mart sales channels.
2  Maybelline Superstay 24 2-Step Color officially launched in January 2011; Maybelline Superstay 24HR Makeup officially launched in July 2009.
3  2013 prices reflect YTD data through October 6, 2013.

Source:
[1]  IRI Data. ("Copy of Maybelline Superstay 24 HR Pricing Details (11-4-13) Updated  Formatted   .xlsx")

CONFIDENTIAL

**Exhibit 14**

CONFIDENTIAL





CONFIDENTIAL



CONFIDENTIAL



**Maybelline SuperStay 24 2-Step Color**
**Promoted and Non-Promoted Prices at Kmart Stores**
**January 2011 - October 6, 2013**

CONFIDENTIAL





CONFIDENTIAL



CONFIDENTIAL



**Maybelline SuperStay 24 2-Step Color and SuperStay 24HR Makeup**

**Promoted and Non-Promoted Prices by Retailers within Grocery Stores, Drug Stores, and Mass Market Sales Channels[1]**

*January 2010 - October 6, 2013*

| | Non-Promoted Prices | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2010 | | | 2011 | | | 2012 | | | 2013[2] | | |
| Products | Stop & Shop | Rite Aid | Kmart | Stop & Shop | Rite Aid | Kmart | Stop & Shop | Rite Aid | Kmart | Stop & Shop | Rite Aid | Kmart |
| SuperStay 24 2-Step Color[3] | | | | $9.96 | $9.05 | $9.47 | $10.42 | $8.88 | $9.36 | $10.17 | $8.82 | $8.92 |
| SuperStay 24HR Makeup | $10.94 | $10.42 | $10.28 | $10.99 | $10.11 | $10.43 | $10.95 | $9.94 | $10.33 | $10.89 | $9.91 | $10.01 |

| | Promoted Prices | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2010 | | | 2011 | | | 2012 | | | 2013 | | |
| Products | Stop & Shop | Rite Aid | Kmart | Stop & Shop | Rite Aid | Kmart | Stop & Shop | Rite Aid | Kmart | Stop & Shop | Rite Aid | Kmart |
| SuperStay 24 2-Step Color | | | | $9.08 | $7.95 | $8.23 | $9.47 | $8.30 | $8.32 | $9.79 | $8.11 | $7.99 |
| SuperStay 24HR Makeup | $9.07 | $8.34 | $8.81 | $9.96 | $9.30 | $9.51 | $10.45 | $9.74 | $9.89 | $10.99 | $9.69 | $9.57 |

Notes:

1  Retailers above were selected by searching for stores within 25 miles of Maybelline's headquarters that sell Maybelline SuperStay 24HR Makeup, according to Maybelline.com.  The first retailer presented in the search results per sales channel was selected.  Stop & Shop is a grocery store chain.  Rite Aid is a drug store chain.  Kmart is a competitor of Wal-Mart and is in IRI's mass market sales channel.

2  2013 prices reflect YTD data through October 6, 2013.

3  Maybelline Superstay 24 2-Step Color officially launched in January 2011; Maybelline Superstay 24HR Makeup officially launched in July 2009.

Sources:

[1]  IRI Data. ("Copy of Maybelline Superstay 24 HR Pricing Details (11-4-13) Updated  Formatted  .xlsx")

[2]  "Super Stay Makeup," Maybelline.com. (http://www.maybelline.com/Products/Face-Makeup/Foundation/SuperStay-24HR-Makeup.aspx, viewed on November 19, 2013.)

CONFIDENTIAL

**Maybelline SuperStay 24 2-Step Color and SuperStay 24HR Makeup**

**Promoted and Non-Promoted Prices by Retailers within Grocery Stores, Drug Stores, and Mass Market Sales Channels [1]**

*January 2010 - October 6, 2013*

| | SuperStay 24 2-Step Color [2] | | | | | | | | | | | |
| | 2010 | | | 2011 | | | 2012 | | | 2013 [3] | | |
| | Stop & Shop | Rite Aid | Kmart | Stop & Shop | Rite Aid | Kmart | Stop & Shop | Rite Aid | Kmart | Stop & Shop | Rite Aid | Kmart |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Difference (Promoted vs. Non-Promoted) | | | | $0.88 | $1.11 | $1.25 | $0.95 | $0.58 | $1.04 | $0.38 | $0.71 | $0.93 |
| % Difference (Promoted vs. Non-Promoted) | | | | 10% | 14% | 15% | 10% | 7% | 13% | 4% | 9% | 12% |

| | SuperStay 24HR Makeup | | | | | | | | | | | |
| | 2010 | | | 2011 | | | 2012 | | | 2013 | | |
| | Stop & Shop | Rite Aid | Kmart | Stop & Shop | Rite Aid | Kmart | Stop & Shop | Rite Aid | Kmart | Stop & Shop | Rite Aid | Kmart |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Difference (Promoted vs. Non-Promoted) | $1.87 | $2.07 | $1.48 | $1.03 | $0.81 | $0.92 | $0.50 | $0.20 | $0.44 | -$0.10 | $0.21 | $0.44 |
| % Difference (Promoted vs. Non-Promoted) | 21% | 25% | 17% | 10% | 9% | 10% | 5% | 2% | 4% | -1% | 2% | 5% |

Notes:

1  Retailers above were selected by searching for stores within 25 miles of Maybelline's headquarters that sell Maybelline SuperStay 24HR Makeup, according to Maybelline.com.  The first retailer presented in the search results per sales channel was selected.  Stop & Shop is a grocery store chain.  Rite Aid is a drug store chain.  Kmart is a competitor of Wal-Mart and is in IRI's mass market sales channel.

2  2013 prices reflect YTD data through October 6, 2013.

3  Maybelline Superstay 24 2-Step Color officially launched in January 2011; Maybelline Superstay 24HR Makeup officially launched in July 2009.

Sources:

[1] IRI Data. ("Copy of Maybelline Superstay 24 HR Pricing Details (11-4-13) Updated  Formatted   .xlsx")

[2]  "Super Stay Makeup," Maybelline.com. (http://www.maybelline.com/Products/Face-Makeup/Foundation/SuperStay-24HR-Makeup.aspx, viewed on November 19, 2013.)

CONFIDENTIAL