# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

YANIRA ALGARIN and PATSY
MURDOCK, on behalf of themselves and
All others similarly situated,

        Plaintiffs,

        v.

MAYBELLINE, LLC, a New York
Limited Liability Company, d/b/a
MAYBELLINE NEW YORK,

        Defendant.

Case No. 12CV3000 AJB DHB

**SUPPLEMENTAL EXPERT REPORT OF KEITH R. UGONE, PH.D.**

**January 31, 2014**

CONFIDENTIAL

**SUPPLEMENTAL EXPERT REPORT OF KEITH R. UGONE, PH.D.**

**January 31, 2014**

## I.   INTRODUCTION

1.     I have been retained by counsel for Maybelline, LLC ("Maybelline" or "Defendant") to offer my opinions regarding various economic and associated class certification issues relevant to the matter of *Yanira Algarin and Patsy Murdock* (the "Named Plaintiffs")*, et al. v. Maybelline, LLC* (Case No. 12CV3000 AJB DHB).  I submitted an expert report in this case on December 9, 2013 (the "Ugone Report" or "Initial Ugone Report", depending on context).

2.     As presented in my Initial Ugone Report and in my *curriculum vitae* attached to that report, I am an economist.  I received my B.A. in Economics from the University of Notre Dame in 1977, my M.A. in Economics from the University of Southern California in 1979, and my Ph.D. in Economics from Arizona State University in 1983.  I am a Managing Principal at Analysis Group, Inc. where I provide economic and financial consulting services, specializing in the application of economic principles to complex business disputes.[1]

3.     I submit this supplemental report in response to the opinions offered by Dr. Keith A. Reutter, a Principal of the Berkeley Research Group, regarding my Initial Ugone Report.  At the request of the Named Plaintiffs' counsel, Dr. Reutter reviewed and commented on

---

[1] Ugone Report, pp. 6 – 7.  My resume is attached as Exhibit 1 to my Initial Ugone Report.  My testimony experience is attached as Exhibit 2 to my Initial Ugone Report.

Supplemental Expert Report of Keith R. Ugone, Ph.D.
January 31, 2014
_____

my Initial Ugone Report.[2]   Dr. Reutter presented three primary criticisms of my analysis.

According to Dr. Reutter:[3]

    a.  "Dr. Ugone's analysis of retail prices is not consistent with the allegations of the case nor is it consistent with economic theories of harm";

    b.  "Dr. Ugone's use of survey evidence is flawed because the survey plausibly includes non-Class members and likely excludes Class members"; and

    c.  "Dr. Ugone's use of online product reviews is flawed because his analysis includes false reviews, reviews from non-Class members, and reviews that are potentially biased."

4.    Dr. Reutter opines that I failed to adequately consider Named Plaintiffs' price premium theory of damages. Dr. Reutter also opines that the materials I relied upon are not reliable and cannot be used to support my finding that individual inquiry is necessary to evaluate claimed damages for the Class.[4]   As I explain later in this supplemental report, Dr. Reutter is mistaken on these rebuttal points.

5.    Dr. Reutter also is mistaken in his own analyses that he describes for at least the following reasons.

    a.  Dr. Reutter assumes the existence of a price premium he claims to be able to prove.

    b.  Dr. Reutter implies the claimed price premium is the simple arithmetical difference in price between the SuperStay 24 Products and corresponding or competing products, regardless of other differences in the products' attributes or value to consumers.

    c.  Dr. Reutter fails to identify the competing products upon which he bases his conclusions (or will base his conclusions).

---

[2] Expert Rebuttal Report Of Keith A. Reutter, Ph.D., dated January 20, 2014 ("Reutter Report").  As of the issuance of my Initial Ugone Report, the Named Plaintiffs had not disclosed or designated an economist or submitted a report relating to the issue of whether standard economic analysis could be used to quantify economic damages on a class-wide basis using common proof.  (Ugone Report, p. 2.)

[3] Reutter Report, p. 4.

[4] Reutter Report, p. 4.

CONFIDENTIAL

Supplemental Expert Report of Keith R. Ugone, Ph.D.
January 31, 2014
_____

    d. Dr. Reutter assumes that the existence of any price difference which may exist as the result solely of the Challenged Claim.[5]

    e. Dr. Reutter asserts without proof that there is no variation at all in the <u>difference</u> between the prices of SuperStay 24 Products and the prices of potential comparator products.[6]

    f. Dr. Reutter does not consider relevant whether consumers have received value in exchange for their purchase (and in fact does not consider value received as part of the claimed damages equation).

6. For all of the above reasons, Dr. Reutter's conclusions are incorrect and unsubstantiated.

## II.  DR. REUTTER'S CRITIQUE OF MY ANALYSIS OF NAMED PLAINTIFFS' PRICE PREMIUM THEORY OF DAMAGES

### A. Contrary to Dr. Reutter's Assertions, I Considered (And Rejected) Named Plaintiffs' Price Premium Theory of Damages

7. Dr. Reutter has a heading in his report entitled "By Not Considering the Price Premium Damages Theory Plaintiffs Allege, Dr. Ugone's Analysis is Fundamentally Flawed."[7] Dr. Reutter also states (later in his report) that the estimation of economic harm in this case should be calculated by analyzing the relative price that should have been charged in the absence of the Challenged Claims (i.e., "the price premium paid by consumers over comparable products").[8] Dr. Reutter concludes "[t]he Ugone Report erred in considering only the absolute price level and in considering the amount of 'value' extracted from the Products by each member of the Class."[9] However, I clearly state the following in my Initial Ugone Report.

---

[5] I demonstrated in my Initial Ugone Report instances when the asserted price premium is negative (i.e., the price of potential comparator products are higher than the price of SuperStay 24 Products). Dr. Reutter did not acknowledge this fact or explain how his claimed methodology would be modified in such a set of circumstances.

[6] I have demonstrated, and Dr. Reutter apparently accepts, that there is a substantial variation in prices for the SuperStay 24 Products and similar variations are likely in competing products.

[7] Reutter Report, p. 4.

[8] Reutter Report, p. 11.

[9] Reutter Report, pp. 11 – 12.

Supplemental Expert Report of Keith R. Ugone, Ph.D.
January 31, 2014

_____

> Alternatively, to the extent that Plaintiffs' damages claims are based upon an asserted price premium associated with SuperStay 24 Products relative to alternative products, such an approach would be confounded by multiple sources of price variability. In addition to the variability in the price paid for the SuperStay 24 Products, there would also be variability associated with the price of products that Plaintiffs may claim that putative Class members would have purchased in the alternative, and with the value received for these alternative products.[10]

8. In my Initial Ugone Report I further explain in detail why a price premium theory cannot be used to calculate Class-wide damages using common proof. I provide these details in a section of my Initial Ugone Report entitled "Alternatives To The Challenged Products Vary By Product Type and Price."[11] In that section I summarize: (a) the price variability associated with the SuperStay 24 Products that I discussed extensively earlier in my Initial Ugone Report[12]; (b) Plaintiffs' potential price premium damages claim[13]; (c) potential comparator products that Plaintiffs may identify (and the fact that no such identification has occurred)[14]; (d) the prices and price variability associated with the potential comparator products[15]; (e) the fact that a number of potential comparator products are priced higher than the SuperStay 24 Products[16]; and (f) the fact that any

---

[10] Ugone Report, p. 5. I also state the following in my Initial Ugone Report.

> Additionally, much as the prices of SuperStay 24 Products vary by such factors as sales distribution channel, retailer within sales distribution channel, geographic location (across and within geographic markets), and the type of promotions offered and/or used when the purchase was made, so too would the alternative products' prices be expected to vary greatly. (Ugone Report, p. 5.)

[11] Ugone Report, pp. 41 – 45.

[12] Ugone Report, pp. 41 – 42.

[13] Ugone Report, pp. 42.

[14] Ugone Report, pp. 42 – 44.

[15] Ugone Report, pp. 42 – 44.

[16] Ugone Report, pp. 43.

CONFIDENTIAL

Supplemental Expert Report of Keith R. Ugone, Ph.D.
January 31, 2014

_____

price premium analysis would be confounded by the price variability for those potential alternative products.[17]

9.    Dr. Reutter states that Named Plaintiffs' theory of damages is premised on the existence of a price premium (which he assumes without proof).  According to Dr. Reutter, two specific methods can be used to calculate the price premium: a retail price method and a wholesale price method.  Also, according to Dr. Reutter, "(t)he Ugone Report  did not analyze the elements of these methods and therefore Dr. Ugone cannot reliably reach conclusions about the appropriateness of Class-wide damages."[18]  Contrary to Dr. Reutter's assertion, I discussed how damages claims based upon an asserted price premium of SuperStay 24 Products relative to alternative products would be confounded by the price variability for those alternative products.[19]

**B. With Regard to the Price Premium Theory of Damages, There Are Wide Variations in Prices of Both SuperStay 24 Products and Alternative Products**

10.    My analyses of retail pricing data collected by IRI clearly demonstrate that there are wide variations in the retail prices associated with the SuperStay 24 Products.[20]    The actual sales prices paid by putative Class members for SuperStay 24 Products differ depending upon the circumstances under which the purchase was made such as channel of distribution, geographic location, and whether the product was purchased on promotion, *inter alia*.  Because of the wide variations in retail prices associated with SuperStay 24 Products, putative Class members' claimed damages cannot be calculated reliably,

_____

[17] Ugone Report, p. 42.

[18] Reutter Report, p. 4.

[19] Ugone Report, pp. 41 - 45.

[20] Ugone Report, pp. 27-41, 45.

Supplemental Expert Report of Keith R. Ugone, Ph.D.
January 31, 2014
_____

including by means of a price premium method, on a Class-wide basis using common proof.

11.    The factors that affect the actual sales prices paid for SuperStay 24 Products by putative Class members include at least:

    a.    the type of store in which the purchase was made (i.e., the sales distribution channel) – because grocery stores, drug stores, mass merchandisers, and other types of retailers often charge different prices for SuperStay 24 Products;

    b.    different retailers in the same sales distribution channel – because different retailers make their own independent determinations regarding mark-ups and the retail selling prices of the Challenged Products given local market conditions;

    c.    the geographic market where the purchase was made – because different pricing conditions (i.e., supply and demand conditions) exist in different geographic areas, both nationwide and within a given state, such as California (with pricing being driven by each retailer's pricing strategy and each retailer's cost structure); and

    d.    the type of promotions offered and/or used when the purchase was made – because discounted prices, coupons, and shopper cards reduce the actual price paid.

12.    Also, in my Initial Ugone Report, I illustrated the price variability for alternative products to the SuperStay 24 Products by reviewing IRI retail data of lip color and foundation products presented in Exhibits 4 and 5 of Ali Goldstein's deposition.[21]  Beginning with lip products, according to Exhibit 4 of Ali Goldstein's deposition, the average retail prices in 2011 of SuperStay 24 2-Step Color, L'Oreal Infallible, and Cover Girl Lip Perfection were $8.57, $8.71, and $6.43, respectively.[22]  Not only do these prices of lip color products vary by up to $2.28 (35 percent), but L'Oreal Infallible was priced _higher_, on average, than SuperStay 24 2-Step Color – indicating that SuperStay 24 2-Step Color did not sell at a premium compared to L'Oreal Infallible.  If L'Oreal Infallible were the alternative product the putative Class members would have purchased, they would have

_____

[21] Ugone Report, pp. 42 - 43.

[22] Ugone Report, pp. 42-43.

Supplemental Expert Report of Keith R. Ugone, Ph.D.
January 31, 2014
_____

suffered no injury as a result of purchasing SuperStay 24 2-Step Color using Dr. Reutter's proposed price premium methodology.[23]

13.    The prices for foundation products also vary. As noted in my Initial Ugone Report, according to Exhibit 5 of Ali Goldstein's deposition, the average retail prices in 2011 of Revlon Photo Ready, L'Oreal Visible Lift Serum Absolute, Maybelline Dream Smooth Mousse, Revlon Colorstay Aqua Mineral, Cover Girl Natureluxe, Maybelline Fit Me, and L'Oreal SSP Magic Smooth ranged from $6.87 (Maybelline Fit Me) to $14.89 (L'Oreal SSP Magic Smooth).[24]  Not only do these prices of foundation products vary by up to $8.02 (117 percent), but Revlon Photo Ready, Cover Girl Natureluxe, L'Oreal SSP Magic Smooth, L'Oreal Visible Lift Serum Absolute, and Revlon Colorstay Aqua Mineral were all priced _higher_, on average, than SuperStay 24HR Makeup.  The prices of these products indicate that SuperStay 24HR Makeup did not sell at a premium compared to these products (using Dr. Reutter's proposed methodology) and that if these products were the alternative products the putative Class members would have purchased, they would have suffered no injury (and would have paid no price premium) as a result of purchasing SuperStay 24HR Makeup.[25]

   **C. An Asserted Price Premium of SuperStay 24 Products Relative to Alternative Products Would Be Confounded by the Price Variability for Those Alternative Products**

14.    While the illustrative examples above showed that price variation exists among alternative products available to putative Class members, I also discussed in my Initial Ugone Report that the lip color and foundation markets are highly competitive and that

---

[23] Ugone Report, pp. 42 - 43.

[24] Ugone Report, p. 43.

[25] Ugone Report, p. 43.

Supplemental Expert Report of Keith R. Ugone, Ph.D.
January 31, 2014

_____

the SuperStay 24 Products compete against a broad range of alternative products.[26]
According to Ali Goldstein, SuperStay 24 2-Step Color not only competes against other
2-Step lip color products in the market, but also against general long-wear lip color
products and regular lip color products.[27] Similarly, SuperStay 24HR Makeup may
compete against long-wear foundation products and regular foundation products.[28]
Therefore, to the degree that putative Class members may claim that these products are
potential alternatives to SuperStay 24 Products, there would be substantial variability
among the alternative products, their prices, and their features and benefits.[29]
Additionally, in paragraphs 37 through 51 of my Initial Ugone Report, I demonstrated
that the prices of SuperStay 24 Products varied greatly across a number of different
dimensions (e.g., geographic region and retailer). It is a reasonable inference that
alternative products also would vary across these same dimensions.[30]

15.    Therefore, contrary to Dr. Reutter's claim that my Initial Ugone Report did not consider
the Named Plaintiffs' price premium theory of damages, I demonstrated that an asserted
price premium of SuperStay 24 Products relative to alternative products would be
confounded by the price variability for those alternative products.

### D. Dr. Reutter's Analysis Relies on Unsubstantiated Assertions And A Faulty Methodology

#### 1. Dr. Reutter Assumes His Conclusion

---

[26] Ugone Report, p. 44.

[27] Ugone Report, p. 44.

[28] Ugone Report, p. 44.

[29] Ugone Report, p. 44.

[30] Ugone Report, p. 44.

Supplemental Expert Report of Keith R. Ugone, Ph.D.
January 31, 2014
_____

16.    In his evaluation of my Initial Ugone Report, Dr. Reutter fails to analyze appropriately the critical question confronting the Court in this matter (i.e., whether common proof can be used to evaluate whether putative Class members suffered economic injury as a result of the Challenged Claims and, if so, the extent of that injury).  Rather, Dr. Reutter's suggested approach (and criticism of my analysis) assumes the conclusion he wishes to reach – that a price premium exists, that it must be due to the Challenged Claim, and that it is invariant across the Class.

### 2.    Dr. Reutter's Proposed Method is Flawed and Cannot Be Applied to Determine Damages on a Class-Wide Basis

17.    Dr. Reutter claims that there are two basic methods for estimating economic damages on a Class-wide basis under a price premium damages theory.[31]

> The first general method is the retail price method wherein the retail prices of the products at issue are compared to the price of a similar, competing product without the alleged deceptive claims. The comparator product may be within the same brand (e.g., Maybelline) or another brand (e.g., L'Oreal). The second method is to compare wholesale prices where the difference in the wholesale price of the Products and similar, competing products represent the amount of injury.

18.    I discussed the retail price method earlier in this supplemental report and in my Initial Ugone Report.  Generally, I discussed why the retail price method cannot be applied to evaluate claimed damages on a Class-wide basis using common proof, including: the price variability associated with the SuperStay 24 Products;   the prices and price variability associated with the potential comparator products that Plaintiffs have not (but may) identify [32]; the fact that a number of potential comparator products are priced higher

_____

[31] Reutter Report, pp. 4 – 5.

[32] Ugone Report, pp. 42 – 44.

Supplemental Expert Report of Keith R. Ugone, Ph.D.
January 31, 2014
_____

than the SuperStay 24 Products[33]; and the fact that any price premium analysis would be confounded by the price variability across the Challenged Products and potential comparator products .

19.  The wholesale price method cannot be applied in this instance, as it would require confidential information on each and every competitor's wholesale prices and cost structure (information that is unlikely to be obtained). Regardless, even if the data were to be available on wholesale prices for all relevant competitors, it should not be mechanically applied to evaluate damages on a class-wide basis using common proof for the same reasons cited earlier.

20.  Regardless, Dr. Reutter outlines his proposed methodology as follows.[34]

> First, I identify similar, competing products.  Identification of these products is often based on contemporaneous business documents.

> Second, I obtain price and quantity data from market research firms like IRI and Nielsen.

> Third, I estimate the difference between the retail price of the product at issue and the similar, competing products during the Class Period.  This difference is known as the price premium.

> Finally, I multiply the price premium by the number of units of the product at issue sold during the Class Period.  This calculation yields the total economic injury to the Class.

21.  As I outline in a subsequent section of this supplemental report, Dr. Reutter did not perform any of these steps in his report (including identifying competing or comparator products) or prove to the Court the efficacy of conducting the proposed steps and whether such steps would yield reliable results.  Also, Dr. Reutter assumed the totality of any

_____

[33] Ugone Report, p. 43.

[34] Reutter Report, p. 6.  Dr. Reutter's proposed methodology was presented in one paragraph in the Reutter Report. I have divided that paragraph by proposed steps.

Supplemental Expert Report of Keith R. Ugone, Ph.D.
January 31, 2014

_____

price difference was due to the Challenged Claims and did not outline a methodology for determining whether this is correct or how to effectuate his analysis if this assumption was not correct. Dr. Reutter did not recognize the requirement that the price difference, if one exists, would have to be allocated between the Challenged Claims and other product attributes that may be associated with (or cause) the price difference. (I will refer to this analysis as an apportionment analysis). Moreover, Dr. Reutter has failed to address the fact that some comparator products sold for prices _greater_ than those of the SuperStay 24 Products (yielding a _negative_ price premium).

### 3. Dr. Reutter Fails to Identify the Competing Products Upon Which He Bases (Or Will Base) His Conclusion

22.    For each proposed method, Dr. Reutter claims that the first step is to "identify similar, competing products."[35] However, as I noted in my Initial Ugone Report, and as reflected in the deposition of Ali Goldstein, there are a great number of alternative products to SuperStay 24 Products.[36] However, in the Complaint, the Named Plaintiffs have failed to identify comparator products for a damages analysis. Dr. Reutter similarly fails to identify the competing products upon which he bases his conclusions.[37] By not identifying comparator products, Dr. Reutter implicitly is asking the Court to accept that the Named Plaintiffs will be able to identify an appropriate comparator product from which to conduct his proposed analysis. Moreover, to implement Dr. Reutter's methodology, such comparator product(s) would need to be either identical on all relevant dimensions, or Dr. Reutter would need to propose a methodology to control for

---

[35] Reutter Report, p. 6.

[36] Ugone Report, pp. 42 – 43.

[37] Ugone Report, pp. 42 - 43.

Supplemental Expert Report of Keith R. Ugone, Ph.D.
January 31, 2014
_____

any differences, as discussed below.  In addition, Dr. Reutter fails to recognize that if the

to-be-determined comparator product is equally-priced or higher-priced (for example),

Dr. Reutter's proposed methodology will fail.

**4.  Dr. Reutter Implies the Claimed Price Premium is the Simple Arithmetical Difference in Price Between the SuperStay 24 Products and Competing Product(s) and Assumes the Totality of Any Price Difference Which May Exist is the Result Solely of the Challenged Claim**

23.    Dr. Reutter's proposed analyses also imply that the totality of any alleged price premium

is solely attributable to the Challenged Claims.  However, lip color and foundation

products are composed of multiple attributes (e.g., color, brand, packaging, means of

application).  These multiple attributes are valued by consumers and help to differentiate

competing products from each other.  These multiple attributes also determine and

explain the differences in prices across competing products.  The variability in product

attributes across competing products demonstrates that an asserted price premium

allegedly associated with the SuperStay 24 Products – relative to alternative products, if

any – would be the result of many factors, and not simply the Challenged Claims.  In fact,

among the many reasons for purchase of the SuperStay 24 Products identified by

respondents to the survey of Dr. Eli Seggev,   duration of 24 or more hours as a reason

for purchase was mentioned by only one percent of those respondents who had purchased

SuperStay 24 2-Step Color and four percent of those respondents who had purchased

SuperStay 24HR Makeup.[38]  Dr. Reutter does not acknowledge this simple fact.

24.    Given the variability in product attributes across competing products, it is highly

improbable that Dr. Reutter will be able to identify comparator products that are identical

---

[38] Study of Consumer Perceptions of Maybelline SuperStay Products by Dr. Eli Seggev dated December 9, 2013, pp. 16, 22.

Supplemental Expert Report of Keith R. Ugone, Ph.D.
January 31, 2014
_____

to the SuperStay 24 Products along every relevant product attribute dimension except for the Challenged Claims. Rather, comparator products are likely to differ from the SuperStay 24 Products across a number of attributes and, therefore, the price premium between the comparator products and the corresponding SuperStay 24 Products, if any, would be attributable to a number of differences between the products, and not just the Challenged Claim. However, Dr. Reutter does not acknowledge the need for an apportionment analysis in such a situation. Because Dr. Reutter does not acknowledge the need for an apportionment analysis, he also does not present how an apportionment analysis would be undertaken. Moreover, I demonstrated in my Initial Ugone Report instances when the asserted price premium was *negative* (i.e., the prices of potential comparator products were *higher* than the price of SuperStay 24 Products). Dr. Reutter did not acknowledge the possibility of negative price premiums and did not propose a methodology to evaluate a claimed price premium (or an apportionment of such a claimed price premium) under that set of circumstances.

**5. Dr. Reutter Asserts Without Proof That There is No Variation At All in the Difference Between the Prices of SuperStay 24 Products and the Prices of Potential Comparator Products**

25.    Dr. Reutter claims that the substantial variation in prices observed for the SuperStay 24 Products described in paragraphs 37 - 51 and Exhibits 6 – 14 of my Initial Ugone Report is not relevant. Dr. Reutter makes this assertion because he assumes the claimed price premium is the relevant level of analysis to use when evaluating Class-wide evidence for the estimation of damages.[39] Dr. Reutter goes on to state that:[40]

_____

[39] Reutter Report, pp. 6 – 7.

[40] Reutter Report, p. 8.

Supplemental Expert Report of Keith R. Ugone, Ph.D.
January 31, 2014
_____

> Dr. Ugone focuses on the fact that different competing products may be priced differently. Variation *across* competing products is not relevant to the estimation of damages since such variation does not enter into the damages formula. What is relevant is the variation *within* a competing product since such variation could affect the difference between the price of a competing product and the price of the SuperStay 24HR Product.

26.   As discussed above and throughout my supplemental report and Initial Ugone Report, there exists substantial variation in prices both across products and within each product. Dr. Reutter fails to recognize that both of these potentialities dictate the need for individual inquiry.

27.   Individual inquiry would be needed to evaluate the comparator product that putative Class members would have purchased (if any) in the absence of the Challenged Claims (especially using Dr. Reutter's proposed methodology).   The fact that there exists variation in prices *across* various comparator products means common proof cannot be used to evaluate claimed damages.   In such a situation, especially using Dr. Reutter's proposed methodology, putative Class members would be compensated uniformly despite suffering varying levels of economic injury or not suffering economic injury at all.

28.   With respect to a variation of prices *within* a competing product, Dr. Reutter essentially is acknowledging that such variation could affect the difference between the price of a competing product and the price of the SuperStay 24 Product.   However, Dr. Reutter goes on to state (without support of any kind) that:

> [b]ecause competing products often are priced based on similar criteria, fluctuations in the retail price of SuperStay 24HR Products are likely coincident (or nearly so) with fluctuations in the retail price of competing products in local markets.[41]

_____

[41] Reutter Report, p. 8.

Supplemental Expert Report of Keith R. Ugone, Ph.D.
January 31, 2014
_____

In essence, Dr. Reutter is claiming that the differences in prices between SuperStay 24 Products and competing products will remain constant (and not vary) in local markets. In addition to being nearly impossible for reasons discussed below, Dr. Reutter is presenting this conclusion to the Court without proof of any kind that the alleged price premiums paid by putative Class members for the SuperStay 24 Products do not vary.

29.    For Dr. Reutter's assertion to be true, promotions, coupons, and other price discounts would have to be executed uniformly, at the same time, and at the same relative amounts across all competing products and manufacturers simultaneously – an untenable assumption. This does not even happen within the same product. In Exhibit 6 to my Initial Ugone Report, I provide examples of promotional prices associated with SuperStay 24 Products varying by promotion price, distribution channel, geography, and time, including but not limited to:

a.    Bed Bath & Beyond: regular price $7.79; two for $14.00 on November 2, 2013 in Dallas, Texas; and

b.    Duane Reade: regular price $10.99; buy 1 at $10.99 and get one for 50% off on December 5, 2013 in New York, NY.

These examples illustrate that prices and promotion prices can vary differently within the same product, within the same or across different distribution channels for the same product, within the same or across different retailers for the same product, and within the same or across different geographic areas for the same product.

30.    The express purpose of special promotions is to distinguish a product from others (and from everyday pricing) for a period of time. It would require a high degree of coordination across products, geographies, and manufacturers to maintain a single, invariant _difference_ on a daily, weekly, or monthly basis between not just SuperStay 24

Supplemental Expert Report of Keith R. Ugone, Ph.D.
January 31, 2014

_____

Products and one comparator product, but across many potential comparators (as Dr. Reutter posits). Consistent with Ms. Goldstein's deposition and my experience, this would seem to be nearly impossible. Given the substantial variation in prices observed in my analyses of the SuperStay 24 Products, it is far more likely that the prices of competing lip color and foundation products are *not* perfectly correlated with each other – due to independent pricing decisions by many competing manufacturers in a competitive market – indicating that the differences in prices also vary. Dr. Reutter fails to address this issue.

### 6. Dr. Reutter Does Not Consider Relevant Whether Consumers Have Received Value in Exchange For Their Purchase

31.    Dr. Reutter disagrees with my opinion that repeat purchasers of the SuperStay 24 Products suffered no economic injury. Dr. Reutter asserts that such an opinion is inconsistent with economic theory and the allegations in the Complaint. According to Dr. Reutter:[42]

> the economic injury alleged is the difference between the price paid for SuperStay 24HR Products and the price of similar, competing products without the 24 hour claim. The allegation therefore does not require an assessment of the value extracted by each individual consumer.

32.    Dr. Reutter tries to illustrate his claim using a misleading analogy with monopoly pricing and antitrust damages. This illustration is wholly irrelevant to the question at hand given: a) the independent pricing decisions of competitors in a vigorously competitive market; and b) how claimed economic damages are evaluated from an economic perspective in matters such as this.[43] As such, Dr. Reutter's illustration should be disregarded.[44]

---

[42] Reutter Report, p. 9.

[43] Reutter Report, p. 10.

Supplemental Expert Report of Keith R. Ugone, Ph.D.
January 31, 2014
_____

33.    As described earlier, lip color and foundation products are composed of multiple attributes valued by consumers (e.g., color, price, brand, packaging, means of application) which differentiate them from competing products.  If a putative Class member purchased a SuperStay 24 Product at the then-current price because of a color or brand name preference (or other preference unrelated to the Challenged Claims), then that putative Class member received the value that they paid for.  This would be especially true if the putative Class member was a repeat purchaser of SuperStay 24 products.  According to Dr. Reutter, such a putative Class member should still be compensated as he appears to believe that the value received in exchange for the price paid is not a relevant inquiry.

## III.    DR. REUTTER'S CRITIQUES OF THE SURVEY

34.    I was retained by counsel for Maybelline to offer my opinions regarding various economic and associated class certification issues relevant to this matter.  I understand Dr. Seggev was retained by counsel for Maybelline to evaluate the reasons for purchase and consumers' expectations at the time of purchase as to the duration of the SuperStay 24 Products.  Dr. Reutter claims that Dr. Seggev's survey results, upon which I rely, are flawed for a variety of reasons.[45]  Given Dr. Seggev's expertise in marketing and survey studies, I understand that Dr. Seggev plans to address Dr. Reutter's criticisms of Dr. Seggev's survey results directly.

_____

[44] In Dr. Reutter's Figure 1, he illustrates that while some consumers are willing to pay higher monopoly prices for a product, they would have greater consumer surplus if they were to pay lower prices charged in perfectly competitive markets.  (Reutter Report, pp. 10 – 11.)  In so doing, Dr. Reutter is using an analogy with an antitrust claim in a monopoly market to form a conclusion about highly competitive lip color and foundation markets – which have multiple manufacturers and products vying for consumers' attention and dollars in a competitive market with differentiated products.  Therefore, Dr. Reutter's use of Figure 1 is irrelevant and does not contribute to the understanding of the issue at hand.

[45] Reutter Report, pp. 8 – 13.

Supplemental Expert Report of Keith R. Ugone, Ph.D.
January 31, 2014
_____

35.     In my report, I did consider and rely upon Dr. Seggev's survey results to demonstrate

variation in consumers' expectations at the time of purchase as to the duration of the

SuperStay 24 Products.  I also considered other evidence[46] and conducted a significant

number of analyses.[47]   Based upon the totality of the analyses I presented in my report, I

arrived at my conclusion that standard economic analysis cannot be used to determine on

a Class-wide basis whether members of the putative Class suffered economic injury, and

if so, the extent of that injury.  My conclusion was based upon a consideration of all of

the evidence I reviewed and all the analyses I performed, including my analysis of price

variations, reasons for purchase, need for individual inquiry, and other factors germane to

this dispute.

## IV.    DR. REUTTER'S CRITIQUES OF ONLINE REVIEWS

36.     Dr. Reutter claims that the online reviews that I included in my expert report cannot

"reliably be used to reach conclusions about the Class, economic injury, or Class-wide

damages."[48]  Dr. Reutter suggests that one or more of the reviews included in my report

were either made by individuals outside of the putative Class or were false, and that I

have overstated the economic relevance of these reviews.[49]  However, my use of online

reviews in my discussion of the need for individualized inquiry was for illustrative

purposes.  As noted above, my conclusions as to whether standard economic analysis can

be used to determine on a Class-wide basis whether members of the putative Class

suffered economic injury, and if so, the extent of that injury, was based on a

_____

[46] Ugone Report, Exhibit 3 (Facts, Data, and Other Information Considered).

[47] *See* Ugone Report.

[48] Reutter Report, pp. 13 – 14.

[49] Reutter Report, pp. 14 – 18.

Supplemental Expert Report of Keith R. Ugone, Ph.D.
January 31, 2014

_____

consideration of all of the evidence I reviewed, including my analysis of price variations,

reasons for purchase, the need for individual inquiry, the survey of Dr. Seggev, and other

factors germane to the issue at hand.[50]

\* \* \* \* \* \*

37.    My analyses and opinions contained in this report are based upon information available

to date.    I reserve the ability to review documents, deposition transcripts, or other

information still to be produced by the Parties to this dispute and to supplement my

opinions based upon that review.


*Keith R. Ugone*

Keith R. Ugone, Ph.D.
January 31, 2014

_____
[50] Ugone Report, pp. 11 - 27.

CONFIDENTIAL